IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Walter Thomas, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1784 RJL |
| | ) | |
| Natwar Gandhi, | ) | |
| Office of the Chief Financial | ) | |
| Officer | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**LCvR 7(h) Statement of Undisputed Material Facts in Support
of Defendant's Motion for Partial Summary Judgment**

1. Plaintiff, Walter Thomas, is an African American male, born December 23, 1940.

2. Defendant, Dr. Natwar Gandhi, is sued in his official capacity as the Chief Financial Officer of the District of Columbia. He is the chief executive of the District of Columbia Office of the Chief Financial Officer.

3. At age 57, Thomas was offered an at-will appointment as a Grade 13 Liaison Specialist within Defendant's Office of Financial Operations and Systems ("OFOPS"), with an annual compensation of $53,866.00. Exh. A, Offer Letter (June 24, 1998). Thomas was referred for employment with Defendant by a former fraternity brother, Herbert Huff, who was then Deputy Director of the OCFO Office of Tax and Revenue, an agency subject to the personnel authority of the OCFO. Exh. B, Thomas Deposition Tr. (Feb. 16, 2003), pp. 128:8-129:4. At the time of his 1998 job interview, Thomas told former OCFO official John Scipione that he had a problem with his vision and needed a

large screen computer equipped with a voice recorder and special lighting, which Scipione agreed to provide. Thomas did not provide any medical documentation to support his request for this equipment. Thomas claims to suffer from nystagmus, keroconus and nearsightedness, for which he wears contacts and prescription lenses. Thomas admits that he does not know what his visual acuity was with his corrective contacts and lenses during his employment with the OCFO. Exh. B., Thomas Depo., pp. 188:16-197:17.

4.    In or around September 1998, after Thomas' first supervisor left the OCFO, Thomas began reporting to Stanley Morel (a Caucasian male), who was then Director of Support Services for the OCFO Office of Mission Support. Thomas was assigned responsibility for coordinating OCFO communications equipment. Morel was never happy with Thomas's performance because he refused and failed to report to work on time and refused to take direction from Morel. At work, Thomas openly bragged about his role as lead plaintiff in a class action employment discrimination lawsuit which he brought against the U.S. Department of State, and spent considerable work time at the computer working on matters related to that lawsuit. Thomas threatened Morel with legal action if he should take any adverse action against him. Morel complained on multiple occasions to higher officials about Thomas' poor performance but was told that nothing could be done because Thomas was under the protection of Herbert Huff, the Deputy Director of the OCFO Office of Tax and Revenue. Exh. D, Morel Affidavit ¶¶ 3-7. The records of the U.S. District Court for the District of Columbia reveal that Thomas was indeed the lead plaintiff in a class action against the U.S. State Department, filed June 12, 1987, Case No. 1:86-cv-02850, and from July 1998 to November 2001, Thomas was

actively challenging the consent decree entered by Judge Sporkin in the class action, while prosecuting two related malpractice actions against his original attorneys in state and federal court.

5.    At Huff's direction, Thomas was detailed to the General Services unit at OTR in or about October 1, 2003, to handle the OCFO security functions that had recently been assigned to that office.   Thomas Exh. N, Powell Affidavit, ¶ 3.

6.    In December 2002, the OCFO announced a restructuring of the Office of Government Relations and Human Capital (OGRHC).   The plan of reorganization was developed and executed by Diane M. Camilleri, Acting Director of OGRHC, who was working for Defendant under a two-year Interagency Personnel Agreement with the Department of Treasury, Internal Revenue Service.   At the time of her IPA assignment to Defendant, Camilleri was a senior personnel manager who had planned and executed more than 25 restructuring projects for the IRS.   Exh. C, Camilleri Depo. Tr. (Feb. 28, 2007), pp. 247:6-248:6.

7.    The Camilleri reorganization plan and its justification and objectives, are laid out in a memorandum from Camilleri to Natwar Gandhi, the Chief Financial Officer, dated December 10, 2002.   Therein, Camilleri recommended the abolishment of all OGBHC positions and support positions assigned to agencies other than OGRBHC, including the positions assigned to the OTR General Services Unit, which she also recommended be abolished to allow for consolidation of all logistical support functions within the new OCFO Office of Management and Administration ("OMA").   Dr. Gandhi accepted Camilleri's recommendations and signed off on the Memorandum.   Exh. C,

Camilleri Depo., pp. 18:18-22:7, referencing Camilleri Depo. Exh. 2, Memorandum from Camilleri to Gandhi (December 10, 2002).

8.    All employees whose positions were to be abolished under the reorganization plan, including Thomas, received notice letters setting forth the legal basis for the CFO's action and proposed time table for completion, a copy of the OMA organizational structure showing the new position titles and alignment, and a copy of the job posting and application process for the open OMA positions shown in the organizational chart.   The letter instructed that available positions in the newly created Office of Management and Administration would be advertised for a minimum of ten (10) business days, beginning Friday, December 13, 2002, during which period interested persons would have the opportunity to apply.  The letter further stated that the vacancy announcements would be made available to employees and the public on the OCFO website and in the reception areas of the human resource office, located at 941 North Capitol Street, N.E., Washington, D.C.   Attachment B to the Letter of December 12, 2002, informed employees that both internal and external candidates would be eligible to compete for vacancies, and that an interview panel would interview all eligible internal candidates and up 10 of the best-qualified external candidates for each open position. Employees were informed that interviews were to be conducted based upon a uniform set of job-related questions designed to test each candidate's relative experienced and ability with respect to the specialized features of the job.  Within five (5) days of the close of the selection process, internal candidates were to be given either a letter notifying them of their selection or a termination letter notifying them of their non-selection.  Exh. C, Camilleri Deposition Tr. (Feb. 28, 2007), pp. 220:2-221:7, referencing Camilleri Depo.

Exh. 31, consisting of Camilleri Letter to Thomas (December 12, 2002) and attachments A (Organizational Chart) and B (Job Application Process). Internal candidates were given no guarantee of priority over external candidates. Exh. C, Camilleri Depo., p. 71:4-9. The notice letter and attached materials contain no representation that employees who were terminated because they did not apply for, or who were terminated due to non-selection for, the OMA positions advertised in December 2002 would receive personal notice of future OCFO job vacancies. Exh. C, Camilleri Depo., pp. 221:15-20; Exh. E, Smoak Depo., p. 175:4-9.

9.     Thomas responded to only one of the vacancy announcements posted pursuant to the reorganization plan: AD-RS-MA017, which described two (2) openings for the position of Lead Support Services Specialist, in the DS-342 Series, Grade 11 ("LSSS"). Both positions were to report to the new Director of Logistics and Support Services, shown on the OMA organization chart attached to the December 12, 2002 notice letter to employees. The minimum requirements for these positions, as stated on the face of the vacancy announcement, were one year of specialized experience in the next lower level position in the 342 Series that demonstrated knowledge of the methods and procedures for providing a variety of functions and services applicable to the position to be filled, or 3 years of graduate-level education. Also relevant were the candidate's ability to plan, organize and control work involving diverse activities; ability to gain cooperation and coordinate the work of others; and skill in oral and written communications. Exh. C, Camilleri Depo. Exh. 12.

10.    Five applicants, including Thomas, responded to Vacancy Announcement AD-RS-MA017 prior to the January 3, 2003 closing date. Three candidates for the

LSSS positions were internal (Thomas, Harold McClure and Alton Hartwell); two were external (Barry Edmonds and Herbert Allen). The application packages of the internal candidates were reviewed and by officials at the D.C. Office of Personnel; all were deemed eligible for consideration based on the information provided. Camilleri reviewed the application packages of external candidates Edmonds and Allen and determined them qualified as well. Because there were only two external qualified candidates for Vacancy Announcement AD-RS-MA017, there was no need to engage in a rank-ordering to reduce the list of external candidates for interview to the top 10. Exh. C, Camilleri Depo., pp. 82:21-83:10; 92:18-93:13; 97:13-105:10, referencing Camilleri Depo. Exhs. 12 (Vacancy Announcement AD-S-MA017), 13 (Thomas Application Package), 14 (Edmonds Application Package).

11.     A comparison of the job-related experience described in the application materials submitted by Thomas and Edmonds reveals that both claimed approximately 21 years' experience in organizational support positions. Thomas claimed experienced gained on the job while serving as a Foreign Service officer abroad from 1971-85, employment as an operations specialist with the D.C. Public Schools (1996-1998), and employment with the OCFO (1998 to March 2003). Edmonds claimed experience gained on the job while employed in service positions with the D.C. Council (1982-1989) and the circulations departments of the *Wall Street Journal* and *The Washington Times* (1989-2003). Exh. C, Camilleri Depo. Exhs. 13 (Thomas Application Package), 14 (Edmonds Application Package): Exh. M, Thomas' Answer to Def. Interrogatory No. 11.

12.     The start of the interview and selection process for the new OMA positions was delayed because of the unavailability of the new Director, Jo Ann Smoak,

who was obligated to assist her prior employer until a replacement could be found. As a result, the reorganization was not completed by February 15, 2003, as anticipated in the December 12, 2002 notice letter. The internal applicants for the LSSS position were interviewed on March 12, 2003, by a three-member panel, consisting of OMA Director JoAnn Smoak, HR Director Camilleri, and the newly appointed Logistics and Support Director Al Lister.

13.    Prior to the interviews, Camilleri distributed the candidates' application packages to Smoak and Lister, together with a rating form for each candidate. Panelists were asked to review the application materials prior to interview. During the interviews, which were scheduled to last 45 to 60 minutes, the panelists took turns asking these pre-established questions and recording their impressions of the candidates and their responses.

14.    Seven inquiries were posed to the candidates for the LSSS position, all of which were designed to elicit discussion from the candidate's regarding their job-related technical skill and experience, as well as the subjective characteristics sought in the Vacancy announcement such as the ability to organize and coordinate, gain cooperation from others, and communicate effectively.    The questions posed to the candidates were as follows:  (1) Tell us about the duties of this position as you understand them and explain why your background would make you the best candidate for the position; (2) Please explain what customer service means to you. Give one recent example in which you were noted for your customer service skills; (3) Describe your specific experience with supply maintenance; (4) Describe your experience with asset inventory and control. What do you see as the problems with the system we currently have in place? (5) What

are your best skills and weakness (*sic*), and how will these affect your performance here? (6) Describe your typical workday. How do you keep yourself busy when the workload is light? (7) Do you have any questions for the panel or would you like to make a closing statement? At the conclusion of the interviews, Smoak and Lister gave Camilleri their completed rating forms, and Camilleri arranged to have each candidate's scores tabulated. Exh. C, Camilleri Depo. Exhs. 16B, and 17 (LSSS rating forms).

15. Thomas received his lowest interview scores from Jo Ann Smoak, OMA's new Executive Director: 16 out of a possible 35 points (5 points being the highest value possible for each question). Exh. E, Smoak Depo. Exh. 9 (Smoak's Rating Form for the Thomas Interview). Based upon Thomas's description of his work in the General Services Unit, Smoak, an African American female currently age 57, formed the impression that "a ten-year-old could have done what he was doing." Smoak faulted Thomas for being unable to articulate doing anything other than process Kastle cards, or that he had the skills to do anything else. In particular, Smoak was critical of the fact that Thomas had no knowledge as to the availability of computerized reports detailing use of the Kastle cards for ingress and egress. Although Thomas had stated that he had knowledge of inventory management, when the panel "drilled down, he didn't know anything about inventory, really, how to manage it, how to track it, how to do anything with it." In summary, Smoak didn't "see any value in the work he had done for the organization." She concluded that Thomas had not demonstrated any "interest in growing the position" or "in making any kind of meaningful contribution to the organization." Exh. E, Smoak Depo., pp. 157:14-164:5. Thomas received cumulative scores from Camilleri and Lister that were slightly higher than those awarded by Smoak

(21 and 20, respectively, out of a possible 35).   Exh. C, Camilleri Depo. Exh. 16B (Camilleri's Rating Form for the Thomas Interview);   Exh. F, Lister Depo. Exh. 3 (Lister's Rating Form for the Thomas Interview).

16.    Smoak, Camilleri and Lister interviewed the external candidates on March 17, 2003, using the same format and questions employed as for the internal candidates. Edmonds received a cumulative interview score of 68 from the panel, Exh. C, Camilleri Depo. Exh. 17 (Camilleri's Rating Form for the Edmonds' Interview); Exh. E, Smoak Depo. Exh. 13 (Smoak's Rating Form for the Edmonds' Interview) ; Exh. F, Lister Depo. Exh. 4 (Lister's Rating Form for the Edmonds' Interview).

17.    In contrast to Thomas, Smoak was favorably impressed with Edmonds because he came to the interview well dressed, seemed "excited" about working for the OCFO, and could articulate relevant past experience, e.g., being able to handle "prima donna" executives and officials (based on experience at the D.C. Council) and being able to perform under stressful conditions (managing delivery services for the Washington Post).  Smoak was also impressed with Edmonds' response to her question about his next step – telling her he wanted her job. Exh. E, Smoak Depo., pp. 166:22-168:2. Camilleri was felt Edmonds was the best candidate because at interview he was "upbeat," "extremely positive," "excited about being there" and able to pinpoint his relevant experience. Exh. C, Camilleri Depo., p. 242:7-19. Lister also concluded that Edmonds outperformed Thomas at interview because he showed up wearing a suit and tie, demonstrated that he was knowledgeable and experienced in the job's requirements, and projected a "positive go-getter type attitude." Exh. F, Lister Depo., pp. 33:11-21; 39:20-40:21.

18.    There is no direct evidence that race, gender, or disability was a factor in Smoak's assessment of the relative skills and abilities of Thomas and Edmonds.

19.    There is no direct evidence that race, gender, or disability was a factor in Camilleri's assessment of the relative skills and abilities of Thomas and Edmonds.

20.    There is no direct evidence that race, gender, or disability was a factor in Lister's assessment of the relative skills and abilities of Thomas and Edmonds.

21.    On March 28, 2003, Thomas met with Camillleri and was served with written notice that he had not been selected for Lead Support Specialist or any other OCFO vacancy and was being terminated in accordance with the provisions of the reorganization plan. The Notice referenced the public laws granting the CFO at will authority to appoint and remove personnel. Exh. O, Termination Notice.

22.    The OCFO did not fill the second Lead Support Specialist position anticipated in Vacancy Announcement, AD-RS-MA017. Shortly after Lister started his employment on March 10, 2003 as Director of Logistics and Support, he reported that he thought his organization needed a logistics specialist out of the 346 job series rather than a second 342 series support. Exh. F, Lister Depo., pp: 24:20-27:15. At the time of his hire, Lister had more than 25 years' experience in logistics management between the military and the private sector. Exh. F, Lister Depo., pp. 5:14-8:9. At about the same time, Camilleri and Smoak concluded that Lister should have a deputy, which all other OMA directors had under the reorganization scheme. Exh. F, Lister Depo., pp. 91: 3-93:2.

23.    As a result of these discussions, Camilleri prepared and posted two new vacancy announcements on April 3, 2003, both in the District's 346 logistics specialist

series: Vacancy Announcement AD-RS-MA-033 and Vacancy Announcement AD-RS-MS-034, titled, respectively, Special Assistant to the Director of Logistics and Support (Grade 13) (hereafter "SAD") and Lead Logistics Management Specialist (Grade 11) (hereafter "LLMS").  Both postings called for a minimum requirement of one year prior experience in the next lower 346 series position, or equivalent education.  Exh. C, Camilleri Depo., pp. 221:21-222:22, referencing Camilleri Depo. Exhs. 20 and 21 (Vacancy Announcements for the SAD and LLMS positions).  The open period for both positions extended through April 16, 2003.  Thomas did not apply for either position. Ultimately, the Grade 11 position was withdrawn without being filled and the Grade 13 position was awarded to a Caucasian female, Barbara Bryant, who was highly qualified. Exh. C, Camilleri Depo. Exh. 29 (Defendant's May 2, 2005 Submission to the EEOC responding to requests regarding the SAD selection process).

24.    On August 20, 2003, Thomas filed a charge of discrimination with the EEOC, alleging that he had been passed over for selection and let go as a result of discrimination on the basis of age, race, gender and disability in connection with his application for the two LSSS positions posted on December 13, 2002.  Exh. G, Charge. The EEOC file contains no evidence that Thomas ever provided any direct evidence of age discrimination in the selection process at issue in this case.

25.    While the EEOC investigation was pending, Thomas submitted a performance review signed by Al Powell, dated March 5, 2003, which purported to rate Thomas as "above average."  Powell had been passed over for the position of OMA Director of Logistics and Support; March 5, 2003 was his last day on the job.  The first page of the evaluation identifies Thomas as a full-time at will employee, states that the

evaluation is a "self-evaluation" as opposed to a mid-year, annual, or follow up evaluation, and covers the period 10/1/01 through 9/30/02.    Powell has executed an affidavit stating that Thomas completed Section 1 of the form (Work Outcomes/Goals), as part of his own self-evaluation.  Powell cannot explain why the form was completed so long after the close of the referenced work period.  Exh. O, Powell Aff., ¶ 7, referencing Thomas' March 5, 2003 Performance Evaluation.  There is no evidence that performance evaluations played any part in the candidate selection process at issue in this case.

26.    The EEOC issued written notice to Thomas on November 3, 2003 of the likelihood that his charge would be dismissed and that the EEOC would take no further action on the complaint.  Exh. H, EEOC Letter (November 3, 2003).

27.    The EEOC agreed to continue its investigation at Thomas's insistence.  On June 29, 2004, a second notice of intent to dismiss was sent to Thomas wherein Commission Investigator Frank E. Rodia wrote that Thomas's claims of discrimination were not substantiated.  Exh. I, EEOC Letter (June 28, 2004).

28.    On June 2, 2005, the United States Department of Justice, Civil Rights Division, issued Thomas a Notice of Right to Sue with respect to the claims arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.  Section 200e, et seq., and Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq.  Exh. J, DOJ Letter (June 2, 2005).    The EEOC issued written notice to Thomas that EEOC was administratively dismissing the charge and terminating all processing, triggering the 90-day period for filing suit under the Age Discrimination in Employment Act.  Exh. K, EEOC Letter (June 7, 2005).

29.    Thomas provided the EEOC with a copy of a May 24, 2001 letter from his physician, Dr. Felton Anderson, to Louis Parker, former Director of the Office of Mission Support, stating that Thomas had had back surgery in 1991 and needed a special chair. Anderson also stated in the letter that Thomas had an unspecified vision impairment requiring special lighting, which had already been provided.  Exh. L, Anderson Letter (May 24, 2001).    There is no evidence of record that Defendant's agents, Smoak, Camilleri or Lister ever saw the Anderson letter before making the disputed selection decisions.  Thomas claims that the letter was in his personnel file in June 2001, but he does not know if it was there at or around the time his selection decision was made. Thomas never talked to Camilleri about his eye condition.  He speculates that Morel discussed it with Camilleri before the time of Thomas' 2001 transfer to the OTR General Services Unit, but Camilleri's IPA assignment at the OCFO did not begin until June 2002.  Exh. B., Thomas Depo., pp. 199:5-2008:21; Camilleri Depo., pp. 12:12-19. Camilleri denies having any knowledge that Thomas claimed to have a disability and there is no evidence to refute her statement.  Exh. C, Camilleri Depo., 252:18-254:2.

30.    Thomas claims that at the time of his interview for the LSSS position on March 12, 2003, he had a known and observable vision impairment (wandering eye). Complaint, Count II.  Smoak and Camilleri deny that they knew or perceived Thomas to be disabled during the course of the interview. Exh. C, Camilleri Depo., p. 233:2-7; Exh. E., Smoak Depo., pp. 164:21-166:15. There is no evidence that Lister perceived Thomas to be disabled. Exh. F, Lister Depo., pp. 126.    Thomas' application package for the LSSS position contains no claim of vision impairment and the records of Thomas' interview session contain no mention of Thomas' eyes or vision.

31.    Although requested by Defendant in discovery, Thomas produced no medical documentation identifying the nature and severity of his alleged vision impairment as of the date of the disputed selection decision.  The only medical records Thomas produced related to treatment for a detached retina which Thomas suffered on July 19, 2003, five 5 months after the date of his interview for the LSSS position.  Exh. M, Thomas' Answer to Def. Inter. No. 8.

April 2, 2007                                    Respectfully submitted,


                                         _Mary E. Pivec_

                                         Mary E. Pivec, Esq., D.C.
                                         Bar No. 445760
                                         Lewis Pivec, LLP
                                         1300 Eye Street, N.W., 11th Floor East
                                         Washington, D.C. 20005
                                         (202) 772-5310
                                         (202) 218-6877
                                         Attorney for Defendant

Index to Record References Contained in Defendant's Statement of Material Facts

Exh. A,  Offer Letter (June 24, 1998).

Exh. B, Excerpts, Thomas Deposition Tr. (Feb. 16, 2003).

Exh. C, Excerpts, Camilleri Deposition Tr. (February 28, 2007) and selected exhibits.

Exh. D, Affidavit of Stan Morel (March 28, 2007)

Exh. E, Excerpts, Smoak Deposition Tr. (February 23, 2007), and selected exhibits.

Exh. F, Excerpts, Lister Deposition Tr. (February 27, 2007), and selected exhibits.

Exh. G, EEOC Charge No. 100-2003-00775.

Exh. H, EEOC Dismissal Notice (November 3, 2003.)

Exh. I, EEOC Dismissal Notice (June 28, 2004).

Exh. J, DOJ Notice of Right to Sue (June 2, 2005).

Exh. K, EEOC Dismissal Notice (June 7, 2005).

Exh. L, Letter, Dr. Felton Anderson to Louis Parker (May 24, 2001).

Exh. M, Plaintiff Walter Thomas' Responses to Defendant's Interrogatories 8 & 11.

Exh. N, Affidavit of Albert Powell (March 27, 2007).

Exh. O, Termination Notice (March 28, 2003).

# EXHIBIT A

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of the Chief Financial Officer



June 24, 1998

Mr. Walter James Thomas
101 G Street, SW, Apt A515
Washington, DC 20024

Dear Mr. Thomas:

This letter confirms your transfer of employment from the DC Public Schools to the Office of Financial Operations and Systems in the Office of the Chief Financial Officer, Government of the District of Columbia. Terms and conditions of your employment are defined below. We are very pleased to have you join our staff and look forward to a productive relationship.

1. Your employment as a Liaison will commence on Sunday, July 5, 1998.

2. Your compensation from the date of commencement is at the annualized rate of $53,866.

3. Your traditional DC Government benefits will continue.

Please be advised that the grade and step in which you are compensated may be adjusted in the future, however, this action will not adversely affect your salary rate.

Report to Mr. Lou Parker, Office of the Chief Financial Officer, 441 4th Street, NW, Suite 410 South, at 9:00 a.m. on Monday, July 6, 1998.

Employment with the Office of the Chief Financial Officer (OCFO) is at will. All employees within the OCFO serve at the pleasure of the Chief Financial Officer.

If you have any questions in the interim, please call Nguyet Huynh, Recruitment Officer, Mission Support Center, on (202) 727-3960.

Sincerely,

Fred Horowitz
Director
Human Resources Division

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------x
WALTER J. THOMAS,           :
                            :
          Plaintiff,        :
                            :
          v.                : No. 05-cv-01784
                            :
NATWAR M. GHANDI,           :
                            :
          Defendant.        :
------------------------x

Washington, D.C.

Friday, February 16, 2007

Deposition of

WALTER J. THOMAS

Plaintiff, called for examination by counsel for

Defendant, pursuant to notice and agreement of

counsel, beginning at approximately 10:10 a.m.,

at the law offices of Sheppard Mullin Richter &

Hampton, LLP, 1300 I Street, NW., Washington, D.C.,

before Lidtz Jean-Philippe of Beta Court Reporting,

notary public in and for the District of Columbia,

when were present on behalf of the respective

parties:

Diane Marie Camilleri

Page 10

1    A.  Well, senior manager is a category, and it
2  was probably in the mid '90s.
3    Q.  And were you employed in this office at
4  that time?
5    A.  No.  I was -- I've been employed in this
6  office since I returned from the D.C. Government in
7  October of 2004.
8    Q.  So your current position, you became
9  employed in that in October of 2004?
10    A.  Right.
11    Q.  But you obtained the position of senior
12  manager in the mid '90s?
13    A.  Yes.
14    Q.  Where were you employed then?
15    A.  I don't exactly remember the office that I
16  worked in.  I think it was in management
17  administration in human resources.
18    Q.  And was it in the Washington, D.C. area or
19  was it located elsewhere?
20    A.  It was downtown, D.C. Yes, main office,
21  IRS.
22    Q.  And when you obtained your position of

Page 11

1  senior manager in the Internal Revenue Service, did
2  you actually apply for the position or how did you --
3    A.  Yes, I did.
4    Q.  And in terms of the position of senior
5  manager, when you initially attained it, did you have
6  individuals under your supervision?
7    A.  Yes.  I always have, since I was a senior
8  manager.  A senior manager means that you're a
9  manager of managers, so I had at least two managers
10  reporting to me since the mid '90s.
11    Q.  Now, in terms of your position in human
12  resources in the mid '90s, how long did you remain in
13  the area of human resources?
14    A.  On and off I've been in human resources
15  for probably close to 20 years.
16    Q.  But in terms of this particular position
17  of senior manager?
18    A.  Probably a year.
19    Q.  One year?
20    A.  Yes, in that position.
21    Q.  And where did you go after that?
22    A.  Two enterprise operations, but I didn't

Page 12

1  hold the chief of staff position.  I was a deputy
2  director for another organization.
3    Q.  So you were -- you moved out of human
4  resources into enterprise operations?
5    A.  Yes.
6    Q.  And how long did you remain in enterprise
7  operations?
8    A.  I've been in enterprise operations for --
9  well, except for the period of time that I went to
10  the D.C. Government -- since -- this would be an
11  estimate -- probably 2001.
12    Q.  Okay.  In terms of the District of
13  Columbia Government position, when did you become
14  employed with the District of Columbia Government?
15    A.  Well, I was never employed by the District
16  of Columbia.  I was always employed by the IRS.  I
17  was just on a loan program through an interagency
18  personnel agreement, and that was, I believe, June of
19  2002.
20    Q.  So you were on what they call an IPA?
21    A.  Yes.
22    Q.  And that began in June of '02.  Can you

Page 13

1  tell me, how did the IPA come about?
2    A.  A previous person that I worked with at
3  IRS called me and asked me if I would come and help
4  the D.C. Government office, and I came down and
5  talked to Dr. Gandhi and accepted the position.
6    Q.  And so that in terms of your IPA, who was
7  the person who called you?
8    A.  Rick Hayes.
9    Q.  And Mr. Hayes, what was his position with
10  the D.C. Government?
11    A.  I think he was a special assistant to Dr.
12  Gandhi.
13    Q.  So he worked in the Office of the Chief
14  Financial Officer?
15    A.  Right.
16    Q.  And in terms of Mr. Hayes, what was it
17  that he was asking you to do and why was he asking
18  you to come to the D.C. Government?
19    A.  He asked me to come to help establish
20  procedures and processes in the human resources
21  function because there really weren't any.
22    Q.  Okay.  And in terms of the IPA, what

4 (Pages 10 to 13)

126

1    A   There is no -- you go before a
2    panel, you go before a panel, and those of us
3    who were not, how do you say, promoted from
4    that panel, so there was no one supervisor
5    but there is a panel that does that.  There
6    is no --
7    Q   Were you given any reason why you
8    were not promoted?
9    A   None other than all of us we
10   weren't promoted because we were in that
11   group that had not been selected for
12   promotion a certain period of time, and then
13   we were in fact notified that a cohort group
14   of us, African- Americans, and well, I won't
15   say I am the, that the African-Americans were
16   the only ones selected out.  Let me not leave
17   you with that impression.
18   Q   Your allegation was that a
19   disproportionate --
20   A   That's correct.
21   Q   -- number of you were separated --
22   A   And we were, yes.

127

1    Q   And there was no finding with
2    respect to that allegation?
3    A   Well, the statistics showed that,
4    but we didn't have --
5    Q   Your statistics showed that,
6    correct?
7    A   No, the State Departments.
8    MS. HUTCHINSON: Objection. The
9    question is argumentative. The case speaks
10   for itself in terms of whatever the concerned
11   decree says.
12   MS. PIVEC:  I agree, Counsel, do
13   you have a copy of the materials or the
14   settlement in that case?
15   MS. HUTCHINSON:  If I -- I may have
16   a copy of the concerned decree. I can't tell
17   you that I do. Some of that stuff you pitch.
18   The concerned decree is in the records of the
19   United States District Court. It was entered
20   by Stanley Sporker, if I am correct, and it
21   was late there so --
22   MS. PIVEC:  Off the record, we'll

128

1    get the caption of the case.
2    MS. HUTCHINSON:  Right.  All right,
3    but I'll look to see if I have, if I retained
4    a copy of it.  I can't say honestly, it's not
5    something that I can say I would generally
6    keep past this sort of a period of time.
7    BY MS. PIVEC:
8    Q   How did you obtain your employment
9    with the Office of the Chief Financial
10   Officer in July of 1998?
11   A   Let's see.  I believe I called
12   around or -- I can't remember specifically
13   how but I knew some people who worked over in
14   the Office of the Chief Financial Officer.
15   Q   Who did you know?
16   A   I knew a Herbert Huff.
17   Q   Are you related to Mr. Huff?
18   A   No.
19   Q   How did you know him?
20   A   From Howard University.
21   Q   Did he go to school with you in
22   1966?

129

1    A   Yes, he was in school during the
2    same time that I -- I knew he had worked for
3    the OCFO and so I enquired over with Mr. John
4    Scipone about employment.
5    Q   And did you apply for a particular
6    position through Mr. Scipone?
7    A   Yes, I applied to come to the
8    operations Division of Mission Support which
9    was under the OCFO.
10   Q   Were they located at 441, 4th
11   street?
12   A   441, 4th street.
13   Q   Mr. Scipone is White?
14   A   Mr. Scipone is White.
15   Q   And you were hired for the
16   Operations Division's position?
17   A   Yes.
18   Q   Who is your first supervisor as you
19   came to work with the CFO?
20   A   Mr. Rick Butler.
21   Q   And what was his race?
22   A   Black.

186

1    Q   And what -- what responsibility did
2  you have over cleaning crew personnel?
3    A   Just to watch them, and make sure
4  that they did their, you know, while they
5  were in our section.
6    Q   And that's why you'll be staying
7  late?
8    A   Yeah, so that someone would be
9  there with them.  And if they were -- and if
10  they wanted certain things done, of course, I
11  was given the instruction about what to tell
12  them -- Mr. Powell, or Stan, or whatever.
13    Q   Did the -- did Stan assign you that
14  responsibility?
15    A   That had been assigned, prior, all
16  along, even when I was in the other building
17  that had been assigned to me, yeah.
18    Q   Now, did Mr. Morel tell you that
19  you needed to report earlier than 9:30 or
20  10:00 o'clock in the morning?
21    A   Did he ever tell me that?
22    Q   Yes.

187

1    A   No.
2    Q   Well, did he ever tell you that you
3  could not have the flex time hours that you
4  just described to me?
5    A   Well, he had said that he was
6  thinking about changing times.  So then I
7  think he was -- informed me that he was
8  thinking about changing everybody's time.
9  And then I think he informed me that as of a
10  certain date, but I was transferred by then,
11  that he was going to require everybody who
12  had flex time not to be on flex time.  But he
13  never came to me directly and said, you know,
14  yours is --
15    Q   Did you ever submit any medical
16  reasons for flex time?
17    A   I don't remember -- either it's --
18  I think I explained it, but never -- you mean
19  a document?  Is that what you mean?
20    Q   Yes.
21    A   I don't think so.
22    Q   Do you have a -- did you have a

188

1  medical reason for flex time at that -- in
2  the summer of 2001?
3    A   Not specifically, but as I said, I
4  would be in there with the people who were
5  staying late.  And if I stayed late I didn't
6  want to come in and spend all those hours,
7  and not -- and, you know, not be compensated.
8  So I came later.
9    Q   So your flex time arrangement had
10  nothing to do with an accommodation for any
11  alleged disability?
12    A   No, unless I went to the -- unless
13  I went to a clinic or something like that,
14  but I was always able to do that and get to
15  work on, you know --
16    Q   Now, there is a question here.
17  "What measures were taken to assist you with
18  assignments in conjunction with physical
19  impairments?"  Did you request any special
20  equipment?
21    A   When I first came there -- they
22  were -- said they were willing to assist me

189

1  with that.  When I first came in 19 -- not
2  89, 98, when I was hired they bought that --
3  they purchased that for me.
4    Q   Now, what did -- who purchased it?
5    A   The division did.
6    Q   It -- was a specific manager
7  involved in meeting that request?
8    A   Mr. John -- yeah, Mr. John Scipone,
9  and it went through the purchasing division.
10  What's the guy's name?  Charles Ortiz was the
11  procurement officer who got it.  And --
12    Q   And what is it that they purchased
13  for you?
14    A   Special computer with a zoom -- you
15  call that zoom program.  And they got me some
16  lamps, or lightings -- lighting for the
17  cubicle to go along with the computer large
18  screen and the zoom.
19    Q   And what condition --
20    A   And -- I'm sorry, and Dragon, you
21  know, the Dragon -- what do they call it?
22  Dragon voice recorder for, you know, writing

190

1 the memo.
2   **Q   A voice recorder?**
3   A   Yeah, Dragon system -- the Dragon
4 system in the computer, programming and
5 everything, so that if you wanted to dictate
6 a -- any work you would do your voice, and
7 then eventually it would pickup, and you
8 could write a memorandum by voice. I mean,
9 that just came along with all of the
10 amenities with the programs that they bought,
11 uh-huh.
12   **Q   Did you produce any medical**
13 **documentation at that time to establish that**
14 **you had a need for such special equipment?**
15   A   I don't recall presenting any
16 medical -- other than their questioning me
17 about my disability, my telling them and
18 asking me, well, how long had it been that
19 way, and so forth and so on. I told them it
20 was like something that I was born with, so
21 -- I mean, but I didn't know. Did I go to
22 the hospital to get medical records, no.

191

1   **Q   All right. Now, this was in 1998**
2 **with Mr. Scipone?**
3   A   With Mr. Scipone, that's right.
4   **Q   Yes, all right. And were you**
5 **required to use a computer in performing your**
6 **duties and responsibilities?**
7   A   Yes.
8   **Q   And did you know that at the time**
9 **that you were hired?**
10   A   Well, it was explained to me, but I
11 was excused from doing it until I got the
12 equipment.
13   **Q   And when did you ask for the**
14 **equipment?**
15   A   When I first came.
16   **Q   At first time of employment. And**
17 **how long --**
18   A   Yeah, when I went for the -- when I
19 was interviewing with Mr. Scipone I explained
20 to him some of the things that I was -- I
21 asked him, would in fact they be willing to
22 help me with the equipment.

192

1   **Q   I see.**
2   A   Yeah.
3   **Q   So you disclosed to Mr. Scipone at**
4 **the time of your interview that you needed**
5 **the special equipment in order to work with a**
6 **computer?**
7   A   Yes, I did. We discussed that,
8 yes.
9   **Q   And it didn't have any impact upon**
10 **his decision to hire you for the job. He**
11 **hired you anyway.**
12   A   Yeah, he said, he wouldn't hold
13 that against me, yeah. And he hired me.
14   **Q   All right. And do you know how**
15 **much money it cost to purchase this special**
16 **equipment for you?**
17   A   I don't know the exact amount
18 ma'am. Don't know the exact amount. It went
19 through the division of purchasing, and the
20 bill didn't come to me. So I would imagine
21 over $2,000. But I'm just imagining, I don't
22 know.

193

1   **Q   And was that equipment made**
2 **available to you throughout the time that Mr.**
3 **Morel was in charge of the office?**
4   A   Yes, yeah.
5   **Q   Prior to the time that you worked**
6 **for the CFO --**
7   A   Well, he says he'll help me get it,
8 but I didn't go -- it was Mr. Scipone that --
9   **Q   Do you know whether Mr. Morel was**
10 **involved in any way in processing the request**
11 **for the equipment?**
12   A   No, I don't know the -- no.
13   **Q   Prior to the time that you came to**
14 **work for the CFO did you ask for that kind of**
15 **accommodation from Fed Capital Inc.?**
16   A   Well, I wasn't doing that kind of
17 work with the computer per se. They had
18 people there who did that, and so that wasn't
19 -- it wasn't required that I would need it to
20 the capacity that I would need it at that
21 particular job. And that's the reason I
22 brought it up.

194

1     Q    When you worked for the department
2  of -- I'm sorry, for the D.C. Public Schools,
3  and you were responsible for preparing
4  various reports for facility manager.  Did
5  you have special computer equipment over
6  there?
7     A  No, and I would turn mine into the
8  secretary, or I would call administrative
9  assistant or whatever have you.  And I would
10 review the product.
11    Q    So you had no problem reading it
12 after it was typed?
13    A  Well, if it came in the right font.
14 Yeah, I would enlarge the font, you know, or
15 get it to the point -- the font that -- so
16 that I could see it, yeah.
17    Q    Do you know what your visual acuity
18 was at the time that you were -- came to work
19 for the CFO in 1998?
20    A  No, I -- I mean, when you say
21 visual acuity can you explain to me what
22 you're talking about?

195

1     Q    Well, I mean, was it 20/20, was it
2  20/30?  And I know -- I realize that it's got
3  to be -- each eye.
4     A  I don't -- yeah, I don't know --
5  I'm not sure of that.
6     Q    Was one eye more impaired than the
7  other eye?
8     A  Under certain circumstances with
9  nystagmus they both are affected.
10    Q    What is the name of the condition?
11    A  Nystagmus, where your eyes -- you
12 can't focus in the -- the moving --
13    Q    And the condition -- keep you from
14 focus --
15    A  Nystagmus and keraconus, yeah.
16    Q    Keraconus.
17    A  Keracaconus or keraconus, and
18 nystagmus and severe -- like nearsightedness
19 also, so all of those combinations is what I
20 had.
21    Q    Now, you have been able to read
22 various documents that have been presented to

196

1  you at deposition today.  Have you had your
2  vision corrected since the time that you left
3  the CFO's office?
4     A  Other than my operation, if that's
5  what you mean by corrected.
6     Q    The operation was for an injury
7  that you sustained in the automobile
8  accident, right?
9     A  Right, yes, uh-huh.
10    Q    The injury to -- in the automobile
11 accident was to your left eye, was it not?
12    A  Left eye, and affected the right
13 one too with regard to adjusting or focusing.
14    Q    And if I recall, from your medical
15 documentation, you were asked to wear contact
16 lenses to improve or correct the vision to a
17 point where you would be able to function and
18 --
19    A  Yeah, with Keraconus and Nystagmus,
20 I mean, yes, that would help me.
21    Q    And do you know what your visual
22 acuity is, now, in corrected form?

197

1     A  I don't.  No, I don't.
2     Q    Are you wearing contact lenses at
3  the present time?
4     A  Yes.
5     Q    And do you wear them in addition to
6  your glasses that you have on your face?
7     A  Yes.
8     Q    So you're wearing both forms of
9  correction --
10    A  Yeah, for optimum correction in
11 seeing and reading, yeah.
12    Q    When you use the computer at the
13 library for your job search, do you have any
14 problems?
15    A  No, because they have the facility
16 to enlarge.  I use what they call computers
17 for the visually impaired.
18    Q    All right.  When you went -- when
19 you transferred from mission support to
20 general services, OTR, in the fall of 2001,
21 were you able to take your computer with you
22 from one location to the other?

198

1    A  Yes.
2    Q  So you had access to that during
3  the entire time that you were -- the CFO.
4    A  I had -- yes, yeah, yes.
5    Q  When Dr. Anderson wrote to Lou
6  Parker in May of 2001 he requested that Mr.
7  Parker keep the information on a confidential
8  basis. Do you recall that request? You may
9  want to go back and look at it.
10    A  What was the question again?
11    Q  Did you ask Dr. Felton to instruct
12  Mr. Parker to keep information about your
13  physical condition confidential from other
14  people?
15    A  Did I ask mister -- the doctor to
16  do that?
17    Q  Yes.
18    A  No, I just assumed he did it
19  because people protect people's medical
20  records, but I didn't ask him to do it.
21    Q  All right. Do you know whether or
22  not Mr. Parker ordered that request?

199

1    A  I don't know. I just know that
2  people in my office knew it. But I don't
3  know outside my office how much he -- I don't
4  know that.
5    Q  Do you have any information which
6  would suggest that anyone on the panel that
7  interviewed you in March of 2003 knew about
8  your eye condition?
9    A  Yeah, well, I know -- I believe any
10  way that Diane Cammalleri knew, and --
11    Q  And what is the basis on which you
12  believe that she knew?
13    A  Well, this was in my personnel
14  file, and that's with the --
15    Q  Do you have any facts which would
16  suggest?
17    A  Pardon me.
18    Q  Do you have any other -- you say
19  that was in your personnel file?
20    A  I believe it was. I believe it, I
21  don't know. But I believe that that's --
22  that was put a part in my personnel file. I

200

1  mean, I looked in there one time, and this
2  letter was in there. I don't know if anybody
3  took it out.
4    Q  When did you look in the file?
5    A  Let me see. I've reviewed my file
6  in -- it would have been -- let's see, this
7  date here is dated May. So may be about a
8  month or so afterwards, because I had asked,
9  I think, Lou Parker, if he had received a
10  letter from my doctor.
11    Q  And so that would have been in June
12  of 2001?
13    A  Yeah. Well, it would have been
14  after this letter was written because I had
15  asked -- the office had a letter going
16  forward, my medical doctor's office. Now, I
17  think this was one of the documents that I
18  saw in the personnel file.
19    Q  You think?
20    A  I'm pretty sure I read it.
21    Q  Did you look in your personnel file
22  in March of 2002?

201

1    A  March of 2002. In March of 2002, I
2  believe in -- I'm trying to think of -- I
3  can't remember if I reviewed it in March of
4  2002. I do know -- I might have also, in
5  December, or just before -- after Cammalleri
6  came there. But I'm not -- I don't know. I
7  can't remember if I did it in 2002.
8    Q  Are you aware that the ADA
9  prohibits medical information from being
10  included in an employee's personnel file?
11    A  Am I aware of that?
12    Q  Yes.
13    A  No.
14    Q  Did you ever have a conversation
15  with Ms. Cammalleri in which she made any
16  statement to you evidencing that she had
17  knowledge of your eye condition?
18    A  Did I ever have any conversation
19  with her?
20    Q  Yes.
21    A  I don't know. I don't remember --
22  I don't know. I won't say, no, because I

202

1  don't know. I don't remember.
2      Q   You don't remember?
3      A   Right. But from what I understand,
4  she had conversation with Stan Morel about
5  it.
6      Q   And how do you -- what's the basis
7  for your belief that that happened?
8      A   Well, because he had said that he
9  had discussed -- when I was asking for
10  special -- my lighting and so forth and so
11  on, he said that he had explained why.
12     Q   To whom?
13     A   To the people in personnel.
14     Q   Was Ms. Cammalleri in personnel at
15  the time that you required -- requested
16  special lighting?
17     A   She was -- let me see. Yeah,
18  because I think that's the reason I wanted --
19  either to go down there in December, review
20  my file. But, he was down there in personnel
21  purging files, or doing something with the
22  files. And I remember because I had asked

203

1  about getting a special -- getting my
2  lighting and so forth and so on.
3      Q   And when did you request the
4  lighting?
5      A   Well, it wasn't that I requested
6  the lighting. I had always requested the
7  lighting. I wanted the lamps. When we made
8  a move they hadn't presented me with the
9  lamps that I had before. When we made the
10  move I'd always requested the special
11  lighting since 1998.
12     Q   So when you went over to OTR in the
13  fall of 2001 the lamps did not come with you.
14     A   2001?
15     Q   Yes.
16     A   Yeah, that's right. For some
17  reason they didn't arrive with the rest of
18  the stuff.
19     Q   Did they ultimately arrive?
20     A   No, I had to go and try to find
21  something to makeshift.
22     Q   Did you ever have a conversation

204

1  with Ms. Cammalleri about the failure to
2  provide with the lamps?
3      A   I did not have a conversation with
4  her, no.
5      Q   Did Mr. Morel ever tell you that he
6  had spoken about the lamps and your need for
7  them with Ms. Cammalleri?
8      A   He didn't say the lamps, but he
9  just said about the, you know, about my
10  impairment. Now, it --
11     Q   When did you have the conversation
12  with Mr. Morel?
13     A   When he assigned me the work
14  assignment that I told you I couldn't do.
15  And I told him that in fact I was going to
16  bring that up. And he says, I've discussed
17  that, so, you know --
18     Q   Do you know when Ms. Cammalleri
19  came to -- or began her services with the
20  CFO?
21     A   I think she did it -- she might
22  have come in September around that time --

205

1  around September, not sure.
2      Q   Of what year?
3      A   I think it's -- what was it? Maybe
4  '01 or '02, I can't remember the --
5      Q   It's a year apart.
6      A   Yeah, but he did say he was
7  discussing it, brought it up with personnel.
8  So --
9      Q   So if she weren't in personnel at
10  the time, it wouldn't have been with her, is
11  that right?
12     A   If she were there, it would have
13  been with her.
14     Q   And if she wasn't, it wasn't.
15     A   Right, I mean --
16     Q   Mr. Winsonant was in -- the
17  director of personnel at the time that you
18  transferred to ORT in the fall of '01, isn't
19  that correct?
20     A   '02 -- I don't think so. I think
21  Lou Parker was there when I transferred in --
22  if I'm not mistaken. And then he --

206

1    Q  I thought you told me that Mr.
2  Winsonant was the one who arranged for you to
3  be transferred over to OTR. That you spoke
4  to Mr. Winsonant, and he is the one that did
5  the transfer.
6    A  I said that Mr. Winsonant, I
7  believe confered with Mr. Huff. You asked
8  me, did I confer with Mr. Huff, and I said,
9  no.
10    Q  You conferred with Mr. Winsonant?
11    A  Uh-huh.
12    Q  And he was in charge of personnel
13  in the October 2001 timeframe.
14    A  Right.
15    Q  And that's when your transfer was
16  made, isn't it?
17    A  '02 is when I was transferred.
18    Q  '01 is when you were transferred,
19  isn't that correct?
20    A  To my recollection, I thought I saw
21  '02 on there -- or 113 --
22    Q  Weren't you --

207

1    A  Wait, just let me finish. I think
2  it was -- there are two dates on the
3  personnel actions, and I think one says --
4  one say, '01, and then there was another
5  personnel action that said, '02.
6    Q  Weren't you in OTR for
7  approximately a year and a half before the
8  time CFO announced the reorganization that
9  led to your ret?
10    A  I don't know. I'd have to look at
11  your file.
12    Q  You have no recollection of how
13  long you were over there?
14    A  It could have been a year, and it
15  could have been less or more. But I'm not
16  sure because the personnel action I think
17  would say, '02, which was '02, and which was
18  '01, I'm not sure.
19    Q  How long was it between the time
20  you saw Ms. Wilson in the summer of 2001
21  complaint about Mr. Morel, and the time when
22  Mr. Winsonant arranged for your transfer over

208

1  to the office of tax and revenue?
2    A  Okay, let me see. I would say some
3  months. And it was in -- you know, the years
4  have fallen in on me, so let me just say, I
5  don't know, if you got something that could
6  refresh my mind or memory then, you know, I'd
7  be happy to look at it, and spinout any
8  confusion.
9    Q  Well, the record will speak for
10  itself, right, as to when you were
11  transferred.
12    A  Okay, all right. Okay. But it
13  certainly would mention it on the personnel
14  folder, I mean, forum, I would imagine. That
15  would clarify it, and if incorrect on
16  something then it will jog my memory -- jog
17  my memory with it. But I don't have --
18    Q  But to be clear, you had not
19  conversation directly with Ms. Cammalleri
20  concerning your eye condition?
21    A  No, I did not.
22    Q  And it didn't come up during the

209

1  time that you were being interviewed for the
2  support specialist position -- I'm sorry the
3  lead -- to get the title of that position
4  right, the lead support specialist position
5  in March of 2003.
6    A  I don't recall. I don't know
7  though. I don't recall.
8    Q  You don't recall?
9    A  I do not recall.
10    Q  What -- I mean, you're bringing
11  this lawsuit alleging that you were
12  discriminated against on the basis of your
13  disability among other things. You're
14  telling me you have no recollection of
15  whether that issue ever came up during your
16  interview process in March of 2003?
17    A  I am telling you that.
18    Q  Did you ever have a recollection --
19    A  I asked them, did they have
20  everything in my personnel file before them.
21  And she said, yes. And it was my
22  understanding that this letter was in there.

# EXHIBIT C

Diane Marie Camilleri

Page 1

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - - - - - - - - - - -x

4    WALTER THOMAS,                        )

5                   Plaintiff    ) Civil Action

6            V.                  ) No. 05-CV-01784

7    NATWAR GANDHI,                        )

8                   Defendant    ) Pages 1-260

9    - - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11

12

13

14            DEPOSITION OF DIANE MARIE CAMILLERI

15              Wednesday, February 28, 2007

16                    Washington, DC

17

18

19

20

21   Reported by:  Sherry L. Brooks

22   Job No. 179505

Diane Marie Camilleri

Page 18

1  2006. Were you contacted prior to September 12th,
2  2006 and asked to give information that might have
3  been used to compile Deposition Exhibit Number 1?
4      A.  No.
5      Q.  Okay. I want you to turn to page 3, and I
6  direct your attention to the response to Number 1 on
7  page 3, Interrogatory Number 1. Do you know Morris
8  Wynn (phonetic)?
9      A.  No, I don't.
10     Q.  Do you know Connie Green (phonetic)?
11     A.  No, I don't.
12     Q.  Okay. Thank you.
13     A.  Wait a minute. I might know Connie. Did
14  I know Connie when I was there? I honestly don't
15  remember. There was a Connie that worked in human
16  resources, but I did not know Morris.
17     Q.  Now, in terms of --
18     MS. HUTCHINSON: I'd like to have this
19  document marked as Deposition Exhibit Number 2?
20     (Exhibit Number 2 was marked for
21  identification and was attached to the deposition.)
22     BY MS. HUTCHINSON:

Page 19

1      Q.  Now, Ms. Camilleri, this is a document --
2  and can you tell me -- it's dated December 10th,
3  2002. It is a memorandum from you, and I'd like you
4  to take a look at this document and ask you if you
5  recall this document in terms of your position, as I
6  guess the position indicated on this deposition
7  Exhibit 2 is acting director?
8      A.  Yes, I do recall it.
9      Q.  And in terms of this particular page 1 of
10  Deposition Exhibit Number 2, there's a name written
11  for you and apparently someone signed this memorandum
12  for you. What is the name of that individual?
13     A.  That's Lucielle Dickinson.
14     Q.  And what was her position in your office?
15     A.  She was also a special assistant to Dr.
16  Gandhi.
17     Q.  And in terms of this particular Deposition
18  Exhibit Number 2, did you write this document?
19     A.  Yes, I did.
20     Q.  Is it something you wrote?
21     A.  Yes.
22     Q.  And in terms of this, the subject is the

Page 20

1  proposed restructuring of the Office of Government
2  Business and Human Capital, correct?
3      A.  Yes.
4      Q.  Now, in terms of this document, prior to
5  issuing this memorandum, can you tell me, had you
6  reviewed the positions that were going to be affected
7  by this restructuring?
8      A.  Yes, I did.
9      Q.  Okay. And can you tell us, please, what
10  exactly did you do to, I guess, issue this document
11  where you're making this proposed restructuring?
12     A.  Well, for the period of time between June
13  and December or maybe through November, I spent
14  considerable time interviewing the managers, the
15  current managers, of the division -- in the division
16  reviewing all known documentation on job descriptions
17  and really sat with pretty much everybody -- I don't
18  know every single person, but almost every single
19  person -- in the division to try to understand what
20  their jobs were versus how they were documented in
21  the -- in any personnel folders that there were and
22  then just, you know, from my previous experience in

Page 21

1  human resources in doing restructurings at the IRS
2  made determinations on what I felt was a more
3  streamlined human resources and Management and
4  Administration function.
5      Q.  Now, on page 1, I'd like you to go to the
6  last paragraph. And in the first sentence, you make
7  a statement, in addition to the abolishment of
8  positions in OGBHC, the General Services Unit in the
9  office -- let me state it as it is.
10     The General Services Unit in Office of Tax
11  and Revenue will be abolished. Now, was that office
12  under your supervision in the Government Business and
13  Human Capital office?
14     A.  No, it was not.
15     Q.  Now, in terms of the General Services
16  Unit, can you tell me, what did you do in terms of
17  reviewing or -- let me withdraw and rephrase that.
18     In terms of the General Services Unit, how
19  did you come to the decision that the positions in
20  the General Services Unit should be abolished?
21     A.  Meeting with various members of Dr.
22  Gandhi's team, and I don't actually recall names at

6 (Pages 18 to 21)

Diane Marie Camilleri

Page 22

1  the time. I do believe Al Powell was one of them.
2  He was the chief of this organization, this General
3  Services Unit, and others. And again, I don't recall
4  them all. Many of the functions that they did were
5  more in line with an Office of Management and
6  Administration, facilities management, logistics,
7  driving support for Dr. Gandhi.
8      Q.  Now, did you review any of the employees
9  -- I'm sorry. Let me withdraw and rephrase it.
10     Did you interview any of the employees in
11  the General Services Unit?
12     A.  I don't recall. No. I don't recall.
13     Q.  Okay. Did you review the personnel
14  folders of the employees in the General Services
15  Unit?
16     A.  I recall reviewing position -- if there
17  were any position descriptions in the personnel
18  folders -- I do recall that.
19     Q.  So you looked at personnel folders for
20  position descriptions?
21     A.  Yes.
22     Q.  Now, you've said that you had been

Page 23

1  involved in reorganizations in human resources in the
2  Federal Government, correct?
3      A.  Yes.
4      Q.  Had you ever had any experience with the
5  District of Columbia Government?
6      A.  No, I have not.
7      Q.  So that in terms of your coming on this
8  IPA in the District of Columbia Government, did you
9  seek to determine whether there were particular types
10  of positions that were being affected as you went
11  through this process from June to December?
12     MS. PIVEC:  Objection as to form.
13     THE WITNESS:  Could you repeat the
14  question? Sorry.
15     BY MS. HUTCHINSON:
16     Q.  Okay. In terms of the review that you
17  were doing from June to December, did you seek to
18  determine whether the positions that might be
19  affected by Deposition Exhibit Number 1 had different
20  -- were in different types of career service or
21  accepted service? Did you make any determinations
22  like that?

Page 24

1      MS. PIVEC:  Objection as to form.
2      THE WITNESS:  Well, the office of the CFO
3  was an at-will employer, but I did spend considerable
4  time with the D.C. Office of Personnel because I had
5  not had experience in the District Government and I
6  wanted to ensure that my federal background and my
7  experience was not so far out of line with what the
8  D.C. Office of Personnel did.
9      BY MS. HUTCHINSON:
10     Q.  Now, in terms of the office of the CFO,
11  the General Services Unit in Tax and Revenue, was
12  that part of the office of the CFO?
13     A.  Yes.
14     Q.  Now, you said you contacted the District
15  of Columbia Government --
16     A.  Office of Personnel, yes.
17     Q.  Okay.
18     MS. HUTCHINSON:  I'd like to have this
19  marked as Deposition Exhibit Number 3.
20     (Exhibit Number 3 was marked for
21  identification and was attached to the deposition.)
22     BY MS. HUTCHINSON:

Page 25

1      Q.  Now, in terms of Deposition Exhibit Number
2  3, This is a D.C. 1 form and it's a personnel action
3  form. During the time that you were conducting your
4  review and you reviewed personnel files, did you
5  review any of the personnel action forms of the
6  various individuals who might be affected?
7      A.  I don't recall doing that, no.
8      Q.  Now, you said you had contacted the
9  District of Columbia, Office of Personnel, and sought
10  their -- I guess sought information from them, and
11  I'd like to direct your attention to Block 37 here.
12  And in Block 37, there's a listing with numbers
13  beside them, and they correspond. Like Number 1 is
14  career, and in this particular Deposition Exhibit
15  Number 3, there is a 1.
16     Did you -- when you were consulting with
17  the District of Columbia Government, Office of
18  Personnel, did you seek any guidance on what might be
19  the rights of individuals who had career positions if
20  their positions were abolished?
21     A.  No, I did not, because I was informed that
22  Dr. Gandhi's office was an at-will employer and they

7 (Pages 22 to 25)

Diane Marie Camilleri

Page 70

1  was proposed and given to employees as to how the
2  process would work for the job applications?
3      A.  Yes.
4      Q.  Okay.  And there was an intention whether
5  accomplished or not, to have external candidates,
6  their applications ranked by a ranking panel?
7      A.  Yes.
8      Q.  And the only thing is that today sitting
9  here you can't recall whether that happened --
10     A.  I can't recall the specifics of how that
11 happened, no, I can't, but I am sure that it did
12 because the attorneys were watching this process
13 extremely carefully.  I just do not recall it.
14     Q.  So they were watching, okay.  Now, if you
15 go to the next page of this job application process,
16 there's a Step 5?
17     A.  Yes.
18     Q.  And Step 5 says that the interview panel
19 will interview all eligible, internal, displaced
20 applicants and up to the top ten best qualified
21 external candidates.  So that in terms of this
22 process, internal applicants and best qualified

Page 71

1  external candidates were all interviewed as part of
2  the same process?
3      A.  Yes.
4      Q.  And internal applicants were not given any
5  type of priority over external applicants?
6      A.  Just first consideration.  In other words,
7  the interviewers saw them first.
8      Q.  That's it?
9      A.  Yes.
10     Q.  Okay.  Now, if you look at the second
11 paragraph of Step 5, it's the third line and the
12 sentence that begins with panel members, that they're
13 to meet for the purpose of reaching consensus on the
14 panel's recommendation with respect to the top five
15 candidates.  Did that happen?
16     A.  Yes.
17     Q.  So that each interview panel after they
18 interviewed the candidates met and discussed the
19 candidates for the position?
20     A.  Yes.
21     Q.  Do you recall meeting with Ms. Smoke and
22 Mr. Lister to discuss the candidates for the lead

Page 72

1  support specialist position?
2      A.  Vaguely, yes.
3      Q.  Ms. Smoke and Mr. Lister have both
4  testified that they had no meetings on the
5  candidates, but you recall having a meeting with
6  them?
7      A.  Yes, I do.
8      Q.  When did that meeting occur?
9      A.  I think it was at the close of the
10 interview.
11     Q.  At the close of the interview?
12     A.  Yes.
13     Q.  Ms. Smoke and Mr. Lister both have
14 testified that they did not meet at the close of the
15 interview to discuss the candidates.  Do you believe
16 they're lying?
17     A.  No, I don't believe they're lying.  That's
18 just what I recall.
19     Q.  You recall that there was a meeting?
20     A.  I recall that each interview -- at the
21 close of each interview, there was a consensus
22 discussion, whether that's a meeting or not, of the

Page 73

1  interview of the people that we interviewed.
2      Q.  Ms. Smoke and Mr. Lister have both
3  testified that they ranked the panel, turned in the
4  sheet, and the candidate with the highest score was
5  selected and there was no discussion.  Do you believe
6  they're lying?
7      A.  I'm telling you what I recollect.
8      Q.  That's your recollection?
9      A.  Yes.
10     Q.  So your recollection is that there was
11 some discussion on the candidates and there was a
12 consensus by the individuals who were the interview
13 panel?
14     A.  I remember that there was a discussion.  I
15 don't know that there was a consensus.  That's what I
16 recall.
17     Q.  Okay.  Now, it says in the third paragraph
18 of Step 5 that there will be -- there's a last
19 sentence that says that the letters will be issued
20 within five days of the end of the selection process
21 notifying people of the selection or a termination
22 letter notifying them of their nonselection, okay?

19 (Pages 70 to 73)

Diane Marie Camilleri

Page 82

1    Q.  So that at the time of the restructuring,
2  it was the intention to fill two lead support
3  specialist positions?
4    A.  Yes.
5    Q.  Okay.
6      MS. HUTCHINSON:  I would like to have this
7  marked as Deposition Exhibit Number 12.
8      (Exhibit Number 12 was marked for
9  identification and was attached to the deposition.)
10     MS. PIVEC:  Counsel, just so you know,
11 this is somewhat confusing because I have a front and
12 back to page 1 and the back of page 1 appears to be
13 the same as 2.
14     MS. HUTCHINSON:  You know, that's a
15 copying error, so sorry.  Okay.  Can we just say on
16 Deposition Exhibit Number 12 that there is a
17 duplicate of page 2 to the vacancy announcement on
18 the back of page 1?  That will eliminate that
19 problem.
20     BY MS. HUTCHINSON:
21   Q.  Okay.  Now, you have before you, Ms.
22 Camilleri, Deposition Exhibit Number 12, and it is a

Page 83

1  vacancy announcement and the number of it is
2  AD-RS-MA017.  And if you'll look back at Deposition
3  Exhibit 11, on Deposition Exhibit Number 11, the
4  announcement number that's listed as AD-RS-MA017 is
5  Deposition Exhibit Number 12, that vacancy
6  announcement?
7    A.  Yes.
8    Q.  And on the vacancy announcement that's
9  Deposition Exhibit Number 12, it actually was
10 advertised beginning December 13th, correct?
11   A.  Yes.
12   Q.  And there's an area of consideration and
13 it says unlimited.  What did that mean?
14   A.  It meant it was open to all, anyone that
15 wanted to apply, not just internal, but external as
16 well.
17   Q.  So that in terms of the vacancy
18 announcements that are represented on Deposition
19 Exhibit Number 11, were they all open to everyone?
20   A.  Yes.
21   Q.  Okay.  So that there was no process
22 whereby individuals who were current employees

Page 84

1  received advance consideration prior to the vacancy
2  announcements?
3    A.  No.
4    Q.  And was that a decision that was made as
5  part of the restructuring process or was that a
6  decision made by you in your position of director of
7  human resources?
8    A.  It was a decision made in the
9  determination of the restructuring that Dr. Gandhi
10 wanted the people to -- gained employment in this
11 organization to be the best qualified, regardless of
12 internal or external candidates.
13   Q.  So did you have a discussion with Dr.
14 Gandhi about this?
15   A.  Well, there were many discussions with the
16 attorneys, with Dr. Gandhi.
17   Q.  And in those discussions, did anyone bring
18 up or discuss the Older Worker's Benefit Protection
19 Act?
20   A.  No.
21   Q.  So there was no discussions about any
22 protections that individuals who were over age 50

Page 85

1  might have in terms of a restructuring of an
2  organization?
3    A.  No.
4      MS. PIVEC:  Off the record for a minute.
5      (Discussion held off the record.)
6      BY MS. HUTCHINSON:
7    Q.  Now, in terms of the discussions on the
8  positions being open to all candidates, were there
9  any discussions of having an assessment done as to
10 how the restructuring might affect individuals who
11 were over age 50?
12   A.  No.
13   Q.  Were there any efforts made to have an
14 assessment in terms of any affirmative action
15 requirements that the Office of the Chief Financial
16 Officer might be under?
17   A.  Could you --
18     MS. PIVEC:  Objection as to form.
19     THE WITNESS:  I really didn't understand
20 the question.  Sorry.
21     BY MS. HUTCHINSON:
22   Q.  Okay.  In terms of the restructuring and

Page 90

1 that Tanya High was the person to which they would
2 submit their applications, correct?
3  A. Yes.
4  Q. And in terms of Ms. High, this is the same
5 Ms. High we were talking about previously?
6  A. Right.
7  Q. Now, at the top of page 2, there are
8 ranking factors. Now, what was the purpose of these
9 ranking factors?
10  A. From my recollection, the reason we did
11 this was to give people guidance in preparing their
12 application package so there would be some
13 standardization to the application procedure so that
14 when the interviewers were looking at our
15 application, they would be able to consistently see
16 answers to these ranking factors.
17  Q. Now, in terms of these ranking factors,
18 were these the ones that were supposed to be used by
19 the ranking panels to qualify individuals?
20  A. No. They were not used to qualify
21 individuals, the ranking factors were not.
22  Q. They were not, so you just had ranking

Page 91

1 factors, as you say, to give guidance to the
2 interviewers?
3  A. Well, for help, for assistance in
4 standardizing the application packet so that
5 everybody had the opportunity to answer the same
6 questions.
7  Q. So where were the ranking factors that
8 were going to be used to evaluate external
9 candidates? Where were those?
10  A. Perhaps these were the ranking factors
11 used, but again, I cannot recall specifically how
12 that happened, so I can't address your questions to
13 the external ranking process because I don't recall
14 it.
15  Q. Well, you have experience in personnel?
16  A. I do.
17  Q. You spent a long time in human resources?
18  A. I have.
19  Q. And ranking factors are generally used to
20 rank external candidates, correct?
21  A. Yes, they are, but again, I don't recall
22 it, so I'm not going to tell you a process that I

Page 92

1 don't recall.
2  Q. Well, you committed to the process by
3 issuing the job application.
4  A. I did, but that was four years ago.
5  Q. So you're just saying you don't recall it,
6 but you believe that whatever was issued to employees
7 as the job application process was what was done?
8  A. Um-hum. Absolutely, and I know that there
9 were a lot of people watching it and I'm absolutely
10 convinced that it was.
11  Q. Okay.
12  MS. HUTCHINSON: I'd like to have this
13 document marked as Deposition Exhibit Number 13.
14 Exhibit Number 13.
15  (Exhibit Number 13 was marked for
16 identification and was attached to the deposition.)
17  BY MS. HUTCHINSON:
18  Q. Now, in terms of Deposition Exhibit Number
19 13, this is an application, and the first page says
20 it's dated December 31st, and it references as to the
21 interview panel announcement AD-RS-MA017 lead support
22 specialist. And that is Deposition Exhibit Number

Page 93

1 12, correct?
2  A. Yes.
3  Q. Okay. Now, if you go to page 2, there's a
4 signature and it's Walter Thomas. Do you see that?
5  A. Yes.
6  Q. If you go to page 3, there is a stamp in
7 the upper right corner, and it says for OCFO use
8 only.
9  A. Um-hum.
10  Q. Okay. Was this the form that you said was
11 stamped and a copy returned to individuals who
12 applied?
13  A. Yes.
14  Q. Okay. And so that this form means that
15 Mr. Thomas turned in an application, correct?
16  A. Correct.
17  Q. Okay. Now, I'd like you to go to the next
18 page, and it's a copy of a vacancy announcement,
19 correct?
20  A. Um-hum.
21  Q. Okay. And if you go to a page titled
22 response to ranking factors -- turn three pages back

Diane Marie Camilleri

Page 94

1   -- it says Walter Thomas and it has a response.
2       Now, on this page, are these the ranking
3   factors that are referenced on page 2 of the
4   Deposition Exhibit Number 12? If you want to take a
5   look.
6       A. Yes. They look like it, yes.
7       Q. Okay. Now, in terms of things -- well,
8   let me go on through. If you'll go through to the --
9   there's a page 4 of ranking factors and then there's
10  a resume.
11      A. Yes.
12      Q. And if you'll go three pages, there's a
13  standard field position description?
14      A. Okay.
15      Q. And if you'll go back, there is also a
16  document titled -- it's 5/28/96. It says PER/EX
17  Foreign Service Personnel Audit Report.
18      A. Okay.
19      Q. And then behind that, there's a
20  certificate -- two certificates. Now, in terms of
21  Deposition Exhibit Number 13, do you recall whether
22  or not this was the application that was submitted to

Page 95

1   your offices or to Ms. High by Walter Thomas for the
2   position of lead support specialist?
3       A. I have no recollection.
4       Q. You don't have a current recollection?
5       A. No.
6       Q. Now, when you were processing the
7   applications for these positions such as the lead
8   support specialist, to the best of your recollection,
9   did you receive applications on each individual who
10  applied?
11      A. Did I -- you mean me personally receive?
12      Q. No.
13      A. I don't know what you mean. Sorry.
14      Q. Once you -- the vacancy announcement
15  closed and you were ready to set up interviews, to
16  the best of your recollection, did you have an
17  application package from each individual who had
18  applied?
19      A. Yes, if they were qualified. Yes.
20      Q. If they were qualified, you had an
21  application package?
22      A. Right.

Page 96

1       Q. And no application packages were missing
2   for people you interviewed?
3       A. No, not that I recall.
4       Q. Okay. And when the application process
5   and the interview process was completed, what did you
6   do with the applications?
7       A. They were placed in the merit promotion
8   folder so there was supposed to be a merit promotion
9   folder for each vacancy announcement?
10      A. Yes.
11      Q. When did you leave the Office of the Chief
12  Financial Officer?
13      A. In September of 2004.
14      Q. Okay. And in terms of Mr. Thomas's
15  application, do you independently recall today
16  reviewing his application after the vacancy
17  announcement, which is Deposition Exhibit Number 12,
18  closed?
19      A. No.
20      Q. Okay.
21      A. Can I say something though?
22      Q. Uh-huh.

Page 97

1       A. I don't think I reviewed anybody's
2   applications because they went to Tanya after the
3   applications closed. Tanya got all the applications.
4       Q. Okay. So that there was -- you know --
5       A. I wasn't involved in the application
6   process.
7       Q. No problem. Okay.
8       MS. HUTCHINSON: I'd like to have this
9   document marked as Deposition Exhibit Number 14.
10      (Exhibit Number 14 was marked for
11  identification and was attached to the deposition.)
12      BY MS. HUTCHINSON:
13      Q. Now, in terms of the Deposition Exhibit
14  Number 14, it's a letter dated January 3, 2003, and
15  it's a -- from a Barry Edmonds. Over in the upper
16  right corner, there's some handwriting. Do you
17  recognize that handwriting?
18      A. I recognize the qualified. That's mine.
19      Q. That's your handwriting?
20      A. Yes.
21      Q. Okay. The rest of it looks like Tanya
22  High's.

25 (Pages 94 to 97)

Diane Marie Camilleri

Page 98

1 Q. The ADRRS?
2 A. Yes.
3 Q. And the handwriting over to the left?
4 A. It looks like Tanya's.
5 Q. Okay. So Mr. Edmonds, he was an external
6 employee, correct?
7 A. Correct.
8 Q. And so you rated him qualified?
9 A. Right.
10 Q. Did you have a ranking panel?
11 A. This is eligibility. He was qualified for
12 the position, eligible/qualified. That's what that
13 meant.
14 Q. So there was never a ranking panel, was
15 there, because you did this?
16 A. This is a qualification. This is
17 qualification, which is different from ranking.
18 Q. So --
19 A. But I can't speak to the ranking panel or
20 process unless I saw something, if you've got
21 something from the folder to help me.
22 Q. How many individuals applied for the

Page 99

1 position of lead support specialist? Do you
2 remember?
3 A. I have no idea.
4 Q. So you said you had hundreds of
5 applications that came in.
6 A. Probably a thousand.
7 Q. And you do not recall whether or not Mr.
8 Edmonds was one of the top five highly qualified or
9 best qualified candidates?
10 MS. PIVEC: Objection as to form.
11 BY MS. HUTCHINSON:
12 Q. Do you recall?
13 A. Well, he must have been top qualified
14 because he was interviewed, but he could have been
15 one of -- maybe he was the only external candidate.
16 I don't recall. I don't have that information in
17 front of me, so I'm not going to pretend to know.
18 MS. HUTCHINSON: Ms. Pivec, we asked for
19 the names of every individual not employed by the CFO
20 who applied for this vacancy announcement.
21 MS. PIVEC: I believe he was the only one.
22 MS. HUTCHINSON: That's not what it says

Page 100

1 here.
2 MS. PIVEC: Which number are you referring
3 to?
4 MS. HUTCHINSON: Interrogatory Number 4.
5 It says that you were continuing to review documents
6 in your possession for additional response of
7 materials. If there are additional candidates, we
8 would like to have them.
9 MS. PIVEC: External candidates?
10 MS. HUTCHINSON: Yes, ma'am.
11 MS. PIVEC: I will check, but I don't
12 believe there were any others.
13 MS. HUTCHINSON: We would like to have
14 them if you have them and if these were ranking
15 panels on these candidates.
16 BY MS. HUTCHINSON:
17 Q. So at any rate, you rated Mr. Edmonds
18 qualified?
19 A. Yes.
20 Q. And apparently this resume -- well, if you
21 go to page 2, it's a signature page and then page 3
22 is a resume, a Barry Edmonds. And if you go to page

Page 101

1 4, whose handwriting is this on the --
2 A. That looks like mine.
3 Q. That's yours?
4 A. Yes.
5 Q. So you reviewed this resume?
6 A. Um-hum.
7 Q. And you determined that he met the
8 qualifications for the lead support specialist
9 position, right?
10 A. Yes.
11 Q. Now, in terms of the ranking factor on
12 page 1 of Deposition Exhibit Number 14, in response,
13 Mr. Edmonds as to his knowledge of real estate
14 management, he says he's taking a real estate course
15 and that was his response to that ranking factor?
16 A. Yes.
17 Q. And in terms of things, did you find that
18 to be sufficient -- a sufficient response to that
19 ranking factor? Was that satisfactory to you?
20 A. There's no satisfactory in ranking
21 factors.
22 Q. Well, did it meet your expectations?

26 (Pages 98 to 101)

Diane Marie Camilleri

Page 100

referring

umber 4.

documents
of
s, we

o have

nking

ds

f you

n page 3

go to page

Page 101

l

esponse,

tate

ate course

ctor?

at

t

?

-752-8979

---

Page 102

1    A.  I used his experience to qualify him for
2    the package.
3    Q.  What experience were you using?
4    A.  As it was outlined in the application, I
5    believe he needed one year -- let's see -- one year
6    of specialized experience.  He demonstrated knowledge
7    of the methods and procedures for providing or
8    performing a variety of functions applicable to the
9    position to be filled, so he had --
10   Q.  What was the specialized experience that
11   you were seeking?
12   A.  The specialized experience for a lead
13   support services specialist, it meant that he had
14   some kind of specialized experience in any of the
15   variety of support services, including space
16   management, property management, publishing services,
17   supply management, mail service facilities, and
18   equipment maintenance and transportation, that he
19   coordinated work space, office layouts, relocated
20   staff.
21        He worked with contractors.  He could
22   coordinate building access matters or manage fleets

Page 103

1    of vehicles, any of this.  If he had one year of
2    experience relating to this, he was deemed qualified.
3    Q.  Now, you're referencing the vacancy
4    announcement and you're looking at the job duties --
5    the duties of the position?
6    A.  Yes.
7    Q.  And that would be just so that we have the
8    correct deposition reference, that's Deposition
9    Exhibit Number 12, the brief description of the
10   duties is what you say is the specialized experience
11   required?
12   A.  Yes.
13   Q.  Okay.  Now, in terms of Mr. Edmonds, were
14   you basing in your statement that he was qualified
15   based upon his resume?
16   A.  Yes.
17   Q.  Okay.  And in terms of his resume, it says
18   the first experience he has is as an area manager for
19   The Washington Times, correct?
20   A.  Yes.
21   Q.  And he doesn't state a date.  It just says
22   present?

Page 104

1    A.  Right.
2    Q.  Okay.  So in terms of things at that time
3    of this application, you wouldn't have known how long
4    he was in this position?
5    A.  No, I wouldn't have, not at the time of
6    receipt.
7    Q.  Okay.  And it says he's -- his
8    responsibilities were to coordinate work schedules
9    for 18 employees who delivered The Washington Times
10   and other publication in a timely manner in Prince
11   George's County.  Is that what you were looking for
12   was someone who was responsible for supervising
13   individuals who delivered newspapers?
14   A.  Not necessarily, but he had previous
15   experience that did give him the qualifications at
16   the D.C. City Council.  He was a purchasing agent, he
17   said, procurement officer, vehicle maintenance
18   coordinator, etc., and his responsibilities to me
19   indicated that that gave him his one year of
20   specialized experience.
21   Q.  Well, he doesn't even have a date as to --
22   yes, he does.  He says he was employed from --

Page 105

1    A.  From '81 to '89.
2    Q.  Okay.  Now, in terms of this experience
3    with the D.C. City Council, did you seek to check to
4    determine whether or not these -- this experience he
5    had listed here was accurate information based upon
6    his resume?
7    A.  We would never do that for -- for just a
8    qualifications analysis phase.  If he was being
9    hired, our office of internal investigations would do
10   that background check.
11   Q.  So whatever somebody puts on their resume,
12   based upon the process that you were using, you
13   accepted that as fact and that they had actually done
14   whatever they put down here?
15   A.  Absolutely.
16   Q.  Okay.  And so there was no kind of check
17   to determine if these qualifications were accurate
18   representations of the person's experience?
19   A.  No.
20        MS. PIVEC:  Objection as to form.
21        BY MS. HUTCHINSON:
22   Q.  Okay.  Now, in terms of the fourth page --

27 (Pages 102 to 105)

Diane Marie Camilleri

1  review something.

2  Q.  And if you reviewed his District of

3  Columbia personnel folder, you -- did you review the

4  duties of the job that he performed at the District

5  of Columbia City Council?

6  A.  If it was in a folder, I would assume so.

7  I pick it up from somewhere, in his resume or folder

8  or whatever.

9  Q.  And in terms of the experience he had for

10  his jobs that he had on his resume that he submitted,

11  did you have any additional information, other than

12  what he had placed on his resume?

13  A.  Not to my knowledge.

14  Q.  Pardon me?

15  A.  Not to my knowledge.

16  Q.  Okay.  Ms. Camilleri, in terms of things,

17  during the time that you were employed at the Office

18  of the Chief Financial Officer, did any employees

19  file any complaints of discrimination in which you

20  were named as a discriminating official?

21  A.  While I was employed.  No.

22  Q.  Okay.  Did any individuals file complaints

1  of discrimination complaining of discriminatory

2  employment practices while you were employed as the

3  director of human resources?

4  A.  No.

5  MS. HUTCHINSON:  That's all I have.

6  MS. PIVEC:  I'd like to get just a few

7  documents marked or copied.

8  EXAMINATION BY COUNSEL FOR THE DEFENDANT

9  BY MS. PIVEC:

10  Q.  Ms. Camilleri, early on in your testimony,

11  Ms. Hutchinson showed you a package of information

12  that related to the announcement of the December '02

13  restructuring of the OCFO.

14  In that packet, there was a letter -- a

15  sample letter that would go to employees announcing

16  the restructuring effort.  Do you recall that

17  testimony?

18  A.  Yes.

19  Q.  I do not believe that Ms. Hutchinson

20  presented to you a copy of a letter directed to Mr.

21  Thomas in particular.  Do you recall whether she did

22  or she didn't?

1  A.  She did not.

2  MS. PIVEC:  I'd like to have this marked

3  as Deposition Exhibit Number 31.

4  (Exhibit Number 31 was marked for

5  identification and was attached to the deposition.)

6  BY MS. PIVEC:

7  Q.  Ms. Camilleri, do you recognize the

8  document we've currently marked as Deposition Exhibit

9  Number 31?

10  A.  Yes.

11  Q.  What is it, please?

12  A.  It's the letter that everybody received at

13  the start of restructuring.  This is Mr. Thomas's

14  specific letter.

15  Q.  Now, that is the first two pages of the

16  exhibit, I take it?

17  A.  Yes, the letter and all the attachments

18  went along with the letter.

19  Q.  Is your signature on the second page of

20  this exhibit?

21  A.  Yes.

22  Q.  Okay.  And what are the exhibits that were

1  appended to the letter in this exhibit?

2  A.  The current work chart of the Management

3  and Administration office, the office that was being

4  restructured, the application process, which was

5  Attachment B, a sample of the application transmittal

6  form and a sample page of the website, the

7  restructuring website.

8  Q.  Okay.  At the outset of the restructuring

9  process, did you have any conversations with Mr.

10  Thomas concerning his eligibility for positions other

11  than those which are contained on the chart, which is

12  attached to the letter, Exhibit Number 31?

13  A.  No.  I don't recall having a discussion

14  with Mr. Thomas at all about eligibility of anything.

15  Q.  Were there any representations made to

16  employees that if they were laid off because they

17  were not selected that they would be entitled to

18  notice with respect to positions that were created

19  after December of 2004 -- 2002?

20  A.  No.  I don't -- no.

21  Q.  During your testimony, you were shown

22  copies of two positions that were first posted on

Diane Marie Camilleri

Page 222

1  April the 3rd, 2003, the lead logistics management
2  specialist position, DS-346111, and the special
3  assistant to the director of logistics and support
4  services and MSS 346, Grade 13.
5        Were these -- where were these positions
6  posted?
7     A.  They were posted on the CFO's website,
8  which is really accessible to any person in the
9  government or any person, external or internal.  You
10  can reach it through, you know, just a regular
11  website -- your website.  They were also put in the
12  front of the human resources office and the office
13  remained open from, I believe, 8:30 to 5:00 every day
14  even to external traffic.
15     Q.  Looking back at the first page of Exhibit
16  Number 31 and referencing the third paragraph of that
17  first page, is the website identified in that
18  paragraph the same website on which these two vacancy
19  announcements were posted?
20     A.  Yes.  It's all reachable through the CFO's
21  web, which is actually reachable through the city,
22  dc.gov web.  It all links together.

Page 223

1     Q.  All right.  I'd like to turn your
2  attention to Exhibit Number 15, the performance
3  evaluation, which Mr. Powell did for Mr. Thomas.
4  Prior to -- strike that.
5        During the time that you were considering
6  candidates for the lead support services specialist
7  position, did Mr. Powell or anyone else provide you
8  with a copy of this performance evaluation?
9        MS. HUTCHINSON:  Objection -- I'll
10  withdraw it.
11        THE WITNESS:  No.
12        BY MS. PIVEC:
13     Q.  You note that at the top of the page in
14  the area stating type of service there is an X next
15  to full time at-will.  Does that designation have any
16  significance for you?
17     A.  It's the type of positions that were in
18  the CFO.  They were at-will employees.
19     Q.  And I take it that means that Mr. Powell
20  was indicating to Mr. Thomas that that was the nature
21  of the position he held?
22        MS. HUTCHINSON:  Objection.  It calls for

Page 224

1  speculation.
2        THE WITNESS:  Yes.  That's correct.
3        BY MS. PIVEC:
4     Q.  When you reviewed Mr. Thomas's personnel
5  file at the time of drafting your Exhibit Number 30,
6  did you take note of the appointment letter that was
7  contained in Mr. Thomas's personnel file?
8     A.  The appointment letter?
9     Q.  The letter notifying him of his
10  appointment to a position within the CFO's office.
11     A.  I may have.  I don't recall.
12     Q.  Do you recall whether or not that letter
13  indicated that he was being offered the position on
14  an at-will basis?
15        MS. HUTCHINSON:  Objection.  It calls for
16  speculation.  The witness has already testified she
17  doesn't recall even looking at the letter.
18        THE WITNESS:  If letters existed, I have
19  to say in any personnel folder, that's what they
20  said.
21        BY MS. PIVEC:
22     Q.  During the time that you were the human

Page 225

1  resources director for the CFO, did you send out
2  appointment letters to newly hired employees?
3     A.  Yes.
4     Q.  And in fact, there are two examples among
5  the exhibits we have today, Exhibit Number 24 and
6  Number 25, I believe.  These were all for letters
7  that were made -- I'm sorry.  One of them is 24.  I'm
8  not sure what the other one is numbered.
9        If you would take Exhibit Number 24 from
10  this pile, what was the nature of the employment that
11  was being offered to Mr. Edmonds in connection with
12  the lead services -- lead support specialist
13  position?
14     A.  At-will.
15     Q.  And did you so indicate in the letter?
16     A.  Yes.
17     Q.  If you would look at Exhibit Number 18.  I
18  believe you testified that you were not involved in
19  preparing or directing that this report be prepared?
20     A.  Correct.
21     Q.  Okay.  But you did testify that the SCD
22  date which corresponds with the date of hire --

57 (Pages 222 to 225)

Diane Marie Camilleri

Page 230

1  program and process in place, you know, which, to my
2  recollection, took like a year or something, there
3  was no use of this performance appraisal.
4      Q.  Do you have any idea why Mr. Powell would
5  wait until 3/5/03 to complete an evaluation for a
6  period ending 9/30/02?
7      A.  No.
8      Q.  Do you know whether or not Mr. Powell
9  completed this evaluation before or after he was
10  notified of his termination?
11      A.  No, I don't.
12      Q.  You indicated that -- and you have a
13  notation to the effect on your notes of your
14  interview of Mr. Thomas that when asked for his
15  comments he had questions about the selection
16  process.  Would you like to refer to your notes?
17      A.  No.  I remember.  Ms. Hutchinson said the
18  same thing.
19      Q.  Do you recall what questions he had about
20  the selection process?
21      MS. HUTCHINSON:  Objection.  Asked and
22  answered.

Page 231

1      THE WITNESS:  No.  I really don't.  I
2  don't have any specific recollection of the question.
3  I can tell you that a lot of people asked the
4  question just how long will it take for us to know.
5      BY MS. PIVEC:
6      Q.  Did Mr. Thomas raise concerns because Mr.
7  Powell had not been selected for the new director
8  position?
9      A.  No.  And quite honestly, I recollect that
10  Mr. Powell didn't apply for the job.
11      Q.  Mr. Powell did not apply for the job?
12      A.  No, so you could maybe check the promotion
13  folder, but I was remembering at lunch that I don't
14  recall that he competed to reapply for the jobs.  He
15  chose to accept severance pay and leave.  That's my
16  recollection.
17      Q.  Directing your attention to the interview
18  at which you delivered Mr. Thomas -- Mr. Thomas's
19  termination notice to him, is it your recollection
20  that someone else was present with you during that
21  interview?
22      A.  Yes.

Page 232

1      Q.  Who else was present?
2      A.  Well, my recollection was Daryl Miller,
3  but I suppose that there were a couple of occasions
4  when Daryl wasn't able to be with me, and then in
5  those cases someone else sat with me, but I never did
6  them alone.
7      Q.  When you met with Mr. Thomas on that date,
8  did he indicate to you any concern that he was not
9  selected because of his age?
10      A.  No.
11      Q.  Did he say to you that Mr. Lister had told
12  him that he was not wanted because he was of
13  retirement age?
14      A.  No.
15      Q.  Did you have any conversation with Mr.
16  Lister during the selection process in which you said
17  that he -- that Mr. Thomas was not wanted because he
18  was of retirement age?
19      A.  No.
20      Q.  Did Mr. Thomas's age play any role in your
21  determination not to offer the position of lead
22  support specialist to him?

Page 233

1      A.  No.
2      Q.  During Mr. Thomas's interview on the 12th
3  of March 2003, did he give any indication of being a
4  disabled person?
5      A.  No.
6      Q.  Did he appear to be disabled to you?
7      A.  No.
8      Q.  If you could look at Exhibit Number 22 --
9  that would be the application -- or no.  The first
10  page is a letter to Mr. Herbert Allen an external
11  candidate.
12      A.  Okay.
13      Q.  Ms. Hutchinson asked you whether or not
14  the package contained ranking factors and you
15  indicated based upon your review at that time that it
16  did not.
17      I would direct your attention -- these
18  pages are not numbered, so we're going to be dealing
19  with them the best we can -- to the first page -- no
20  -- to the application -- employment application form
21  that is in the middle of this packet.  It is not
22  marked in terms of -- the D.C. -- District of

59 (Pages 230 to 233)

Diane Marie Camilleri

Page 242

1  There was no -- you know, there was no other way to
2  fairly judge everybody at the same time in our
3  estimation in reviewing the process because, again,
4  there was no performance management program. There
5  was really very little documentation or policies in
6  the CFO's office.
7      Q.  You indicated that Dr. Gandhi wanted to
8  ensure that the best qualified person was selected
9  for the positions in the new organization. Were you
10  satisfied that Barry Edmonds was the best qualified
11  candidate based on his performance at the interview?
12     A.  Yes.
13     Q.  Why was that?
14     A.  He just had a great interview. He was
15  extremely positive. He was really upbeat. He was
16  able to really pinpoint his experience to the
17  questions we asked. It seemed pertinent, relevant,
18  and he was excited, very excited to be there. It was
19  an upbeat interview.
20     Q.  How was he dressed when he appeared for
21  interview?
22     A.  I don't think I recall.

Page 243

1      Q.  You don't recall?
2      A.  No, I don't.
3      Q.  Do you recall drawing any comparison as
4  between the way he was dressed and the way Mr. Thomas
5  was dressed on the date of his interview?
6      A.  No. Quite honestly, I wasn't thinking
7  that. At that point in time, it was really about the
8  numbers.
9      Q.  Do you recall being shown a document
10 relating to the selection of Ms. Gaddy for a position
11 within logistics -- I'm sorry -- logistics and
12 support services? I think it was one of the latter
13 documents, Number 30?
14     A.  Yes.
15     Q.  We don't have any paperwork relating to
16 her, other than this. Did you sit on the selection
17 panel --
18         MS. HUTCHINSON:  I object to the form of
19 the question.
20         BY MS. PIVEC:
21     Q.  Did you participate in the interviews
22 leading to the reselection of Ms. Gaddy for her

Page 244

1  position?
2      A.  I believe so. I don't specifically recall
3  if I was on that panel, but I remember something
4  about it, so I'm going to say yes, I probably was.
5      Q.  Do you have a recollection as to how she
6  performed at the interview?
7      A.  She did really great, from what I recall.
8  She was, again, really positive. You know, she --
9  yes.
10         I definitely was there because I remember
11 her talking about the fact that she had been around
12 for a really long time and it was probably time for
13 her to move on, but, you know, she hoped that there
14 was a place for her in the future.
15         She loved her job and she explained
16 everything that she did and all the stuff that she
17 had accomplished and I do recall -- you know, I
18 don't recall every single question or whatever, but
19 it was a positive interview.
20     Q.  Do you know how many candidates were
21 competing for the selection for which she was
22 reselected?

Page 245

1      A.  I do not remember.
2      Q.  Do you remember what ratings you assigned
3  to her with respect to her --
4          MS. HUTCHINSON:  I'm going to object to
5  this line of questioning as being totally irrelevant.
6  Ms. Gaddy didn't apply for the position at issue. Go
7  ahead.
8          THE WITNESS:  I don't recall.
9          BY MS. PIVEC:
10     Q.  Well, Ms. Gaddy applied for a position in
11 the reorganized logistics and support services
12 department, did she not?
13     A.  She did.
14     Q.  And she was interviewed for one of those
15 positions and she was offered the job, correct?
16     A.  Yes.
17     Q.  Do you know what her age was at the time
18 that she was reselected?
19     A.  I did not, not until later after I was
20 asked to do an analysis.
21     Q.  Do you know the age of the internal
22 candidate by the name of McClure who applied for the

62 (Pages 242 to 245)

Diane Marie Camilleri

Page 246

1  lead support services position?
2      A.  No.  He's not -- no.  I don't know.
3      Q.  And you were pointing to a document --
4      A.  Yes.  This is that document that I
5  apparently prepared.
6      Q.  And what number was that?
7      A.  That was 9, Exhibit 9.
8      Q.  Would that indicate to you that he was
9  under age 50 at the time that he applied for the
10  position?
11      A.  No.  These are restructuring selections.
12  I don't think Harold McClure was reselected.
13      Q.  I see.  Do you know how old he was at the
14  time that he applied?
15      A.  I do not.
16      Q.  If you could look at Exhibit Number 18 and
17  if you look at page 3 of that exhibit, it has the
18  D00136 on the side.
19      A.  Yes.
20      Q.  Can you find Mr. McClure's name on that
21  page?
22      A.  Oh, yes.  Yes.

Page 247

1      Q.  And what is his date of birth, according
2  to this document?
3      A.  3/7/60.
4      Q.  And Ms. Gaddy's date of birth?
5      A.  10/6/41.
6      Q.  Over the course of your career with the
7  Internal Revenue Service, how many reorganizations
8  have you been responsible for planning?
9      A.  I would guess -- I have no -- maybe --
10      Q.  Was it more than ten?
11      A.  Oh, yes.  I was going to say between 25
12  and 50.  I've been there 34 years.
13      Q.  Did you bring the experience of those past
14  reorganizations to bear in the reorganization you
15  planned for the OCFO in December of '02?
16      A.  Yes.  Can I expand?
17      Q.  Yes, please.
18      A.  Not only just that experience, but also my
19  experience within human resources and my training in
20  a position -- sound position management, span of
21  control, you know, using the right span of control
22  and just being trained in the personnel functioning

Page 248

1  and actually supervising it for many years.
2      Q.  In your opinion, based upon your
3  participation in the process, was the process you
4  designed, followed, and executed the reorganization?
5      A.  In executing the reorganization?
6      Q.  Yes.
7      A.  Other than the charge of discrimination
8  filed by Mr. Thomas, were there any other charges
9  filed that were to this reorganization?
10      A.  No.
11      MS. PIVEC:  I think that probably does it.
12  That does it.
13      EXAMINATION BY COUNSEL FOR PLAINTIFF
14      BY MS. HUTCHINSON:
15      Q.  Ms. Camilleri, at the outset of this, you
16  said you had had your deposition taken in another
17  proceeding.  What type of proceeding was that?
18      A.  It was long ago when I worked in human
19  resources.  I was involved in -- I don't know if it
20  was -- I don't remember if it was an MSPB case or --
21  I don't recall.  It's been a long time.
22      Q.  Was there any discrimination claims

Page 249

1  alleged in that case?
2      A.  No.  It wasn't -- I wasn't really
3  involved, just as an HR official.
4      Q.  Okay.  Had you ever had a discrimination
5  claim filed in which you were alleged as a
6  discriminating official or part of the organization
7  which was allegedly discriminated during the time you
8  have been with the Internal Revenue Service?
9      A.  No.
10      Q.  Now, in terms of things, you testified
11  about the performance evaluation that is Deposition
12  Exhibit Number 15.  And in terms of this evaluation,
13  Mr. Powell was not under your supervision at that
14  time, was he?
15      A.  Well, as of 3/5/03 -- I don't know how to
16  answer that question.
17      Q.  In accordance with the reorganization,
18  individuals maintained their positions?
19      A.  Yes, but I don't know if his jobs were
20  really considered abolished -- I'm going to say no,
21  he wasn't.  I had no involvement with --
22      Q.  The General Services Unit was a separate

63 (Pages 246 to 249)

Diane Marie Camilleri

Page 250

1 unit?
2    A.   Exactly.
3    Q.   They were in Office of Tax and Revenue and
4 their management structure ran through the lines of
5 the Office of Tax and Revenue, correct?
6    A.   Correct.
7    Q.   Now, in terms of -- I think it's the --
8 this is Deposition Exhibit Number -- the organization
9 of the -- the reorganization or restructuring was for
10 the Office of Government Business and Human Capital.
11 That's what was the focus of this reorganization,
12 correct?
13    A.   That and the support services function in
14 Tax and Revenue, yes.
15    Q.   And in terms of things, though, when you
16 came aboard -- and if you want to take a look at your
17 letter to -- I guess it was Dr. Gandhi of December
18 5th, your letter of December 5th -- let me find it.
19    A.   It's right here.
20    Q.   Your letter -- or memorandum and it's
21 dated December -- what is that date -- December 10th,
22 you were talking about restructuring of the OGBHC,

Page 251

1 right?
2    A.   Um-hum.
3    Q.   And in terms of this restructuring, you
4 said Dr. Gandhi had complaints about Mission Support.
5 Was he talking about the operation support office in
6 OGBHC?
7    A.   He was talking about OGBHC because the
8 name of that office prior to OGBHC was mission
9 support and he never got out of the habit of calling
10 it mission support.
11    Q.   So in all of these complaints he's talking
12 about, he's talking about what was going on over in
13 this organization, correct?
14    A.   In this organization, yes.
15    Q.   So that the people over in the General
16 Services Unit weren't in this organization at that
17 time, were they?
18    A.   No, they were not.
19    Q.   Okay.  Now, you testified that you had had
20 extensive experience in restructuring and
21 reorganizing with the Internal Revenue Service?
22    A.   Yes.

Page 252

1    Q.   And in terms of this restructuring that
2 you devised here vis-a-vis the Office of the Chief
3 Financial Officer, am I correct that during this
4 process -- well, let me withdraw it and rephrase it.
5        During the time from December 10th through
6 March 28th, 2003 you conducted no assessment
7 concerning the impact of this restructuring on
8 minorities or individuals who may or may not have
9 disabilities?
10    A.   I did not.
11    Q.   Okay.  And in terms of this same period of
12 time, December 10th, 2002 to March 28th, 2003, did
13 you make any requests to have a review done to
14 determine if there were any individuals who had any
15 kind of disabilities in terms of the individuals who
16 were affected by the restructuring?
17    A.   I did not specifically.
18    Q.   And so when you testified that you don't
19 know and didn't know that Mr. Thomas had some type of
20 disability, that was just something that you didn't
21 know because of your own personal knowledge, but you
22 had not done any research to determine if he had any

Page 253

1 disabilities that anyone was aware of?
2    A.   No.  I didn't go searching for that
3 information, no.
4    Q.   And you testified that you didn't observe
5 anything during his interview.  Did you look at Mr.
6 Thomas and make eye contact with him during the
7 interview?
8    A.   Yes.
9    Q.   And did you not observe that he had any
10 type of different structure to his eyes or vision?
11    A.   I don't recall that, no.
12    Q.   And if you look at Mr. Thomas today --
13        MS. PIVEC:  Objection.
14        BY MS. HUTCHINSON:
15    Q.   -- do you observe that there's any
16 distinction between one eye and another?
17    A.   Let me put my glasses on.
18    Q.   Can you observe whether there's any
19 distinction between one eye or the other?
20    A.   Not necessarily.  One is closed a little
21 bit more than the other.
22    Q.   But you didn't observe that during the

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376        MD 1-800-539-6398        VA 1-800-752-8979

Diane Marie Camilleri

Page 254

1  time of the interview?
2      A.  No, I didn't.
3          MS. HUTCHINSON:  That's all I have.  Thank
4  you.
5          MS. PIVEC:  I have no further questions.
6  Diane, since this is new to you or at least it's been
7  awhile, the reporter is taking down everything that
8  we said today.
9          And as the witness, you have a right to
10  review the testimony to determine whether it's been
11  accurately recorded.  And if you don't avail yourself
12  of that opportunity, then it will become part of the
13  record without your having done so.
14          THE WITNESS:  How will I know about this?
15          MS. PIVEC:  The reporter will contact you
16  and contact me and Ms. Hutchinson regarding
17  availability of the transcript.  She'll make it
18  available to all of us and to you, and you will have
19  30 days from that date in order to complete an errata
20  sheet that is at the back of the deposition.
21          Do you want to do that?
22          THE WITNESS:  Yes.

Page 255

1          THE REPORTER:  Would you like a copy?
2          MS. PIVEC:  Yes.
3          (Signature having not been waived, the
4  deposition of Diane Marie Camilleri was concluded at
5  4:05 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 256

1          ACKNOWLEDGMENT OF DEPONENT
2
3          I, Diane Marie Camilleri, do hereby
4  acknowledge I have read and examined the foregoing
5  pages of testimony, and the same is a true, correct
6  and complete transcription of the testimony given by
7  me, and any changes or corrections, if any, appear in
8  the attached errata sheet signed by me.
9
10  _____   _____
11  Date              Diane Marie Camilleri
12
13
14
15
16
17
18
19
20
21
22

Page 257

1          CERTIFICATE OF REPORTER-NOTARY PUBLIC
2          I, Sherry L. Brooks, Court Reporter and
3  Notary Public, the officer before whom the foregoing
4  deposition was taken, do hereby certify that the
5  witness named herein was duly sworn by me; that the
6  foregoing transcript is a true and correct and
7  complete record of the testimony given; that said
8  testimony was taken by me stenographically and
9  thereafter reduced to typewriting by me and/or under
10  my direction; and that I am neither counsel for,
11  related to, nor employed by any of the parties to
12  this litigation and have no interest, financial or
13  otherwise, in its outcome.
14          IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my notarial seal.
16
17  My commission expires:  October 14, 2010
18
19  _____
20  NOTARY PUBLIC IN AND FOR
21  THE DISTRICT OF COLUMBIA
22

65 (Pages 254 to 257)