**BARBARA L. BRYANT**
1530 26th Street, Northwest
Washington D.C. 20007
202-316-5521

## SKILLS PROFILE

Significant experience in administration and operations management and associated supervisory, managerial and administrative roles. Articulate planner and manager who takes ownership and responsibility. Highly skilled at anticipating, being positive, solution-driven and hands-on, when required. Strong facilities management, maintenance, construction, space planning, vendor and purchasing background. Human resources, training and team building. Adept at coordination with departments, multiple facilities and organizations. Has extensive knowledge of meetings, special events, generally accepted business, management, facilities, financial, accounting, research and analytical principles, techniques, methods and procedures.

Excellent experience in development and implementation of program design and budgetary plans. Works well with culturally diverse staff. Project, priority and deadline-oriented. Seasoned professional who may also provide direct right-arm assistance to a senior level executive in both social and business arenas. Relates successfully with clients. Experienced in meeting and conference management, promotions, exhibits and presentations. Proficient in Microsoft Office, Outlook, Works, Word, Excel, PeopleSoft HRIS, Payroll and Requisition modules, VAX/VMS, Internet recruiting and research.    Clearance:    Departments of Treasury, Defense and Commerce.

## CURRENT POSITION

04/2001-Present    Administrative Officer
District of Columbia Government
Office of Citizen Complaint Review
Washington DC
Reference: Karey Hall    202-727-7085

Provides leadership, direct supervision and expert technical advice to the Executive Director and Deputy Director within the agency on facilities management, space planning, human resources, finance, program management, administrative planning, support services, policies and operations. Collaborates with Deputy and Executive Directors on the formulation of policy, plans, programs, and management of operations. Broad responsibility for determination of resources, analysis, evaluation and reporting.

Serves as a Special Assistant to the Agency Executive Director on facility, space, financial and budgetary matters and performs a variety of special assignments while maintaining a high degree of confidentiality. Plans, oversees, coordinates, supervises and monitors the Agency maintenance, equipment and supply management programs.    Oversees the Agency financial staff involving professional, technical, administrative and clerical work.    Oversees, supervises and monitors the Agency's annual budget preparation. Assigns and reviews work of a financial nature. Provides training, advice and guidance on problem or precedent situations.    Performs performance evaluations.    Recruits, interviews, and recommends individuals to fill vacancies. Approves leave requests. Recommends, initiates and oversees appropriate actions to effect personnel changes. Resolves complaints and grievances.    Serves as project manager for intense, mission-critical services, installations, and upgrades.    Serves as project manager for recruitment projects throughout the Agency and oversees agency activities with relevant external entities. Serves as troubleshooter on facility, budgetary and financial matters for the Executive Director.

## MAJOR DUTIES

**As Agency's Facilities Manager:** Ensures a secure, and functional work environment for the Agency, the public, and its staff, by providing the day-to-day management, oversight, and supervision of the agency's physical facilities, maintenance, and operational condition. Oversees, supervises and manages the maintenance schedules and coordinates the rectification of known deficiencies of the agency's non-government building, property, and its management; including, but not limited to; common access, safety, security, code and lease compliance, public areas, utilities, maintenance and functional operation of the agency's leased space. Oversees the maintenance of the agency's assets, inventory and property disposal. Represents agency to Office of Property Management, tenant alliance, contractors, vendors, and off-site building management company. Provides direction and supervision over performance of vendors involved with agency facilities and functions. Advises and recommends, to Deputy and Executive Directors, facilities improvements, interruptions, and service upgrades. Schedules and coordinates agency and facility activities with relevant external entities. Heads Agency Fleet Management, Recycle Program, Emergency Preparedness and Disaster Recovery Program. Manages keyless entry program.

**As Agency's certified Contracting Officer Technical Representative (COTR):** Prepares bid packages, secures estimates and negotiates agency printing and publishing services. Oversees, analyzes and supervises the preparation of reports and work of the Staff Assistant in purchase card and procurement, supply management, purchases, expenditures, contracts and procurement activities of the agency. Manages the monitoring and review of prime contracts. Assures contractors performance, within the terms and conditions, are being met. Updates the D.C. Government's Chief Contracting Officer (CCO) on the status of contracts, procurement and performance.

**As Agency's Meetings, Conference and Events Planner:** Plans, organizes, and coordinates onsite and offsite meetings and venues, including setup of furniture, equipment and facilities for agency functions. Coordinates protocol, set-up, and receives agency visitors, domestic, and international dignitaries. Plans, negotiates contracts, and manages agency's annual retreats which include, logistics, transportation, accommodations, facilities setup, food and beverage, speaker, program, consultant, team building. Developed pending proposal and presentation to Board of Directors of agency's national professional society, National Association for Civilian Oversight of Law Enforcement (NACOLE), to host 2004 Annual Conference in Washington, D.C.

**As Agency's IT and Telecommunications Manager:** Monitors network and telecommunications performance and identifies bottlenecks. Determines resources, writes reports and make recommendations to Deputy and Executive Directors on automated technology, to improve service deliveries. Proposes alternative service delivery methodologies, as appropriate. Oversees, supervises and manages the work and schedules of IT Contractors, and OCTO. Oversees the management and acquisition of the agency's service support, hardware, software, periphery, storage capacity, telecommunications and support services. Remains abreast of agency's technology, management, network needs configuration, and capacity planning. Manages the contractor's performance on diagnostics and resolutions to complex data management problems and issues. Consults with contractors regarding the design of user-friendly, useful formats. Requests and analyzes proposals for modified services. Develops instructions and performs agency staff orientations on the approved and official usage of IT and telecommunications. Prepares cost/resource requirements, impact analysis for all development and maintenance requests by determining volume, staff time, computer costs and makes recommendations on the effective method to the Deputy and Executive Directors. Represents Agency IT and Telecommunications interests to OCTO and other entities external to agency. Manages ADP security system.

**As Agency's Budget Manager:** Assignments involve financial and budgetary matters affecting the operations and practices of the agency. Independently, studies, reviews and edits reports originating either outside or within the agency, which affect its operation and for purposes of summarizing and analyzing the subject matter of the report for the information of the Deputy Director and Executive Director. Continuously, oversees, researches, analyzes and reports on matters concerning payroll, budget, purchases, expenditures, contracts and procurement activities of the agency. Prepares comments and recommendations representing agency and unit views for approval of the Executive Director. Ensures 100% compliance with FRP's and executive summary reports. Certifies and monitors all fund types for budget implementation, inclusive of all personnel actions, MOUs and contracts. Collaborates with Deputy and Executive Director on the development and oversees the preparation of the agency's annual budget and various budgetary analysis requests from OFRM, OCFO, OB and Deputy Mayor. Monitors reprogramming modifications for approval by the Executive Director. Monitors the agency's budget spending plan. Ensures that the budget is implemented in accordance with District, and financial guidelines.

**As Agency's Human Resource Manager:** Responsible for the design, implementation and management of the Human Resource Information System (HRIS) which consists of analyzing, developing, managing, implementing and evaluating a variety of human resource management services. Provides analysis of current and projected agency workforce trends to Executive Director. Prepares reports on personnel status for the Deputy Director and Executive Director. Recommends personnel and human resource responses and actions to the Executive Director. Implements and coordinates recruitment strategy to fill agency vacancies. Collaborates with Deputy and Executive Directors on the development of standard operating procedures for all aspects of agency's personnel and human resources operation. Coordinates and reviews all performance evaluations and incentive award requests for adherence to and conformance with District government rules and regulations. Represents agency as HR Advisor, attends HR Advisors Meetings, and performs work assigned on behalf of agency. Oversees the agency's Administration Unit, internships and Capital City Fellows recruitment programs. Oversees and arranges training opportunities. Manages the issuance of ID badges, key control, and facilities access by personnel. Collaborates with Deputy and Executive Directors on agency's organizational plans. Researches and recommends to Deputy and Executive Directors activities that assure the diversity and expansion of employment opportunities within the agency.

**As Agency's Executive/Administrative Officer:** Advises the Deputy and Executive Directors on aspects of operations of the agency. Determines resources, writes reports and makes recommendations to Deputy and Executive Directors concerning customer service and administration deliverables, and proposes alternative service delivery methodologies, as appropriate. Establishes and implements agency and units operating systems, policies and procedures that achieve the directives and strategies set by the Executive Director. Directs and coordinates approved programs, projects, and major activities of the staff, as assigned. Prepares routine and special reports recommending and justifying new approaches, methods, modifications and procedures compatible with agency needs and standards for the Deputy and Executive Directors. Provides supervision and direction over Administrative Services. Responsible for planning, assignment, and review of work and special projects. Evaluates the performance of subordinates and conducts staff meetings. Prepares qualified agency personnel for supervision and administration of projects from "cradle to grave". Serves as representative and liaison officer by attending meetings and conferences held between offices within the cluster or by other District agencies. Presents views and attitudes of the OCCR on operations, policy, and administrative procedures.

**EXPERIENCE:**

11/2000-4/2001        Special Assistant to e-Business Systems Manager/Chief Information Officer
(Contractor)          United States Mint Headquarters
                      Washington DC
                      Reference: Sarah Jones, Asst. Deputy Director (acting)    202-354-7555
Provided implementation, coordination and facilities management of executive level administration offices, multiple location sites, supplies, publication and printing services, asset management, inventory, workspace assignments, operations, programs, and policies as delegated by the Manager of the U.S. Mint Headquarters. Provided seamless meetings (25-40/wk) and conference management (6-8/yr) in the functioning of the offices of the directors, and contractors. Responsible for logistics, transportation, facilities set up, furniture, equipment, meeting space, travel, exhibits, promotions, presentations and meeting planning. Tasks include air and lodging; negotiations and reservations; travel, expense budgeting and reimbursement processing, Confidential, executive level communications, planning, and correspondence. Meeting management and scheduling responsibilities include site selection, authorization and procurement negotiation, surface transportation and fleet management coordination, facilities workspace, equipment set-ups, materials distribution and on-site management. Independent decision making on behalf of senior management involving multiple facilities relocations, resources, transportation, contracts, procurement, budgets, schedules and complexities of meetings, conferences and special events.

1/2000-11/2000        Administrative Manager, Meetings and Events
(Temporary            American Dental Education Association
Contract)             Washington DC
                      Reference: Deborah Martinez    202-667-9433
Managed concurrent operations as back up to the Deputy Executive Director. Administered budget supervision, space assignment and planning including facilities usage and moves. Arranged legislative and public policy activities, meetings and exhibits, including impromptu dinners, receptions, and ceremonies; the planning and management of a government and institutional relations workshop; a legislative conference for DDS', PhD's, and Dental Educators; The Prague International Deans Conference Reception and the 2000 Leadership Institute, Ceremony, Reception and Dinner. Secured sponsorships and obtained future commitments. Negotiated contracts, prepared and distributed promotional materials, invitations, targeted lists, programs and course materials. Managed reservations, food and beverage, transportation, moves and logistics. Prepared and adhered to budgets, scheduling, contracts. Processed expenses. Coordinated catering, decorations, event sites and facilities. Provided HR, supervised staff, room block and was liaison to President and VIPS, both domestic and international. Provided post-event follow-up and evaluation analysis with management. Performed web-based research. Authored event articles for the Association's publications. All activities and special events were performed under-budget and executed in a timely, professional manner. Traveled extensively.

11/98 - 11/99         Manager, Administration
(One Year             U.S. Department of Commerce - Bureau of the Census
Contract)             Washington D.C.
                      Reference: Cydney Alexander, Sr. Manager, Administration 609-968-4993
Temporary, Schedule A, (One Year) Excepted Service Position. Research, establishment, set-up, management and closure of 5 mid-Atlantic region offices, incorporating a total applicant/employee load of 4800+. Managed group projects as the Project Manager in the time and labor area. Administered all aspects of meetings, exhibits and conference management including staffing, set up, equipment, supervision and contract negotiations. Planned, developed managed facilities maintenance, inventory, supplies, property disposal, operations, administrative and human resources activities including recruitment, applicant processing, hire, ID Badging, access and key administration, training, personnel, payroll, supply, material requisitioning, and financial expenditures. Hired and functionally trained all staff, including data capture and payroll personnel, in Oracle-based program, PeopleSoft PeopleTools HRIS and Payroll modules.

11/93 - 11/98    Field Staff Manager, QA and QC
Bonner and Associates, Inc.  Public Policy Lobbyists
Washington D.C.
Reference: Carole Gaston, Vice President    202-463-8880

Field Staff, Quality Control and Assurance Administration for grass roots/lobbyist firm for clients such as Blue-Cross Blue Shield, MGIC, Electric Utility Shareholders Alliance, and National Hemophiliac Society. Supervised field staffs and trained on proprietary computer programs. Trained and Managed field staff in meeting QA and QC client objectives. Performed research, prepared QA and QC reports and daily summaries for clients on projects. Coordinated Kastle Kard keyless Entry System.

4/88 - 10/93    Executive Director, and CEO
Private Practice Association
Washington D.C.
Reference: Ernest A. Burch, President    410-828-8384

Executive Officer of national association of healthcare professionals who own or manage small businesses; i.e., independent practices. Created national headquarters office, managed headquarters facility, inventory, safety and security, and publication services. Hired and trained staff and management on customized computer programs. Established strategic plan and budget setting process. Implemented policies and achieved goals set by Board. Created public policy program and recognition of industry by Congress and consumer. Developed and marketed trade publication. newsletter, legislative bulletin, program planning, membership and sponsorship development and continuing education. Meeting planner for annual conference and 320 off-site meetings, including special events. Liaison with and coordinator for International study missions, affiliations and endeavors. Designed and maintained computerized profit and loss statement for programs and projects. Promoted mission and made presentations both domestically and internationally. Consistently met or exceeded quotas and goals set by Trustees. Traveled extensively.

7/85 - 4/88    Director
American Road and Transportation Builders Association
Washington D.C.
Reference: William Toughey, Vice President    202-289-4434

Director of Membership and Federation Development. Supervised department staff. Trained volunteers. Planned and hosted exhibits, activities, events, association meetings, exhibits, conferences. Provided management, marketing and creative services to seven division and 5000 members. Created computerized reporting on effectiveness of representation at industry and association events. Promoted and presented issues, regulatory information to industry and congress. Traveled extensively.

11/82 - 6/85    Vice President Business and Operations
E.G. Snyder Construction Company, Inc.
Rochester, New York

Established Marketing and Business Development resulting in the establishment of five branch offices and 325    employees. Hired and supervised staff of branch offices and headquarters development department.    Created market opportunities and corporate training programs. Represented firm to clients, industry and associations. Traveled extensively.

1/80 - 11/82    Director, Business Development
Phoenix Mechanical and Electrical Contractors, Inc.
Grand Rapids, Michigan
Reference: Robert Bodine, President    616-763-5400

Marketing and Business Development resulting in the establishment of seven branch offices and 1250 employees. Supervised support staff and vendor negotiations. Computerized the reporting of branch offices and departments to headquarters. Construction management opportunities and value engineering. Traveled extensively.

1/75 - 1/80    Administrator, Estimating Department, Branch Offices, and Subsidiary Events
Grunau Construction Company, Inc.
Milwaukee, Wisconsin
Reference: Gary Grunau, President    414-769-8900

Industrial and Power Construction firm.  Supervision of estimating departments, post-bid and pre-contractual negotiations.  Supplier and vendor negotiations. Value engineering. Planned corporate events. Site/housing logistics. Industry representation.

# PERSONAL HISTORY

## EDUCATION:

| Glendale College Michigan | Los Angeles State College | Rutgers University | University of |
|---|---|---|---|
| Glendale, CA Business and Music | Los Angeles, CA Business and Music | Middlesex, NJ Strategic Planning | Ann Arbor, MI Humanities-1997 |

## TRAINING:
Contracting Officer Technical Representative Training Program. 2003.
Society of Human Resource Management Certificate Program. 2002
Managing Multiple Priorities. 2002
Preventing Workplace Harassment. 2002
Seven Steps to Investigate Allegations of Employee Misconduct. 2002
Creating a Team-Oriented Environment. 1999.
Diversity in the Workplace. 1999.
Hiring and Training Welfare-to-Work Mothers. 1998.
Finance and Accounting for Non-Financial Executives. 1992.
Managing Multiple and Changing Priorities, 1998.
Strategic Planning and Budget Adherence, 1997.
Budgeting for an Uncertain Economy, 1991.
Developing Leaders of the Not-For-Profit Board, 1990.
Effective Leadership of the Executive Director, 1991.
Managing Resistance To Change, 1992.
Managing Diversity in the Not-For-Profit Organization. 1991.
Successful Government Retreats. 1999.
Contract Negotiation for Meeting Professionals, 1999.
Planning and Placement of Government Meetings. 1998
Legal Aspects of Planning Professional Meetings. 1998.
Cost Accounting for Meeting Professionals, 1999.
Human Resources and Conflict Resolution in the Workplace, 1996.
PeopleSoft HRIS and Payroll Modules, 1998
PeopleSoft HRIS, 7.5 Module, 2000.
PeopleSoft Requisitions 7.5 Module, 2001
How to Hire, Train and Retain Personnel. 1997.
Creating a Team-Oriented Environment, 1997.
Performance Appraisal and Salary Review, 1998.

## APPOINTMENTS AND AWARDS:
Certified Meeting Planner.
Registered Meeting Professional.
Construction Woman of the Year - State of WI.
Distinguished Civilian Award, U.S. Navy, First Female Recipient, 1979.
Governor's Council on Tourism, State of New York, 1994
Horatio Alger Award, National Candidates Finalist, 1981.
Construction Woman of the Year, State of Wisconsin, 1980.
Integreat Award, Milwaukee Public Schools, 1980.
Steering Committee: Women and Minorities in Non-Traditional Careers. Governor, State of WI

## MEMBERSHIPS:
Society of Government Meeting Professionals
Capital Speakers Club
Foundation for International Meetings
Choral Arts Society - Benefit Committee
Friends of Rose Park

**\*Ranking Factor #1**: Thorough knowledge of the concept practices, regulations, policies, and precedents associated with real estate management programs.

As the daughter and granddaughter of construction and real estate managers, I believe I have an instinct for facilities, their proper maintenance, refurbishment and management.

Throughout my early career years, I was involved in areas of significant authority with nationally prominent construction and real estate development/management firms. Due to my expertise, dedication and hard work, frequently involving, evenings and weekends, I was awarded: Construction Woman of the Year, for the State of Wisconsin.

For many years, I held professional, volunteer positions, and was a member of committees, in the following organizations:
Member - Forum Committee on Construction Industry. American Bar Association.
Executive Committee - Construction and Building Owners and Executives.
National Committee Chairperson - Associated General Contractors of America.
National Committee Chairwoman - National Association of Women in Construction
Member - Construction Industry Advisory Board - Office of the Governor, State of Wisconsin.
Corporate Representative - Collective Bargaining Committee, Rochester, New York.
Corporate Representative - Mechanical Contractors Association.
Engineering Society of Baltimore
Construction Financial Management Association.

Later, I was recognized by my peers as one of only two women, within the national construction industry, qualified to hold a position as a national director of a construction industry association, based in Washington, D.C., and was awarded this position in 1985.

On my way up the ladder of career success, I've taken many construction and building management courses, spent numerous years as a field office coordinator, chief expeditor, purchasing agent, OSHA representative, administer of estimating and bid process, as well as project coordinator and later project manager. I have relocated numerous offices, facilities, and staff. I am familiar with permits, certificates of insurance, building codes, fire and safety regulations, architectural restrictions, code inspections and compliance.

I read blue prints, understand change orders, scopes of work (SOW), contractor performance, and comprehend scheduling sequences and techniques. I work within the chain of command of architects, engineers, owners representatives, project managers, and government agency inspectors and officials. When called upon, I moderate meetings, as well as exercise leadership and authority, as authorized.

My knowledge of maintenance requirements of Plumbing, Heating, Ventilation and Air Conditioning (HVAC), Electrical, and general building life cycles; and coordination of associated activities, would be of benefit to the multiple facility sites of the Office of Management and Administration, Office of Financial and Resource Management, District of Columbia Government.

**Ranking Factor #2:** Knowledge of the principles, practices, regulations, policies, and techniques associated with other support services functions (e.g., property management, safety, security, mailroom operations, etc.).

Among my priorities, as Assistant Manager of Administration, were non-exempt personnel and payroll for six Local Offices of the Department of Commerce, prior to their rollout. I was solely responsible for all Monday through Sunday Daily Time Sheets being received from the field (with signatures of employee and field supervisor) audited/corrected for accuracy, and data-captured into the PeopleSoft Payroll Module. The culmination of this activity was the weekly event for me to personally validate the accuracy; initial and send each Tuesday morning, electronically, the PeopleSoft Pay Period Report. This tight deadline, was mandated by the Regional Office and the National Finance Center to accommodate the same scenario in all 42 local offices in our region.

The difficulty was receipt of Daily Time Sheets from field employees who were authorized to work Friday, Saturday and/or Sunday. As many employees were in rural areas, the DOC contractual arrangement with Federal Express satisfied timely receipt of only Monday through Thursday submissions. It was imperative to have a full payroll, no partial payroll, for every employee who worked each pay period: and, a minimum of one day for auditing and accurate data-capture by administrative personnel into PeopleSoft Payroll Module to meet the weekly pay period deadline.

Insofar as our office had two fax machines, I queried the libraries, community centers and churches where we had previously scheduled trainings or had knowledge of their being forthcoming. Where access was unavailable on a Saturday or Sunday evening, I contacted grocery and convenience stores. In almost every case, the owners or managers would permit the faxing of the Friday, Saturday and/or Sunday Daily Time Sheets. (In many instances, free of charge.) I submitted the concept and sought approval from my superiors at the Regional Office to use faxed copies of each Daily Time Sheet. My Regional Office obtained a determination that a faxed, fully executed and signed document would be considered an official time sheet for auditing, and keying into PeopleSoft.

The alternatives I considered: Initially, two or three field supervisors who drove a 200-mile radius to pick-up the daily time sheets. However, additional field staff was added which deemed this solution unworkable and impractical due to weather, and unreliability of all personnel, which caused its cancellation.

Consideration was given to having the PeopleSoft Payroll personnel work overtime on Monday evenings. This was not approved by the Regional Office.

Everyone involved in the auditing and keying (we referred to ourselves as "The PeopleSoft Family") was requested, during our "Family Meetings", to contribute ideas for a solution to this dilemma that impacted all. Several good suggestions came from "The Family": such as, having the PeopleSoft Payroll personnel work a split shift: i.e., one-half (of "The Family") work every other weekend, with two days off mid-week. (This was ideal for the working parents as it would save on childcare, as well.) I pursued this concept and found that the building that housed our office had automatic utility setbacks on weekends (no HVAC) nor adequate security for access.

The people affected by my decision: Non-exempt Field Employees. Field Supervisors. PeopleSoft Payroll personnel. Administrative auditing personnel. My superiors, local, and regional.

The outcome of my decision: Our Local Office had all, exempt employees, rural and local, fully compensated for their work performed during each weekly pay period: and, in so doing, it enhanced the already strong, esprit de corps among "the PeopleSoft Family".

(Although our Local Office had the highest number of non-exempt personnel in the entire region, we were the first office to accurately submit to the Regional Office each Tuesday (sans two) the PeopleSoft Payroll Report.

**Ranking Factor #3:** Comprehensive knowledge of management principles, and project management processes.

Upon taking the position as Executive Director and CEO of a national trade association, I was fairly certain of the challenge before me. The membership consisted of 3600. It had a budget of $720k, assets of $40k, no reserves, two years of uncollected income and $239k in liabilities with a fund balance of $35k. However, I soon learned that the financial situation was far graver than described in the interim financial report or articulated by the president and executive committee.

In being on the job less than a week, I found there were $249K in Accounts Payables, it had spent the annual dues revenue collected from the bulk of the membership on a Madison Ave public relations firm as well as a prestigious law firm to lobby Congress. The Association was down to its last 10K letterhead and envelopes, hadn't paid the office rent for the month, had less that $40K in the bank, and hadn't funds for payroll nor quarterly payroll taxes, all due within thirty days.

Further, each board member had an American Express Card, flew mostly first class, with no advance planning, nor airline sponsorship, in place. Each board member booked his/her own accommodations and rarely asked for lower rates. This resulted in a consolidated monthly statement in the mid to high five figures.

A Board of Directors meeting was scheduled. I reported my findings, outlined my short-term goal and long-term plan and asked for commitment to saving the association from bankruptcy. It was unanimous. I asked for each Board member's American Express Card. The Treasurer and I furnished them with expense reimbursement forms and stated that all reimbursable air and hotel accommodations would be booked through the headquarters office, personally by me.

Within the same month, I called an evening meeting of all the vendors, suppliers with aged Accounts Payables and particularly those who threatened liens and suit. This included entities such as publishers, public relations firms, Marriott, Hyatt, computer services, and building management. I promised each that arrears would be paid in full, sans late fees and interest, within eighteen months. In return, I asked them to continue to support us to assure meeting our commitment.

People who were directly involved: Executive Committee, Board of Directors, Staff, Vendors and Suppliers. Purposely Not Involved: Bankers, Attorneys.

The Outcome: Although I won no popularity contest with several on the Board of Directors, we had met our commitment, broke-even and were debt-free within eleven months.

In fifteen months, I increased the membership to 4600. Within two years, developed the annual conference and exposition into the number-one revenue-generating activity netting a 42% return. At the conclusion of my five year contract, the association had 10,000 members, a $1.5MM budget, $860k in reserves, and no indebtness.

<u>Ranking Element #4:</u> Strong interpersonal skills and knowledge of written and oral communication techniques and methods in order to develop/persuade/negotiate a wide range of technical and implementation issues, and to solicit or provide information in a highly effective and articulate manner.

As Assistant Manager for Administration, Department of Commerce, I was told that Congress mandated a goal of 12% of our workforce be Welfare-To-Work Mothers. Special consideration regarding skills, aptitude and experience would be granted beyond that of other applicants and recruits.

As their Manager, I was in charge of recruiting, testing, training and placement of these young woman between the ages of 19-26; most with two or more "fatherless" children. Several new hires determined that they wished to work in the field while others wanted an "inside" job.

None of these young woman had ever been in an office environment previous to this assignment. Some were quite hardened, belligerent and at times, mean-spirited. They openly expressed their displeasure at being forced to "be here" in order to pick-up their (welfare) checks. They were beginning to come to the realization that although they have been in an environment where for two and three generations nothing was ever expected in return for a government check that they were now being the generation forced into a work mindset, totally resentful, it sneaking up and happening to them.

With so much low self-esteem, many different attitudes, appearance and actions were utilized. I determined this must be a way of attracting attention; but not necessarily fulfilling expectations. The people involved: The Welfare-to-Work Mothers and myself.

The specific actions taken: Besides describing the opportunities of learning data-capture, a cutting-edge information technology skill, such as PeopleSoft HRIS and Payroll Modules, as well as training those who were receptive and interested, I would hold, from time to time, a 10 minute business etiquette/ professionalism, (and somewhat self-deprecating) session.

For those who found no interest in learning from me, and would rather spin in their chairs all day, I found that several weeks into regime being assigned adjacent workspace to the producers provided an atmosphere of passive learning and instruction which culminated in a "break-through" and skills development of three very hardened young woman I encouraged and complimented on positive appearance and behavior. I exercised a great deal of positive reinforcement, and refused to acknowledge any bad behavior nor tolerate disrespect.

The outcome: Several became quite proud in their accomplishments in data-capture. Their speed and dexterity allowed for them to quickly master the computer keyboard. Two became so cooperative and efficient I appointed them as PeopleSoft back-up trainers to me and later "Family Leaders" in our "PeopleSoft Family".

Personally, I am deeply humbled and grateful for being challenged to foster and aid in improving the future direction of these young woman and ultimately, their families.. Contributing to a career path and being instrumental in raising self-esteem are outstanding intangible rewards. Hopefully, the opportunity and experience were mutually beneficial. I feel fortunate to have been assigned this area of responsibility

## Government of the District of Columbia
## Office of the Chief Financial Officer



December 12, 2002

Walter Thomas
General Services Unit
Office of Tax and Revenue
941 N. Capitol Street, NE
Washington, DC 20004

EXHIBIT 31
Camilleri
2/28/07 slb

Dear Mr. Thomas:

Due to budget reductions recently enacted throughout the Government of the District of Columbia
for FY 2003, and in order to achieve greater efficiency and a more cost effective government, the
Chief Financial Officer (CFO) of the District of Columbia will exercise the legal authority vested in
the CFO by the Congress under Section 424 of the District of Columbia Home Rule Act, P.L. 93-
198, as amended by Section 302 of the District of Columbia Financial Responsibility and
Management Assistance Act of 1995, P.L. 104-8, Section 142 of the District of Columbia
Appropriations Act of 1997, P.L. 104-194, as extended by Section 111(c) of the District of
Columbia Appropriations Act of 2002, P.L. 107-96, and Section 409 of the 2002 Supplemental
Appropriations Act, P.L. 107-206, and restructure certain operations of the Office of the Chief
Financial Officer (OCFO).

Among the actions being taken during the restructuring is the abolishment of all positions in the
General Services Administration unit, Office of Tax and Revenue, and the creation of the Office of
Management and Administration (M&A) (please see Attachment A for the organization chart). As
a result, all positions in the GSA unit shall be abolished upon the signing of the applicable
administrative order.

All available remaining positions in M&A will be advertised for a minimum of ten (10) business
days, beginning Friday, December 13, 2002. During that period, interested persons will have an
opportunity to apply for consideration. Vacancy announcements will be available on the OCFO
web site and in the Office of Human Resources reception area, Suite 1200, 941 North Capitol
Street, N.E., Washington, D.C. A fact sheet on the selection process is included in Attachment A.

If you choose not to apply for any of the available positions in M&A or other posted vacant OCFO
positions, you will be terminated within five (5) business days after the close of the application
period, and receive a severance payment. Similarly, if you are selected for an OCFO position, but
choose not to accept the position, you will be terminated and receive a severance payment.

Walter Thomas
December 12, 2002
Page 2

In the coming days, the OCFO will provide you with detailed information concerning eligibility for retirement, severance payments, and other employee benefits. Please be aware that an Outplacement Services Team has been established to assist you throughout this process. Any questions regarding these services should be directed to Pamela Madison at (202) 727-2476. We encourage you to take advantage of all outplacement services offered to you.

Please also be aware that we are offering affected employees up to two (2) hours of administrative leave per week for resume preparation, appointments with search firms, etc. This leave must be scheduled in advance and approved by your immediate supervisor.

Sincerely,

Diane Camilleri
Director, Office of Human Resources



December 5, 2002

GOVERNMENT OF THE DISTRICT OF COLUMBIA
OFFICE OF THE CHIEF FINANCIAL OFFICER

**Attachment B**

**Job Application Process**

### Step 1

Employees prepare resumes or DC 2000 (Employment Application) to become ready for the reapplication period. This reapplication period will be announced via email and will also be posted on the OCFO intranet site at: http://ocfo.in.dc.gov/ under **Restructuring Guide**.

During the time leading up to the reapplication process, employees should also consider other options available to them such as early out or optional retirement. Fact sheets outlining these and other items of interest will be posted on the intranet site noted above.

### Step 2

All vacancies in the new organization, as well as in other areas of the Office of the Chief Financial Officer (OCFO), are posted for application and a definitive competition period of at least ten (10) workdays.

Applications or resumes must be submitted on the attached transmittal sheet, clearly outlining the position being applied to. A separate transmittal sheet and resume or application must be submitted for each vacancy announcement number. Each vacancy announcement will outline selective placement factors that must be addressed and submitted with the application.

Five days after the close of the vacancy announcement period, termination letters may be issued to employees who do not apply for positions in the new organization, or for other existing vacancies in the OCFO. Exceptions may be made if the employee is eligible for optional or early out retirement and expresses in writing to the HR Director the intent to make application for retirement.

### Step 3

Applications will be reviewed for qualification determination. This review will consider (1) minimum and/or specialized experience and/or educational requirements as outlined in the vacancy announcement; and (2) any selective factors outlined in the vacancy announcement.

Eligible external (outside of the OCFO) applications will be forwarded to a ranking panel for determination of highly and/or best-qualified candidates. Eligible internal applications will be automatically forwarded to the interview panel.

## Step 4

The ranking panel will receive the applications of all eligible external candidates for determination of highly and/or best qualified as outlined in a pre-established ranking plan. This ranking plan will be available for review after the close of the competition and selection process.

The applications of up to the top ten best-qualified external candidates will be forwarded to the interview panel.

## Step 5

The interview panel will interview (1) all eligible internal (displaced) applicants and (2) up to the top ten best-qualified external candidates. Candidates will be given a minimum of 24 hours' notice of the intent to interview. When a face-to-face interview is not possible, a telephone interview is acceptable. The requirement to interview is satisfied when one of the interview panel members makes a reasonable effort to communicate the time and place of the interview with all interview candidates. Documentation of such efforts will be recorded. Interviews will be conducted based upon a uniform set of job-related questions designed to test each candidate's relative experience and ability with respect to the specialized features of the job.

The performance of each of the candidates at interview will be documented by each member of the interview panel and made part of the selection file for the vacancy in question. Panel members will meet for the purpose of reaching consensus on the panel's recommendation with respect to the top [5] candidates for a vacancy. The final hiring decision has been delegated by the Chief Financial Officer to the selecting official. Selection decisions will be made without regard to an individual's race, color, gender, sexual orientation, marital status, national origin, religion, or any factor prohibited by law.

At the close of the selection process, candidates will be given a letter, either: (1) notifying them of their selection to the position applied for, or (2) a termination letter notifying them of their non-selection to a continuing position in the new organization or in other continuing positions in the OCFO. These letters will be issued within five days of the end of the selection process.

It is anticipated that all final decisions will be made no later than February 15, 2003.

## Additional Information

- Severance pay packages will be completed individually on each employee being terminated due to job abolishment. Severance pay will be a minimum of 12 weeks, up to a maximum of 26 weeks based on age and longevity. The formula for determining severance pay will be posted on the OCFO website.

2

- In the competition process, employees applying and being selected for positions at a lower grade level than their positions are currently, need to be aware of the possibility that they may lose pay. Every attempt will be made to adjust the salary to the same level in the lower grade for which selected, but instances may occur where this cannot be accommodated. No pay or grade retention will be offered.

- In the competition process, employees who are currently in the Management and Supervisory Services (MSS) and are selected for positions in District Service (DS) will not be eligible for retained pay.

- Questions regarding this process may be directed to Eric Balliet, Acting Communications Director, via email at: eric.balliet@dc.gov

- Appointments to review Official Personnel Folders, and to discuss Outplacement Services or other employee benefits, may be made by calling Tanya High at (202) 727-2476.

-----------------------------------------------------------------------------------

The foregoing competitive process does not constitute a waiver of the legal authority of the Chief Financial Officer to appoint persons to OCFO positions to ensure continuity of operations and the fiscal integrity of the District of Columbia Government, pursuant to Section 424(a) of the District of Columbia Home Rule Act, as amended by P.L.104-8 and Section 409 of the Supplemental Appropriations Act of FY 2002, P.L. 107-206.





FOR OCFO USE ONLY

**Office of the Chief Financial Officer**
**Application Transmittal Form**

**EMPLOYEE NAME:** _____

**CURRENT OFFICE:** _____

**VACANCY ANNOUNCEMENT NUMBER:** _____

**POSITION APPLIED FOR:** _____

**GRADE LEVEL:** _____

I am attaching the following required paperwork to apply for the vacancy announcement noted above.

❏    **RESUME OR DC FORM 2000, EMPLOYMENT APPLICATION**

❏    **STATEMENT ADDRESSING RANKING FACTORS**

I understand that I must submit this application paperwork by the closing date of the announcement in order to be considered for the position.

Applications are to be sent to:

Ms. Tanya High
Office of the Chief Financial Officer
1350 Pennsylvania Avenue, N.W.
Suite 209
Washington, DC  20004
FAX:  (202) 737-5258
PHONE:  (202) 727-2476

Cc:  Applicant

cfo: Restructuring Guide - Microsoft Internet Explorer

Address http://www.ocfo.in.dc.gov/cfo/cwp/view.asp?a=1189&q=496527&cfoNAV=|30641|



CFO HOME
ABOUT CFO
DEPARTMENTS
SERVICES
  CFO Newsroom
  CFO Source
  Help Desk/Network Support
  Human Resources
  Retirement/Investment Plans
  Restructuring Guide
  Training

## Restructuring Guide

In September the Mayor and the Council agreed to a revised FY 2003 budget for the District that reflects a decrease in city revenue. As a result, the Office of the Chief Financial Officer (OCFO) must reduce its budget by approximately $3 million this year. Operations across the OCFO were reviewed in order to find areas that should be restructured, so better service could be provided more efficiently. In these areas, a number of positions will be abolished and new positions created. Affected employees will have the opportunity to compete for the new positions or apply for vacancies elsewhere in the OCFO.

Although these changes will be difficult, a key goal moving forward is to maintain a fair process for making these changes and to give you the information you need to participate in it. The information below will help you navigate this process as successfully as possible.

| Information | Contact | Telephone |
|---|---|---|
| Appointments to review Official Personnel Folders or discuss severance and other employee benefits | Diane Camilleri | (202) 442-6523 |
| Appointments to discuss Outplacement Services | Tanya High | (202) 727-2476 |
| Employee Assistance Program | | (202) 829-5240 |

**New OCFO Organization Charts**

- Office of Management and Administration* (formerly Office of Government Business and Human Capital)
- Department of Health OCFO*

**New Positions**

- Vacancy Announcements
- Application Process*
- Application Transmittal Form*
- DC 2000 Employment Application
- District Schedule Salary and Grade Tables

**Fact Sheets**

- Employee Benefits for OCFO Employees Hired by DC Government before October 1, 1987*
- Employee Benefits for OCFO Employees Hired by DC Government on or after October 1, 1987*
- Services for Dislocated Workers

Start     cfo: Restructuring G...

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Walter Thomas,                          )
                                        )
        Plaintiff                       )
                                        )
        v.                              )        Civil Action No. 05-1784 RJL
                                        )
Natwar Ghandi,                          )
Office of the Chief Financial           )
  Officer                               )
                                        )
        Defendant                       )
_____)

## AFFIDAVIT OF STAN MOREL

Being of legal age and capacity, I, Stan Morel, do depose and say:

1.      I have personal knowledge of the facts to which I testify herein.

2.      I am currently employed by the Superior Court of the District of Columbia in the position of Capital Projects Manager, a position I have held since 2004. From 1998 and 2004, I was employed by the Office of the Chief Financial Officer of the District of Columbia ("OCFO"). I currently have no employment or other relationship with the OCFO and have not and will not receive anything of value in return for this testimony.

3.      During my tenure as Operations Director for the OCFO Office of Mission Support (a name that was later changed to the Office of Government Relations and Human Capital or OGRHC), I supervised the Plaintiff, Walter J. Thomas, who was employed in the position of "Liaison." Between the fall of 1998 and approximately March 2001, I assigned Thomas primary responsibility for coordinating the computer and

telephone equipment needs of OCFO personnel.   In this capacity, he coordinated equipments requests through the District's Office of the Chief Technology Officer.

4.     Throughout the time he worked for me, Thomas failed and refused to report to work during regularly required OCFO work hours.  He typically reported at 10 am or later, even though he was told to report by 8:30 a.m.  I had many complaints from OCFO staff personnel and managers that Thomas was unresponsive to their equipment requests, failed to respond to telephone calls, and were rude and unprofessional in his dealings with our clients.    Whenever I spoke to him about his attendance and performance issues, Thomas refused to listen to me on.    He openly bragged about his participation in a class action discrimination lawsuit against the U.S. Department of State, spent considerable work time day at his computer working on matters related to that lawsuit.  Thomas told me I would have to talk to his lawyer if I tried to take action against him, and I believed him.

5.     In or around February 2001, after receiving numerous complaints from OCFO officials about Thomas' performance, I placed Alton Hartwell in charge of telecommunications issues for the OCFO. After than time, Thomas refused to do any work I assigned having to do with communications issues.

6.     I never rated Thomas while he worked for me because he refused to fill out the self-evaluation section of the annual rating form, which was a mandatory part of the process.   In my opinion, his performance was always less than satisfactory.  I tried to remove him from employment but was repeatedly told that I couldn't do that because he was under the protection of Herbert Huff, the Director of the Office of Tax and Revenue.

7.    Thomas transferred to the General Services Unit of the Office of Tax and Revenue sometime in the fall of 2001, at the request of Al Powell, who was then supervisor of that Unit.  Needless to say, I was happy to see him go.

8.    When the reorganization of the OGRHC was announced in December 2002, my position as Director of Operations was abolished.  Under the reorganization plan resulting in the creation of the Office of Management and Administration ("OMA"), the functions of the Operations division of Mission Support were combined with and the functions performed by the General Services Unit at OTR.  I deliberately chose not to apply for the position of Manager of Logistics and Support in OMA out of concern that I might have to manage Thomas once again.  I applied and was selected by a panel of OCFO managers for a Human Resource Specialist position, focusing on staffing and recruitment, a position I held until I voluntarily resigned to assume my current position with the Superior Court.


AFFIRMATION

On this the 28 day of March, 2007, I swear and affirm under penalty of perjury under the laws of the United States of America that foregoing statement is true and correct.

BY:

Stan Morel

# EXHIBIT E

JoAnn Smoak

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW JERSEY

3     - - - - - - - - - - - - - - - - - X

4     WALTER THOMAS,                    :

5          Plaintiff,                   : Civil Action No.

6          v.                           : 05-cv-01784

7     NATWAR GHANDI,                    :

                                        :

8          Defendant.

      - - - - - - - - - - - - - - - X   Pages 1 - 214

9

10

11

12

13              DEPOSITION OF JO ANN SMOAK

                    District of Columbia

14                  February 23, 2007

15

16

17

18

19

20

21     Reported by:  Marijane Simon, RDR, CLR

22     Job No. 179299

JoAnn Smoak

Page 154

1   had federal work were complying with federal EEO
2   laws as part of my audit.
3           When I left IBM, I was an
4   entrepreneur. I had a McDonald's franchise for
5   five years. And McDonald's, of course, in support
6   of their franchisees, had on staff EEO and other
7   consultants to make sure that -- as part of what
8   we paid them for every month. And so, always, if
9   there were EEO issues related to some 60 employees
10  that I had, McDonald's was there to support that
11  and to advise and, in fact, to train.
12          When I left McDonald's and went to the
13  Urban League, I was the EEO officer for the Urban
14  League. It was a relatively small organization,
15  but as the director of finance and administration,
16  I wore five hats, and personnel was my function,
17  and I was the EEO officer for that agency.
18          When I left the Urban League and went
19  to Immigration and Refugee Services of America,
20  similarly as the HR person, administrative person,
21  the EEO function fell under me. I had a director
22  at that time who oversaw EEO things and issues

Page 155

1   directly; but I managed and supervised that person
2   and in fact worked through any -- it was
3   particularly a challenging job because, IRSA hired
4   a lot of immigrants and refugees; so most of the
5   staff there were not Americans. And there were a
6   lot of really interesting issues that always came
7   up related to potential discrimination based on
8   country of origin and language and other things.
9           When I left IRSA and went to DPG, the
10  administrative function was pretty much handled by
11  an HR person. I didn't get too involved in that.
12          And, similarly, at Consortium, I
13  wasn't there long enough for it to be an issue.
14          I am the EEO officer now in the State
15  Education Office.
16      Q.  And do you continue to exercise
17  similar duties and responsibilities at the State
18  Education Office with --
19      A.  Sure.
20      Q.  -- with respect to EEO?
21      A.  You know, we have to certify
22  compliance and, again, the biggest role is to

Page 156

1   understand and implement the law, so it's not
2   anything most people walk around. I would be
3   nervous of anyone who says they totally know all
4   the laws for every situation. I'm constantly
5   referencing and referring and conferring with
6   general counsel and making sure that for those
7   things that I don't know off the top of my head,
8   that I make the right decision.
9       Q.  Have you yourself ever been named as
10  an alleged discriminator --
11      A.  I have.
12      Q.  -- in any charge of discrimination?
13      A.  I have.
14      Q.  You have. And how were those cases
15  resolved?
16      A.  It was dismissed.
17          I was at IRSA. We terminated an
18  African-American female who felt that she had been
19  discriminated against by the agency; and because I
20  was the administrative director, I was named in
21  that. We hired an outside consultant, went
22  through the EEOC process, and in both instances,

Page 157

1   both the independent study from some EEOC person
2   at Georgetown, preliminarily -- and then we went
3   through the process, and I was dismissed.
4       Q.  Okay. I would like to direct your
5   attention to the interview of Mr. Thomas for the
6   position of lead support specialist. The records
7   now establish that interview took place on or
8   about March the 12th, 2003.
9           You testified you have a recollection
10  of what transpired at that interview.
11      A.  I do.
12      Q.  Could you please describe what took
13  place.
14      A.  Well, again, I remember the interview
15  so well because of two things. One is because of
16  my determination that existing employees get the
17  appropriate amount of consideration; and, two,
18  because of my experience at Immigration and
19  Refugee Services of America, when I looked at
20  Mr. Thomas's file, I was very excited that he had
21  foreign-service experience, because at Immigration
22  and Refugee Services, I had worked with a cadre of

JoAnn Smoak

Page 158

1  people who did foreign-service-related work. And,
2  in fact, my board had consisted of a couple of
3  foreign-service officers, and I simply admired
4  very much the kinds of work they did. And so in
5  that context, I didn't know him. I was excited to
6  meet him and to talk to him -- and about the
7  potential of having someone like that on my staff,
8  because I was new there.
9        And when he came in, I was very
10  disappointed in the interview, in his demeanor, in
11  his lack of knowledge about his basic job, and
12  just in terms of how he presented.
13        Q. Well, with respect to his demeanor,
14  could you focus on that specifically? What
15  disappointed you about Mr. Thomas's demeanor at
16  interview?
17        A. Well, starting with the way he came in
18  dressed for the interview. I can't remember the
19  exact apparel he had on, but everyone that we had
20  interviewed -- We interviewed everyone in that
21  office, some who had the same position, did
22  similar things -- they all came dressed like they

Page 159

1  wanted the position, dressed professionally.
2        And remember, in the back of my mind,
3  this is someone who would have to interface with
4  the deputy CFOs, perhaps with general counsel,
5  perhaps with other high-level staff. And he did
6  not come in in a way that I thought was a good
7  representative dress. And it went downhill from
8  there.
9        He was not able to articulate to
10  any -- to my satisfaction what he had represented
11  on his resume as extensive experience in areas of
12  supply and management and typical, basic logistics
13  things. When we drilled down in those questions,
14  he just didn't know. And he seemed nonchalant and
15  bored and whatever.
16        And I was looking for people who
17  seemed to really want to be a part of this new
18  organization. And he didn't have any
19  understanding of his own position.
20        At the end of the day, I felt like all
21  he did was, every now and then, make data cards
22  which -- when someone -- And to understand what

Page 160

1  that was, when a new employee comes on board, or
2  if someone loses their card, you go to a machine,
3  and you make a new one.
4        When I talked to Mr. -- I remember
5  asking him; because this was -- Remember, this was
6  right after 9/11, so I was very, very sensitive to
7  issues of security; and these data cards
8  represented our first line of defense about
9  security issues.
10        And when he talked about data cards,
11  he didn't know the reports. I had taken the time
12  to find out what that system would do, what that
13  Kastle system would do. He didn't know anything
14  about the reports, what kinds of information.
15  There was no information about how many people had
16  duplicate cards or what do you do when a card is
17  lost. He just -- He seemed lost to me so that was
18  what was so remarkable about him.
19        Q. When did you investigate the ability
20  of the Kastle system to generate the types of
21  computer reports that you've just described?
22        A. Well, I actually did that early on,

Page 161

1  because, again, I even want to say, I don't know
2  the exact time, but one of the first complaints I
3  got, and I got a lot of complaints about that
4  office, was the way the -- That office was
5  supposed to be the interface with the people --
6  the guards, the people who went through the
7  magometer (phonetic) or whatever you call that
8  machine -- which had been broken, by the way, for
9  months.
10        And so when I started to talk to the
11  building office and then drilled down to who in my
12  office was the contact and what's the process and
13  how do we know if this -- if this machine that you
14  put your purses and things through is broken, how
15  do we know that people are not coming in in --
16  with things -- contraband and things like that --
17        And remember, that also was the
18  building where the tax office was, so there were a
19  lot of reasons we were concerned about security.
20  And that had provoked me to find out what the
21  process was. And that's when I found out: Well,
22  yeah, if you guys ask for reports, we can give

ESQUIRE DEPOSITION SERVICES
MD 1-800-539-6398
DC 1-800-441-3376                                        VA 1-800-752-8979

JoAnn Smoak

Page 162

1  them to you. Nobody's ever asked. We can tell
2  you who's got active cards. We can tell you how
3  many cards are assigned to one person.
4       It turned out, by the way, there were
5  many people who had several active cards assigned
6  to them, so it was not --
7       And he didn't know any of that. He
8  didn't know about any of that.
9       Q.  And your testimony today is that when
10  asked -- when asked about the availability of his
11  computerized reports, he knew nothing about it?
12      A.  He knew nothing about it.
13      Q.  Prior to the day of the interview, had
14  you had any substantive discussion with anyone
15  regarding Mr. Thomas's past performance in support
16  service positions for the OCFO?
17      A.  No.
18      Q.  Did you review his personnel file --
19      A.  No.
20      Q.  -- prior to the day of the interview?
21      A.  That would have been totally
22  inappropriate.  No, didn't do that.

Page 163

1       Q.  What conclusions, if any, did you draw
2  with respect to Mr. Thomas's responsibility within
3  the General Service Division at OTR?
4       A.  I felt that -- Not to be harsh, but I
5  felt like a ten-year-old could have done what he
6  was doing and that he had not demonstrated in the
7  amount of time -- And I don't remember how long he
8  had been doing that job, but he had demonstrated
9  no interest in growing the position, in having any
10  kind of meaningful -- making any kind of
11  meaningful contribution to the organization.
12      I didn't -- I didn't know if it is
13  simply attritted (phonetic) that he only did
14  Kastle cards, but that was all he did, and he
15  could not articulate doing anything else
16  substantive or that he had the skills to do, even
17  had additional work been assigned to him, if
18  necessary.
19      He talked in his resume or in the
20  interview about having inventory management, but
21  when we drilled down, he didn't know anything
22  about inventory, really, how to manage it, how to

Page 164

1  track it, how to do anything with it.
2       So I felt that I did not see any value
3  in the work he had done for the organization. And
4  I left with the impression that he was -- he had
5  retired in place, really.
6       Q.  After Mr. Thomas left the interview
7  room, what happened next?
8       A.  I don't know what you mean, "what
9  happened."
10      Q.  Well, at what point did you complete
11  the note sheet that has been marked today as an
12  exhibit?
13      A.  I don't remember.  It was my habit to
14  go back to my office, and -- in privacy -- which
15  was only two or three doors down from the
16  interview room and finish my notes privately as I
17  reflected on the whole interview.  That was my
18  habit.  Occasionally, I would fill them out right
19  there, and sometimes -- So I don't remember which
20  I did.
21      Q.  Was Mr. Thomas's age a factor in your
22  evaluation of his overall qualification for the

Page 165

1  position of lead support specialist?
2       A.  Well, let me say first I didn't know
3  his age; and let me say second I'm 57.
4       Q.  Well, beyond that, yes or no?
5       A.  No.
6       Q.  Was it a factor?
7       A.  No, it was not.  I didn't know his
8  age.
9       Q.  Do you personally have any biases
10  against older workers in the workplace?
11      A.  You know, I do have biases, but
12  they're actually towards older workers, quite
13  frankly.  I tend to like -- I like the energy of
14  young people, but I also like the experience, and
15  I like having a good mixture.  And I think, if you
16  look at my current office, you'd see that I have a
17  good mixture of maturity and expertise.
18      I certainly think that there are some
19  things that only come with time.  And particularly
20  when you're trying, as we were doing then, to
21  staff an organization with some strong bench
22  strength, it made sense to me in every place where

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376            MD 1-800-539-6398            VA 1-800-752-8979

JoAnn Smoak

Page 166

1  I could to have existing knowledge base and then
2  to bring in a good mixture of people from
3  different backgrounds, different perspectives,
4  so -- No, I appreciate very much, by the way,
5  having mature workers as a part of -- a core part
6  of my staff.
7      Q.  Mr. Thomas has alleged that he was not
8  selected, in whole or in part, because of a
9  disability.  At the time that you interviewed
10 Mr. Thomas, did you have any knowledge that he had
11 previously claimed having a disability?
12     A.  No.
13     Q.  During the interview, did you observe
14 him to have any discernible disability?
15     A.  No.
16     Q.  The documents presented today
17 establish that Mr. Edmonds was interviewed at a
18 later date and that you were a participant in the
19 interview.  Do you have any recollection of how
20 Mr. Edmonds performed at his interview?
21     A.  I do.
22     Q.  And could you describe or tell us what

Page 167

1  your recollection is.
2      A.  Well, he seemed excited to -- at
3  the -- at the potential of being there.  As a
4  matter of fact, one thing I remember that he
5  said -- one of the questions that came up was how
6  this position -- I think he was talking about his
7  work with the Washington Post which I remembered
8  because it sounded very stressful; and the office
9  that we were trying to staff for was a very
10 stressful office.  The deputy CFOs were very, very
11 demanding, sometimes unreasonably so.  So it had
12 to be someone who could respond but not get -- you
13 know, totally stressed out about it.  And Barry
14 seemed able to manage that, but he was very
15 engaged.  He seemed to have the temperament that
16 he would be able to handle these prima-donna CFOs,
17 and he seemed hungry to really show what he could
18 do.
19     Q.  What do you mean by that?
20     A.  Anxious.  One of the questions was --
21 When he was talking about his next step, he said,
22 I want your job, which I liked.  That's what I

Page 168

1  mean -- when he seemed hungry.  He told me -- When
2  he left that interview, he said, I want your job.
3      Q.  Prior to the interview, had you ever
4  met Mr. Edmonds?
5      A.  No.
6      Q.  Did you know him?
7      A.  No.
8      Q.  Is he related to anyone you know?
9      A.  No, I'd never spoken with him.
10     Q.  Did you consult with anyone else
11 before completing your notes on the interview of
12 Mr. Edmonds?
13     A.  No.
14     Q.  As between Mr. Thomas and Mr. Edmonds,
15 who was the better qualified candidate in your
16 opinion?
17     A.  Definitely Mr. Edmonds.
18     Q.  And why was that?
19     A.  Well, there were two reasons.  One is,
20 I felt that he really had or did a better job of
21 communicating his experience in the areas that I
22 required, supply management inventory.  I felt

Page 169

1  that he was -- he clearly demonstrated an ability
2  to handle the stress related to it.  He was
3  engaging.  He didn't seem bored with the whole
4  interview process and dismissive but engaged and
5  excited to be there.  And -- And he had some of
6  the inventory experience and the fleet management
7  which was a mess -- he had talked about having to
8  get up in the morning and manage -- logistically
9  manage getting all those papers delivered when he
10 worked for the Post because he did something with
11 the Post -- I don't remember exactly what it was,
12 but he had a small window where he had things that
13 had to be delivered.  I guess it was newspapers or
14 whatever.  And he had many carriers.  And I felt
15 that just managing that logistics was very similar
16 to managing that fleet.  So I just felt that he
17 had the temperament and the experience to do that.
18     Q.  In terms of dress, how did Mr. Edmonds
19 present at interview compared with Mr. Thomas?
20     A.  He came in in a suit, and he was -- he
21 was -- He introduced himself.  He shook people's
22 hands.  He just -- He had manners.  He was just

43 (Pages 166 to 169)

JoAnn Smoak

Page 174

1      Q.   All right.  You have been asked

2    questions today about the abolition of one of the

3    lead support specialist positions on the

4    December 2005 or 2002 reorg chart and a vacancy

5    announcement that came out on or about April 3 for

6    special assistant to the director of logistics.

7          Do you recall those questions?

8      A.   Pretty much.

9      (Interruption.)

10         MS. PIVEC:  Go off the record for a

11   minute.

12         BY MS. PIVEC:

13     Q.   As you understand the process and

14   procedure used for finding candidates for that

15   position, was there any obligation to notify

16   terminated CFO employees with respect to specific

17   vacancy announcements that came up after they were

18   terminated?

19     A.   No.

20     Q.   How would they learn, if at all, about

21   a position such as the one that was first posted

22   on April 3, 2003?

Page 175

1      A.   They would have had to check the

2    website, I imagine.  I mean, I don't know how we

3    could have logistically been responsible for that.

4      Q.   To your knowledge, was there any

5    promise made to employees at the time the

6    reorganization was announced that they would be

7    specially notified of positions that were posted

8    at a later point in time?

9      A.   No.

10     Q.   To your knowledge, did Mr. Thomas ever

11   apply for the special assistant to the director of

12   logistics?

13     A.   I don't know.  I don't -- I have no

14   way of knowing.

15     Q.   Okay.

16         Do you have personal knowledge of the

17   qualifications of the successful candidate for

18   that position, a Ms. Bryant, Miss Barbara Bryant?

19     A.   I do.  I do.

20     Q.   And what is your knowledge of her

21   qualifications for the position?

22     A.   Well, I met with her.  It must have

Page 176

1    been after she was selected.  I had a one-on-one

2    with her.  It might have been before, between --

3    when going through the second interview.  I just

4    don't remember when it was.  And I talked with her

5    extensively about her skills -- and it was such an

6    important position at that time.

7      Q.   Why was it such an important position?

8      A.   Because my boss had indicated that he

9    didn't want to continue to hear some of the

10   complaints he was hearing and that that office had

11   to get fixed; and when my boss speaks to me, I

12   tend to really listen.  And he had said it more

13   than once.

14     Q.   Is your boss Dr. Ghandi?

15     A.   Yes, Dr. Ghandi.  That's right.  He

16   had indicated to me in his own subtle way on more

17   than one occasion, although once would have been

18   enough, that he was tired of the complaints about

19   that office.

20     Q.   What specific complaint was he

21   referencing?

22     A.   He talked often about the fleet issue.

Page 177

1    He talked about things that he had gotten from --

2    the information he had gotten from the Office of

3    Integrity and Oversight which were part of

4    investigations that I was not privy to nor should

5    I have been; but he talked very generically about

6    things missing, about employees not doing their

7    work, about poor procurement.  I mean, it was

8    procurement practices in terms of things coming on

9    the dock and not showing up, and he was hearing

10   things, and he would share them with me.  And

11   then -- So it was important that we got someone

12   who had a sense of how to go in and manage this

13   new organization.

14         And in the past, we had a new

15   procurement system coming on board, and we had to

16   have someone who at least had some idea about how

17   to interface with and use that system, because the

18   past system was very, very restrictive in terms of

19   how you procure things.  And no one in that office

20   at the time had any computer skills, even, so I

21   just -- all the major complaints that he had

22   seemed to come back to having a good, strong,

45 (Pages 174 to 177)

# SMOAK EXHIBITS

EXHIBIT
Smgak
A.23.07

## OFFICE OF THE CHIEF FINANCIAL OFFICER
## PANEL REVIEW

Job Candidate: _____    Date: _____

Position interviewing for:  Support Services Positions (Lead/Specialist/Assistant Clerk)

Interviewer: _____

Instructions:

❖ Each panel team should decide on a lead interviewer and timekeeper.

❖ The lead interviewer should welcome the candidate, introduce him or herself, and begin the introduction of other panel members.

❖ Greet the candidate giving your name and position.

❖ Explain the interview structure, the applicant will be given the interview questions and panel members will take notes.

❖ Explain the purpose of the interview: to acquaint interviewers and the applicant, to learn more about the applicant's background and experience to help make the best decision possible.

❖ Interviews should run approximately 45 minutes to 1 hour. Based on 1 hour, that allows approximately 6 minutes per question.

❖ Each panel member should review the candidate's application materials prior to the interview.

❖ It is suggested that panel members rotate asking the interview questions.

# SCORING FORM

Panel Member Signature: _____

Candidate: _____

Position: _____

Directions: Please ask the questions listed below. Ask questions twice and allow time for reflection and processing. Make notations on pertinent information given in the applicant's response

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 1. Tell us about the duties of this position as you understand them and explain why your background would make you the best candidate for the position. | | | | | |

Comments: _____

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| Please explain what customer service means to you. (Give us one recent example in which you were noted for your customer service skills | 5 | 4 | | | |

Comments:

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| Describe your specific experience with supply management | | | | | |

Comments:

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|

Describe your experience with asset inventory and control. What do you see as the problems with the system we ...

Comments:

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| What are your best skills and weakness, and how will these affect your performance here? | 5 | | | 2 | |

Comments:

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 8. Describe your typical workday. How do you keep yourself busy when the workload is light? | | | | | |

Comments:

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 9. Do you usually questions for the Panel? Would you like to make a closing statement? | | | | | |

Comments:

# OFFICE OF THE CHIEF FINANCIAL OFFICER
## PANEL REVIEW

Job Candidate: _Barry Edmonds_    Date: _3/17/03_

Position interviewing for:  Support Services Positions (Lead/Specialist/Assistant/Clerk)

Interviewer: _Jo Ann Smoak_

Instructions:

◆ Each panel team should decide on a lead interviewer and timekeeper.

◆ The lead interviewer should welcome the candidate; introduce him or herself; augment the introduction of other panel members.

◆ Greet the candidate giving your name and position.

◆ Explain the interview structure: the applicant will be given the interview questions and panel members will take notes.

◆ Explain the purpose of the interview: to acquaint interviewers and the applicant; to learn more about the applicant's background and experience to help make the best decision possible.

◆ Interviews should run approximately 45 minutes to 1 hour. Based on 1 hour, that allows approximately 6 minutes per question.

◆ Each panel member should review the candidate's application materials prior to the interview.

◆ It is suggested that panel members rotate asking the interview questions.


EXHIBIT
Smoak
13
ms 2-23-07

Doc 1/2

## SCORING FORM

Panel Member Signature: _Jaomoak_

Candidate: _Barry Edmonds_

Position: _Lead Support Services Specialist_

Directions: Please ask the questions listed below. Ask questions twice and allow time for reflection and processing. Make notations on pertinent information given in the applicant's response.

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 1 — Tell us about the duties of this position as you understand them and explain why your background would make you the best candidate for the position. | 5 | 4 | 3 | 2 | |

Comments: _Worked in support services Division of DC city council. Budgeting, supplies, equipment, vehicles._

_D-e-627_

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 2 | 5 | 4 | (3) | 2 | 1 |

Please explain what customer service means to you. Give us one recent example in which you were noted for your customer service skills.

Comments: *Always trying to make people happy. ① Bon Jour operation was #1 to 3 by straight sign-in.*

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 3 | 5 | (4) | 3 | 2 | 1 |

Describe your specific experience with supply maintenance.

Comments: *Just kept a log of what was in use or in storage. You tell if crew members forgot to sign in or ...*

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| | | | | | |

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 4 | Describe your experience with asset inventory and control. What do you see as the problems with the system we currently have in place? | 5 | 4 | (3) | 2 | 1 |

*Comments:* @ *[illegible handwriting]*

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 5 | What are your best skills and weakness, and how will these affect your performance here? | 5 | 4 | (3) | 2 | 1 |

*Comments:* *[illegible handwriting]*

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|

D000729

| 6 | Describe your typical workday. How do you keep yourself busy when the workload is light? | 5 | ' 4 | (3) | 2 | 1 |

*Comments:* (handwritten text)

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 7 | Do you have any questions for the panel or would you like to make a closing statement? | 5 | 4 | 3 | (2) | 1 |

*Comments:*



*Comments:*

*Other Notes:*

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
------------------------------x
WALTER J. THOMAS,               :
                                :
         Plaintiff,             :
                                :
    v.                          :    No. 05-cv-01784
                                :
NATWAR M. GANDHI,               :
                                :
         Defendant.             :
------------------------------x
```

Washington, D.C.

Tuesday, February 27, 2007

Deposition of

ALPHONSO LISTER

a witness, called for examination by counsel for

Defendant, pursuant to notice and agreement of

counsel, beginning at approximately 4:11 p.m. at the

law offices of Sheppard Mullin Richter & Hampton,

LLP, 1300 I Street, NW., Washington, D.C., before

Jacqueline Richards-Craig of Beta Court Reporting,

notary public in and for the District of Columbia,

when were present on behalf of the respective

parties:

2

1  APPEARANCES:
2  On behalf of Plaintiff:
3  BARBARA B. HUTCHINSON, ESQUIRE
   Law Office of Barbara B. Hutchinson
4  7907 Powhatan Street
   New Carrollton, Maryland 20784
5  (301) 577-3387
6  On behalf of Defendant:
7  MARY E. PIVEC, ESQUIRE
   Lewis Pivec, LLP
8  1300 I Street, NW., 11th Floor East,
   Washington, D.C. 20005
9  (202) 772 5310
10 ALSO PRESENT:
11 Walter J. Thomas
12
13
14
15
16
17              * * * * *
18
19
20
21
22

3

1            C O N T E N T S
2  EXAMINATION BY:                    PAGE
3  Counsel for Defendant          4
4  Counsel for Plaintiff          49
5  DEPOSITION EXHIBITS:
6  No. 1 - Organizational Chart        11
7  No. 2 - Evaluation of Walter Thomas     14
8  No. 3 - Walter Thomas's Panel Interview    30
9  No. 4 - Barry Edmonds's Panel Interview    38
10 No. 5 - Vacancy Announcement        41
11 No. 6 - Vacancy Announcement        43
12 No. 7 - Organization Chart for the Department
      of Logistics and Support Services    44
13
   No. 8 - Barbara Bryant's Panel Interview    47
14
   No. 9 - May, 2003, OMA List of Positions    65
15
   No. 10 - January 3, 2003, Letter of      107
16    Application from Barry Edmonds
17 No. 11 - Vacancy Announcement for the Position 108
      of Lead Support Services Specialist
18
   No. 12 - December 31, 2002, Letter of    120
19    Application from Walter Thomas
20
21              * * * * *
22

4

1         P R O C E E D I N G S
2  Whereupon,
3              ALPHONSO LISTER
4  was called as a witness and, having been first duly
5  sworn, was examined and testified as follows:
6       EXAMINATION BY COUNSEL FOR DEFENDANT
7  BY MS. PIVEC:
8    Q  Good afternoon, Mr. Lister.  My
9  name is Mary Pivec and I am the attorney for
10 the Defendant in an action that has been
11 brought by Mr. Walter Thomas who is to your
12 left, I think, and whose attorney, Ms.
13 Barbara Hutchinson is between you and Mr.
14 Thomas.
15      Your deposition is being taken here
16 today as a fact witness regarding your
17 knowledge of Mr. Thomas's employment
18 situation and certain allegations that he has
19 made in his complaint.  Could you state your
20 full name for the record please?
21   A  Alphonso Lister.
22   Q  And Mr. Lister, could you state

5

1  your address?
2    A  P.O. Box 738, Lorton, Virginia
3  22199.
4    Q  What is your current occupation,
5  Mr. Lister?
6    A  Acquisition logistics.
7    Q  Logistics.  And by whom are you
8  employed?
9    A  DoD.
10   Q  Could you briefly describe your
11 employment history up to the present time?
12   A  From where I've been to where I'm
13 at now?
14   Q  Well, let's say since you completed
15 college up to the present time.
16   A  Okay.  Joined the military, spent
17 20 years in the military, 21 years and some
18 change, in the military in various
19 assignments around the world.  Served in all
20 types of units from special ops to rapid
21 deployment to communications information
22 system organizations to tank outfits, combat

2 (Pages 2 to 5)

6

1  support outfits. Retired from the military,
2  went to work for the intelligence agency.
3        From the intelligence agency, I
4  went over to FEMA and from FEMA, I went to
5  work for the Walt Disney Company,
6  corporation. From Walt Disney, I went to
7  work for the Department of Veteran Affairs.
8  From the Department of Veteran Affairs, I
9  went to work for the District. From the
10  District, I went to work back at the
11  Pentagon, working for OSD. And now I'm
12  working for another agency within DoD.
13    **Q   Okay.**
14    A   Oh, wait a minute. Back up. I
15  left out one, State Department. Between OSD
16  and the, back to DoD -- State Department.
17    **Q   All right. What was the**
18  **approximate year of your retirement from the**
19  **military?**
20    A   '95.
21    **Q   And over what course of time did**
22  **you work for Walt Disney?**

7

1    A   '98 to 2001.
2    **Q   And what was your title when you**
3  **worked for them?**
4    A   Senior logistics and procurement
5  manager.
6    **Q   And what was your position with the**
7  **Department of Veterans Affairs?**
8    A   Program manager.
9    **Q   Did your job entail any logistical**
10  **functions?**
11    A   Yes, we had the logistical
12  operation for all the Department of VA
13  worldwide, all the veterans hospitals,
14  national cemeteries, and benefit
15  organization, Veteran Benefit Administration.
16    **Q   Were you employed here in the**
17  **District of Columbia?**
18    A   Yes.
19    **Q   And over what period of time did**
20  **you work for the Department of Veterans**
21  **Affairs?**
22    A   2001 till 2003.

8

1    **Q   And you say you worked for the**
2  **District of Columbia at that point in time.**
3  **Did you work for a specific arm of the**
4  **District of Columbia?**
5    A   The OCFO, Office of Management and
6  Administration, OMA.
7    **Q   And during what period did you work**
8  **for the CFO?**
9    A   2003 till July, 2003.
10    **Q   What was the start date in 2003?**
11    A   Around the first of March, or
12  somewhere along there.
13    **Q   And in July of 2003, did you go to**
14  **the Pentagon?**
15    A   Yes.
16    **Q   And have you been there**
17  **continuously since that time?**
18    A   No. I left the Pentagon, 2006,
19  went over to the State Department.
20    **Q   And are you currently with the**
21  **State Department?**
22    A   No, I came back to the Pentagon.

9

1    **Q   Okay.**
2    A   In 2006, late 2006.
3    **Q   I believe you stated in the**
4  **beginning that you are currently in logistics**
5  **support. What is the title of your current**
6  **position with the Pentagon?**
7    A   Chief of Center for Life Cycle
8  Logistics.
9    **Q   Chief -- I didn't catch all of it.**
10    A   Center for Life Cycle Logistics.
11    **Q   And what do you do to the extent**
12  **that you can describe what your current**
13  **duties are?**
14    A   We have a world -- we have a global
15  sustainment mission.
16    **Q   And what does that mean?**
17    A   We support all IT systems
18  worldwide, the DoD.
19    **Q   So you are uniquely centered now on**
20  **information technology systems for DoD?**
21    A   Yes.
22    **Q   Do you currently have any**

3 (Pages 6 to 9)

22

1    A   Well, we got to take care of our
2  customers because when we fail the customers,
3  we're failing ourselves as an operation, as
4  an organization and they are depending on us
5  to do our job. So we need to be proactive
6  enough to do -- to keep folks squared away.
7    Q   And did Mr. Thomas become a little
8  more responsive to the Kastle card issues
9  after you had that discussion?
10   A   Not enough for me. Because I took
11 time to go down and visit the company down in
12 the Rosslyn, the Kastle card company, and to
13 get a good understanding of why does it take
14 so long to get things done in this system.
15   Q   And what did you find out?
16   A   Do it in a matter of about an hour
17 ago and how you process stuff and how you
18 delete, add, and all of that stuff and I
19 walked away with a newfound knowledge on how
20 to do it myself. So it was relatively easy
21 to do. It wasn't something that was hard to
22 perform.

23

1    Q   Did you draw any conclusions about
2  the way Mr. Thomas had been going about his
3  duties as a result of what you learned on
4  your visit to Kastle?
5    A   Yes, and he just wasn't being
6  proactive enough to do the job.
7    Q   In March of 2003, were you asked to
8  serve on an interview panel for the position
9  of lead support services specialist in the
10 342 series?
11   A   Yeah.
12   Q   Are you familiar with 342 series?
13   A   Yes.
14   Q   What does the 342 series entail?
15   A   Facilities --
16   MS. HUTCHINSON: Objection, the
17 question's ambiguous. The 342 series, is
18 this for the District government, or federal
19 government, or who?
20   BY MS. PIVEC:
21   Q   You can answer.
22   A   A 342 is a 342. Same requirements

24

1  of a 342 in the federal government, the same
2  as in the -- in the District.
3    Q   And what are they?
4    A   Facilities, just got a whole host
5  of things that can follow up under that 342.
6  Depends on how much you want to stick up on
7  that because this -- it can be a repair job
8  or it can be into space management, you can
9  be, you know, facilities, operation, and that
10 type of stuff.
11   Q   Moving back to the Exhibit Number
12 1, you will see that under director of
13 support services, there were two lead support
14 service specialists designated in the 342
15 series. Did you have anything to do with
16 selecting that job series for the lead
17 support services specialist positions?
18   A   No, this was set up prior to me
19 getting there.
20   Q   Did there come a time when you
21 asked for a more specific job series to be
22 used for support specialists in your

25

1  organization?
2    A   Well, I did report back to my boss
3  after doing an assessment of the operation
4  and we was heavily into 342 and we -- and our
5  operation covered a span of a lot of other
6  things other than 342. We had a logistics
7  operation that we didn't have any folks that
8  actually had———————— spectrum of logistics.
9  We had a little, meaning warehouse, operation
10 going on in there, had some budget stuff
11 going on -- budget -- I want to say
12 self-service account, but it's a -- what did
13 they call it? -- the credit card account
14 where the credit, small credit card
15 operation -- where we bought office supplies
16 and that type of stuff as well as the
17 warehouse which is two separate entities.
18   Q   Did you recommend that another job
19 series be used?
20   MS. HUTCHINSON: Objection to the
21 form of the question.
22   THE WITNESS: No, I made him aware

7 (Pages 22 to 25)

26

1  that the folks I have, the current series
2  that we have, is not the right makeup for
3  that operation to be able to perform all the
4  things that this operation want us to do.
5        Because we had a mail room, we had
6  drivers, you know, so a 342 is not a
7  catch-all series. When you start spreading
8  out to series that are 346s or possibly 301s,
9  when you start getting into mail room
10  operation that can go into another series.
11  So it would -- and the different makeups of
12  logistics folks could have even be expanded
13  to the 2040 series which is the supply and
14  support. That would be the answer in dealing
15  with the warehouse operation key. And I had
16  an admin operation in there as well.
17        BY MS. PIVEC:
18      Q  Do you know when you went to your
19  boss to express your need for more
20  specialization in the organization?
21      A  I think it was after the -- but
22  that night I went home, I looked at all the

27

1  manning documents that I had, that was left.
2  And I was looking at series, looking at
3  operation, and not just wanting to make my
4  boss aware that the series 342 that we had
5  was like mixing apples and oranges, but we
6  have a mixed operation down here, and I think
7  US 342 could be 346s or mail room operator.
8        In a lot of cases none of the folks
9  was trained in those areas. They've been
10  doing the job. I guess it was OJT-type
11  learning. But I understood that the
12  structure was already in place. But I just
13  wanted to let them know that we're sort of
14  handicapped. But we're going to do the best
15  we can to get folks trained up.
16      Q  Okay, we'll come back to that. Did
17  there come a time in early March of 2003 when
18  you participated in the interview of internal
19  candidates in your organization for the
20  position of Lead Support Services Specialist
21  in the series 342?
22      A  Uh-huh.

28

1      Q  Do you recall doing that?
2      A  Yes.
3      Q  Okay. Did you receive the
4  applications of the employees who had applied
5  for that position before the interviews?
6      A  No, the package was there when you
7  show up for the interview.
8      Q  Do you recall receiving a package
9  that had been prepared by Mr. Thomas prior to
10  his interview?
11      A  No.
12      Q  You don't remember seeing that?
13      A  Uh-uh.
14      Q  When you went to the interview,
15  were you given a package of information that
16  you were to use in the course of the
17  interview?
18      A  Yes, in the course --
19      Q  And what did that consist of?
20      A  The candidate that we was actually
21  interviewing at that particular time, and the
22  questions that he had for the panel.

29

1      Q  Were the employees in your
2  organization notified, in advance of their
3  interviews, as to the time and date when they
4  would be interviewed?
5      A  I don't know. I received my
6  meeting notice via the Microsoft. You get a
7  meeting and you accept. That's when I knew
8  when the interview was going to be conducted.
9      Q  I see. And how far in advance of
10  the internal candidate interviews were you
11  notified of the interview dates?
12      A  As HR was scheduling the
13  appointments, they would send out the meeting
14  via the Internet.
15      Q  Okay. Do you have a current
16  recollection of what transpired during Mr.
17  Thomas's interview for the Lead Support
18  Specialist position?
19      A  He came in to the interview. He
20  was asked a series of questions by each panel
21  member, and then he was allowed to ask if he
22  had any questions of us, and then we thanked

8 (Pages 26 to 29)

30

1 him for his time, and I guess he almost -- I
2 mean, he thanked us for the interview. And
3 then that was it.
4    Q   Do you recall what questions were
5 asked of him by the panel?
6    A   I wouldn't know.
7    Q   Did you fill out any rating form?
8    A   Yes, their HR had prepared a score
9 sheet, and it is a kind of number stuff fall
10 out. I can't remember. I would have to see
11 one of those sheets again.
12       MS. PIVEC: If you can mark this as
13 Exhibit 3.
14       (Deposition Exhibit No. 3 was
15       marked for identification.)
16       THE WITNESS: Yes, this is the
17 score form we used.
18       MS. PIVEC: Now, wait a minute.
19       THE WITNESS: Oh.
20       MS. PIVEC: We're not on the record
21 yet.
22       THE WITNESS: Oh.

31

1       MS. PIVEC: And she has to mark the
2 exhibit.
3       MS. HUTCHINSON: Is there some
4 reason why you gave the witness the
5 unlabelled exhibits? I mean, is there some
6 reason for that?
7       MS. PIVEC: No, there isn't.
8       MS. HUTCHINSON: Oh.
9       MS. PIVEC: If you want me to give
10 him the labeled exhibit I will.
11       MS. HUTCHINSON: Just so that it's
12 marked and he knows he is looking at that
13 Lister Number 3.
14       BY MS. PIVEC:
15    Q   And Mr. Lister, do you recognize
16 the document which has been marked as Exhibit
17 Number 3?
18    A   Yes.
19    Q   And what is it?
20    A   This is the form we used for the
21 panel interview, and it's graded on how each
22 individual answered the questions and

32

1 performed.
2    Q   Is this your handwriting or your
3 script on the first page of the document
4 marked as Number 3?
5    A   What? Is that my handwriting?
6    Q   Yes.
7    A   Yes.
8    Q   And does your handwriting appear on
9 the scoring form itself?
10    A   Yes.
11    Q   It begins at page 2 and continues
12 to the last page of this document.
13    A   Yeah, that's mine.
14    Q   When did you record the information
15 that is on the form?
16    A   Based on that, March 12.
17    Q   Did you do it during the course of
18 the interview?
19    A   As he was answering the question,
20 yes.
21    Q   And after you completed the form,
22 what did you do with it?

33

1    A   I turned them over to HR.
2    Q   Did you total your ratings on the
3 first page of this form?
4    A   Yeah.
5    Q   You did. Is that your handwriting
6 encircling the 20?
7    A   And that would be mine. That'll be
8 my latitude.
9    Q   His longitude, okay.
10    A   No, I don't rule out latitude.
11    Q   Do you have a recollection of how
12 Mr. Thomas was dressed for his interview?
13    A   I want to say a pair of slacks and
14 something like a three-button polo shirt or
15 sweater, whatever you want to call it. Yes.
16    Q   In your opinion was he dressed
17 appropriately for the interview?
18    A   In my opinion, I wouldn't have
19 participated in the interview. I would had
20 on a shirt and tie, or a coat and tie, or a
21 suit and tie.
22    Q   Were his clothes disheveled in any

9 (Pages 30 to 33)

38

1 asking questions. And as he answered a
2 question everybody was grading him based on
3 his response.
4   Q   Do you recall what questions were
5 asked of Mr. Edmonds during his interview?
6   A   If there's any indication of deed,
7 it was the same question.
8   Q   Do you recall specifically at this
9 point without reference to Mr. Thomas's --
10   A   I will have to see the panel sheet.
11     MS. PIVEC: Exhibit marked.
12       (Deposition Exhibit No. 4 was
13       marked for identification.)
14     BY MS. PIVEC:
15   Q   Mr. Lister, would you take a look
16 at the exhibit which has been marked as
17 Number 4, I believe?
18   A   Uh-huh.
19   Q   And tell me whether you recognize
20 Exhibit 4.
21   A   Yeah, that's it.
22   Q   What is it?

39

1   A   Oh, it is the panel interview
2 questionnaire, I guess.
3   Q   Do you recognize the handwriting on
4 the form?
5   A   Yes, it is mine.
6   Q   And did you record the responses on
7 the rating form?
8   A   Yes.
9   Q   And these are your comments. And
10 what did you do with the form after you
11 completed it?
12   A   Turned it over to HR.
13   Q   Do you know what happened to the
14 form after that point in time?
15   A   Like, I'm assuming -- I assume they
16 tallied that up, and came out with who was
17 the best candidate.
18   Q   Do you recall Mr. Edmonds's race?
19   A   African-American.
20   Q   How was Mr. Edmonds dressed for his
21 interview, if you recall?
22   A   He was in a suit and tie.

40

1   Q   Okay.
2   A   He was in a suit and tie.
3   Q   Do you have a recollection of how
4 he did at his interview, compared with how
5 Mr. Thomas did?
6   A   Well, he outperformed in my
7 opinion, better. He answered the questions.
8 His mannerism and his delivery was a lot
9 better than Mr. Thomas.
10   Q   In your opinion, was Mr. Edmonds a
11 better qualified candidate than Mr. Thomas?
12   A   Yes.
13   Q   And why was that?
14   A   Knowledgeable, experience,
15 background, delivery. How he answered the
16 questions and projected that positive
17 go-getter type attitude.
18   Q   Do you know who was selected for
19 the position of Lead Support Services
20 Specialist?
21   A   Barry Edmonds.
22   Q   And did Mr. Edmonds also ultimately

41

1 report to you as Director of Logistics and
2 Support?
3   A   Yes.
4   Q   Okay. And you remember a few
5 moments ago I asked you about the 342 series
6 and whether you thought that was appropriate
7 for the members of your organization. Did
8 there come a time when OMA advertised for a
9 Lead Logistics Management Specialist, a 346
10 series position?
11   A   I can't remember.
12   Q   If I were to show you a vacancy
13 announcement for that position, would it help
14 you to recollect?
15   A   That might --
16     MS. PIVEC: Mark this as 5.
17       (Deposition Exhibit No. 5 was
18       marked for identification.)
19     THE WITNESS: You're asking me
20 questions that are over three years ago or
21 four years ago or something.
22

11 (Pages 38 to 41)

90

1    A    Uh-huh.
2    Q    And this position was advertised,
3  or the vacancy announcement posted, on April
4  3rd, correct?
5    A    Uh-huh.
6    Q    And this person was going to be
7  working directly for you, according to Lister
8  Exhibit 7, right?
9    A    Uh-huh.
10    Q    And you did not have any input into
11  actually establishing what the requirements
12  would be for a special assistant who was
13  going to work for you?
14    A    No, if memory served me correctly,
15  my boss said I do need -- I did need a
16  deputy, over there --
17    Q    And when you say your boss, are we
18  talking about Ms. Smoak?
19    A    Yes.
20    Q    Okay.
21    A    And I think when we were doing --
22  during our conversation there had been either

91

1  deputy. I'm not hiring deputies. I think I
2  could do the job myself.
3    Q    So you had discussions with Ms.
4  Smoak when you first became employed and she
5  believed you needed a deputy. Is that right?
6    A    Because we wanted to make sure --
7  if I am not mistaken, no -- I'm thinking here
8  -- I'm not mistaken. They wanted to make
9  sure we had coverage. And again that I had
10  to go out on vacation, school, or whatever,
11  and you needed someone to oversee the
12  operation. And as you look around the
13  District, everybody had deputies. And they
14  needed someone to be the back-up for me.
15    Q    So that when you came on board, Ms.
16  Smoak had that kind of discussion with you,
17  correct, in March?
18    A    You know, we -- because when I went
19  back and talked to her about the makeup of
20  their positions and all of them being 342s, I
21  was looking at workers. Not bringing in a
22  deputy. I was looking at trying to get the

92

1  right number of people there to be the -- for
2  the mission that we had.
3    Q    And so that this position of
4  special assistant, in terms of the
5  requirements of the job and what the job
6  would do, this was not something that you
7  developed as far as the job duties that are
8  listed on Lister Exhibit Number 6?
9    A    Oh, yeah, I have developed what --
10  what a person would have to do now. Come on
11  I'm not -- my boss is not going to say, well,
12  I'm going to have a deputy, and I am going to
13  come up with the job description. You need
14  to come up with the job description, because
15  the person is going to be working for you.
16  What do you have for him or her to do?
17    Q    So that once there was a decision
18  to have a special assistant position, you
19  then help develop the requirements for the
20  job, right?
21    A    Because if you look across the
22  whole org chart I was the only one there that

93

1  did not have a special assistant or a deputy
2  or whatever you want to call it.
3    Q    Did you work with the Office of
4  Human Resources to develop the duties that
5  would be performed in Lister Exhibit Number
6  6?
7    A    Yeah.
8    Q    And when that process was
9  completed, then did human resources go
10  forward to advertise this position that is
11  represented by Lister Exhibit Number 6?
12    A    I would assume so.
13    Q    And in terms of this vacancy
14  announcement that is Lister Exhibit Number 6,
15  did you review it before it was finalized and
16  submitted to be published?
17    A    Yes.
18    Q    So that if in fact you came on
19  board March 10th, this vacancy announcement
20  which is Lister Exhibit Number 6 is dated
21  April 3rd, then in a matter of a period of
22  approximately three weeks, you reviewed the

24 (Pages 90 to 93)

**126**

1  A  It's a computerized system.
2  Q  And so Mr. Thomas, if he was
3  handling the Kastle Card system, would spend
4  time on the computer reviewing that system?
5  A  Uh-huh.
6  Q  And did he have to input data into
7  it?
8  A  I would assume so.
9  Q  And he would have to take it out
10  and delete things, and change pass codes?
11  A  ——————————————————————————.
12  Q  And in terms of Mr. Thomas, did he
13  have a special computer at his workstation,
14  do you know?
15  A  I don't remember, because I know I
16  had it all -- I had -- I could access the
17  system from my computer, so I don't know if
18  his had anything special about it.
19  Q  Well, now you said that you
20  observed him. You said you went by there,
21  and you saw him on the internet.
22  A  But I don't know if he -- there was

**127**

1  a special system, because I use the Kastle
2  Card on my system, so if he had a special
3  system for something else, I don't know.
4  Q  Now, you said you observed him and
5  you saw him on the internet, cruising the
6  internet. So if you went and you were close
7  enough to see the screen to see he was on the
8  internet, then you had to see whether or not
9  he had a special screen for vision purposes,
10  or --
11  MS. PIVEC:  Objection.
12  BY MS. HUTCHINSON:
13  Q  -- or something else, correct?
14  A  No, no, that's not necessary.
15  Q  Couldn't see it?
16  A  That is not necessary, because
17  everybody had a bunch of junk in the office,
18  and a lot of -- lot of folks there had a lot
19  of stuff in there that I didn't know what it
20  was, so he could have some more equipment in
21  there. It don't mean necessarily I am taking
22  inventory of what was actually in there.

**128**

1  Q  You said that --
2  A  I looked at his computer screen. I
3  am not concerned about all the other
4  equipment that's in that office.
5  Q  Well, this was his computer screen.
6  He needed it for his vision. You didn't see
7  that?
8  MS. PIVEC:  Objection.
9  MS. HUTCHINSON:  Go ahead.
10  THE WITNESS:  And like I said --
11  MS. PIVEC:  Objection to form.
12  THE WITNESS:  -- the system, or the
13  regular computer with the monitor, that's all
14  I was concerned about. Any additional
15  equipment, I am not concerned, because we all
16  had a lot of extra -- a lot of extra junk in
17  that office.
18  BY MS. HUTCHINSON:
19  Q  Well, you said that you were
20  observing him and he spent an inordinate
21  amount of time surfing the net and how did
22  you determine that he was surfing the net?

**129**

1  A  Surfing the internet is not the
2  same as sitting there looking at how many
3  pieces of electronic gear you have in your
4  office. I am not concerned.
5  Q  How did you determine that he was
6  surfing the net? You said you were there all
7  the time, so you could tell how much time he
8  spent on it.
9  A  It doesn't -- it doesn't take a
10  genius to determine whether you're surfing
11  the net or not. If you are not doing your
12  work, you're surfing the net. So if you're
13  not working -- if you're not doing the Kastle
14  Card, and you had another website that is not
15  work-related and you're not researching
16  something for a project that I have you
17  working on --
18  Q  Now in terms of the Kastle Card
19  System, was it something that you accessed
20  directly, or did you have to go through an
21  internet server to access your Kastle Card
22  System?

33 (Pages 126 to 129)

# LISTER EXHIBITS

# OFFICE OF THE CHIEF FINANCIAL OFFICER
## PANEL REVIEW

Date: 3/12/03

Job Candidate: WAlter Thomas

Position interviewing for: Support Services Positions (Lead/Specialist/Assistant/Clerk)

Interviewer: AL LiSTER

Instructions:

- Each panel team should decide on a lead interviewer and timekeeper.

- The lead interviewer should welcome the candidate; introduce him or herself; augment the introduction of other panel members.

- Greet the candidate giving your name and position.

- Explain the interview structure: the applicant will be given the interview questions and panel members will take notes.

- Explain the purpose of the interview: to acquaint interviewers and the applicant; to learn more about the applicant's background and experience to help make the best decision possible.

- Interviews should run approximately 45 minutes to 1 hour. Based on 1 hour, that allows approximately 6 minutes per question.

- Each panel member should review the candidate's application materials prior to the interview.

- It is suggested that panel members rotate asking the interview questions.

## SCORING FORM

Panel Member Signature: _[signature] Gregory R. Poe_

Candidate: _WALTER THOMAS_

Position: _Lead Support Services Specialist_

Directions: Please ask the questions listed below. Ask questions twice and allow time for reflection and processing. Make notations on pertinent information given in the applicant's response.

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 1 | Tell us about the duties of this position as you understand them and explain why your background would make you the best candidate for the position. | 5 | 4 | ③ | 2 | 1 |

Comments: _provide support to OBFO. understand the duties of the position._

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 2 | Please explain what customer service means to you. Give us one recent example in which you were noted for your customer service skills. | 5 | 4 | (3) | 2 | 1 |

Comments: Ability to quickly ~~exceed~~ provide customer service support.

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 3 | Describe your specific experience with supply maintenance. | 5 | 4 | (3) | 2 | 1 |

Comments: understand the concepts of supply maintenance.

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
|  | | | | | | |

D00671

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 4 | Describe your experience with asset inventory and control. What do you see as the problems with the system we currently have in place? | 5 | 4 | (3) | 2 | 1 |

*Comments:* Apply understands the concepts of Asset inventory and control.

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 5 | What are your best skills and weakness, and how will these affect your performance here? | 5 | 4 | (3) | 2 | 1 |

*Comments:* witness walking too much Faith in what someone tell him.

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|

D 00622

| 6 | Describe your typical workday. How do you keep yourself busy when the workload is light? | 5 | 4 | 3 | ②  | 1 |

Comments:

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 7 | Do you have any questions for the panel or would you like to make a closing statement? | 5 | 4 | ③ | 2 | 1 |

Comments:

Dooley 2

## SCORING FORM

Panel Member Signature: _George R. Poe_

Candidate: _Barry N. Edwoods_

Position: _Lead Support Services_

**Directions:** Please ask the questions listed below. Ask questions twice and allow time for reflection and processing. Make notations on pertinent information given in the applicant's response.

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 1 | Tell us about the duties of this position as you understand them and explain why your background would make you the best candidate for the position. | 5 | 4 | (3) | 2 | 1 |

*Comments:*

Ex 4

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 2 | Please explain what customer service means to you. Give us one recent example in which you were noted for your customer service skills. | | | | |
| | 5 | 4 | (3) | 2 | 1 |

*Comments:*

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 3 | Describe your specific experience with supply maintenance. | | | | |
| | 5 | 4 | (3) | 2 | 1 |

*Comments:*

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|

| | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 4 — Describe your experience with asset inventory and control. What do you see as the problems with the system we currently have in place? | 5 | 4 | (3) | 2 | 1 |

Comments:

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|
| 5 — What are your best skills and weakness, and how will these affect your performance here? | 5 | 4 | (3) | 2 | 1 |

Comments:

| Questions | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|

| | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 6 | Describe your typical workday. How do you keep yourself busy when the workload is light? | 5 | (4) | 3 | 2 | 1 |

*Comments:*

| Questions | | Outstanding Response | Above Satisfactory Response | Satisfactory Response | Below Satisfactory Response | Unsatisfactory Response |
|---|---|---|---|---|---|---|
| 7 | Do you have any questions for the panel or would you like to make a closing statement? | 5 | 4 | (3) | 2 | 1 |

*Comments:*

# EXHIBIT G

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 100-2003-00775 |

D.C. Human Rights Commission _____ and EEOC
*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| **Mr. Walter J. Thomas** | **(703) 521-1067** | **12-23-1940** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1400 South Joyce Street #913** | **Arlington, VA 22202** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **OFFICE OF TAX & REVENUE D.C. GOVERN** | **500 or More** | **(202) 442-6200** |

| Street Address | City, State and ZIP Code |
|---|---|
| **941 North Capitol Street N.E.** | **Washington, DC 20002** |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☒ AGE  ☒ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **03-28-2003**     Latest **03-28-2003**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I. I began working for the Respondent on July 6, 1998 as the Support Services Specialist. In December 2002, I was informed that my position was being abolished due to budget restraints. I applied for two positions in which I was highly qualified. I received a letter dated March 28, 2003, stating that my employment was terminated because of the abolishment of my position and my non-selection for the two positions for which I applied.

II. The Respondent did not give any reason for the above actions.

III. I believe that I have been discriminated against because of my sex (male), race (Black) age (62) and disability in violation of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967 and the Americans with Disabilities Act of 1990.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Aug 20, 2003** *Date*     *Walter J Thomas* *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

D00628

# EXHIBIT H



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

1400 L Street, N.W., Suite 200
Washington, D.C. 20005
(202) 275-7377
TTY (202) 275-7518
FAX (202) 275-6834 & 0025

**NOV 3 2003**

Mr. Walter J. Thomas
1400 South Joyce Street
#913
Arlington, VA 22202

RE: Charge No: 100-2003-00775
Thomas v. Office of the Chief Financial Officer

Dear Mr. Thomas:

The reference charge has been forwarded for supervisory review. In accordance with th Equal Employment Opportunity Commission procedures regarding charge processing, an initial assessment of your charge and the supporting information has been made.

Based on our assessment of your charge, we will not proceed further with the investigation at this time. If you have any new information you wish for us to consider, please submit it with **ten (10) days** or make an appointment to present additional evidence by calling me at (202) 275-7377.

The evidence we have obtained indicates that Respondent instituted an office-wide restructuring and your position was abolished. Respondent indicated that you along with other displaced employees were eligible to apply for any available positions you deemed yourself qualified to perform. You applied for the position of Lead Support Specialist, DS 11, but you were not selected. A Black male over the age of 40 was selected for the position. Additionally, Respondent maintains that there is no information in your employment records which indicate you have a disability. Lastly, there is no information to substantiate your belief that your former position of Support Services Specialist grade DS 13 was re-advertised. The position you offer as evidence is Special Assistant to the Director grade MSS 13.

At present it is likely that your charge will be dismissed and you will be issued a Dismissal and Notice of Rights that will allow you to proceed with your claim in court if you so desire. The EEOC will take no further action on the complaint.

If you have additional evidence, you may contact me at (202) 275-7377.

Sincerely,

Janice Campbell
Janice Campbell
Supervisory Investigator

D00630

# EXHIBIT I



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Pittsburgh Area Office**

Liberty Center
1001 Liberty Avenue, Suite 300
Pittsburgh, PA 15222-4187
(412) 644-3444
TTY (412) 644-2720
FAX (412) 644-2664

Our Reference: 100-2003-00775
              Thomas v Office of Tax & Revenue

Mr. Walter J. Thomas
1400 South Joyce Street #913
Arlington, VA 22202

Dear Mr. Thomas:

Your charge of discrimination referenced above was investigated pursuant to the Commission's policies and procedures in which it was determined the allegations were not substantiated as indicated below:

Although the information you provided by email dated 6/28/04 implies that the Respondent conducted its reorganization in an unfair manner, it offers no reason to believe that you were treated disparately due to your race, age, sex, nor disability when compared to others who were similarly situated. You have provided no reason to believe that the eight others from your office, who were younger(except one), male and female, and not disabled were treated any differently or any better than you. They too were denied positions within the new organization (except for Ms. Gaddy, a 62 year old black female) and laid off.

Based upon the above, it is not likely that further investigation will result in a finding of a violation against the Respondent, as alleged. Accordingly, enclosed please find the Commission's Dismissal and Notice of Rights. If you wish to pursue this matter further you may file a lawsuit on your own behalf within 90 days of your receipt of the attached notice.

                                    Sincerely,

6/29/04                             Frank E. Rodia
Date                                Investigator
Enclosure

# EXHIBIT J



**U.S. De  ment of Justice**

Civil Rights Division

---

*Employment Litigation Section - PHB*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*
*www.usdoj.gov/crt/emp/emphome.html*

JUN  2 2003

DJP:WBF:mdw
DJ 170-64-0


Joseph H. Hardiman, III
Area Director, EEOC
Liberty Center, Suite 300
1001 Liberty Avenue
Pittsburgh, PA 15222-4187

　　　　　Re: Re: Walter Thomas v. Office of Tax and Revenue, D. C.
　　　　　Government, EEOC No. 100-2003-00775

Dear Mr. Hardiman:

　　　We have issued a notice of right to sue under Title VII of the Civil
Rights Act of 1964 and Title I of the Americans with Disabilities Act of 1990
to the charging party on the above referenced charge and we are returning the
file to your office under separate cover.

　　　We are writing you separately to point out that, although the charging
party also alleged age discrimination in the charge under the Age
Discrimination in Employment Act of 1967 (ADEA), we did not see in the file a
copy of a document in which the EEOC issued the charging party a notice of
right to sue under the ADEA. The Department of Justice has no authority to
issue a notice of right to sue on a charge under the ADEA, regardless of
whether the respondent is a public or a private employer. Please give this
matter appropriate attention, considering the Supreme Court's decision in
Kimel v. Florida Board of Regents, 528 U.S. 62 (2000).

　　　　　　　　　Sincerely,

　　　　　　　　　David J. Palmer
　　　　　　　　　Chief
　　　　　　Employment Litigation Section
　　　　　　　Civil Rights Division

　　　　By:　　　William B. Fenton

　　　　　　　　　William B. Fenton
　　　　　　　　　Deputy Chief
　　　　　　Employment Litigation Section

cc: Barbara B. Hutchinson, Esq.
　　Attorney for Charging Party



**U.S. Department of Justice**

Civil Rights Division

---

*Employment Litigation Section - PHB*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*
*www.usdoj.gov/crt/emp/emphome.html*

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

RAA:WBF:mdw
DJ 170-64-0

CERTIFIED MAIL                                              JUN  2 2003
RETURN RECEIPT REQUESTED

Walter Thomas
c/o Barbara B. Hutchinson, Esq.
7907 Powhatan Street
New Carrollton, MD 20784

          Re: Walter Thomas v. Office of Tax and Revenue, D. C.
              Government, EEOC No. 100-2003-00775

Dear Mr. Thomas:

     Because you filed the above charge with the Equal Employment Opportunity
Commission and more than 180 days have elapsed since the date the Commission
assumed jurisdiction over that charge, and no suit based thereon has been
filed by this Department, and because you through your attorney have
specifically requested this Notice, you are hereby notified that you have the
right to institute a civil action under Title VII of the Civil Rights Act of
1964, as amended, 42 U.S.C. Section 2000e, et seq., and Title I of the
Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq., against the
above-named respondent.

     If you choose to commence a civil action, such suit must be filed in the
appropriate court within 90 days of your receipt of this Notice.

     We are returning the EEOC files pertaining to your case to the District
Office of the EEOC, located at the following address: Equal Employment
Opportunity Commission, Liberty Center, Suite 300, 1001 Liberty Avenue,
Pittsburgh, PA 15222-4187.

     This notice should not be taken to mean that the Department of Justice
has made a judgment as to whether or not your case is meritorious.

                              Sincerely,

                              R. Alexander Acosta
                              Assistant Attorney General
                              Civil Rights Division

               By:

                         William B. Fenton
                         Deputy Chief
                    Employment Litigation Section

cc: Office of Tax and Revenue,
     D.C. Government

    Area Office EEOC

# EXHIBIT K



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Pittsburgh Area Office**

Liberty Center
1001 Liberty Avenue, Suite 300
Pittsburgh, PA 15222-4187
(412) 644-3444
TTY (412) 644-2720
FAX (412) 644-2664

Our Reference:    Thomas v Office of Tax & Revenue
100-2003-007775



Mr. Walter J. Thomas
1400 South Joyce Street #913
Arlington, VA 22202

Dear Mr. Thomas:

We have received your request that the Equal Employment Opportunity
Commission (EEOC) issue you a Notice of Right to Sue for the above-
referenced charge of age and Title VII discrimination which has been filed
with EEOC. With respect to the Title VII discrimination allegation, the
case has been sent to the Department of Justice for issuance of the
appropriate Notice of Right to Sue. However, it is EEOC's position that
such Notices are not required as a prerequisite for filing a suit in U. S.
District Court under the Age Discrimination in Employment Act of 1967, as
amended (ADEA). Therefore, this office cannot issue you a Notice of Right
to Sue for that portion of your charge.

On November 21, 1991 the ADEA was amended. For charges where the date of
alleged violations on or after that date, a private ADEA lawsuit may be
filed any time from 60 days after a charge is filed with EEOC until 90
days after receipt of notification that EEOC has terminated its
processing of the charge.

Based on your indicated intent to file a private ADEA lawsuit in this
matter, EEOC is hereby administratively dismissing this charge and
terminating all processing. Therefore, this letter constitutes notice of
EEOC's dismissal. Any 90-day period applicable to this charge during
which suit should be filed begins upon your receipt of this notification
of dismissal.

Should you decide to exercise the right to file a lawsuit, please notify
this office that suit has been filed so that the Commission can take
appropriate action to insure that the case file will be preserved in
accordance with the Commission's file destruction procedures.

If there are any questions in this regard, please contact Frank E. Rodia
at (412) 644-2752.

Sincerely,

___06.07.05___
Date

*Joseph M Hardiman III*

Joseph M. Hardiman, III
Area Director

cc: Barbara Hutchinson, Esquire

E    l Employment Opportunity Commissi

---

# DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Mr. Walter J. Thomas<br>1400 South Joyce Street # 913<br>Arlington, VA 22202 | From: Equal Employment Opportunity Commission<br>Liberty Center, Suite 300<br>1001 Liberty Avenue<br>Pittsburgh, PA 15222-4187 |

[ ]   *On behalf of a person aggrieved whose identity is*
      *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 100-2003-00775 | Philadelphia Legal Unit | 215)440-2828 |

*(See the additional information attached to this form.)*

YOUR CHARGE IS DISMISSED FOR THE FOLLOWING REASON:

[ ]   The facts you allege fail to state a claim under any of the statutes enforced by the Commission.

[ ]   Respondent employs less than the required number of employees.

[ ]   Your charge was not timely filed with the Commission, *i.e.,* you waited too long after the date(s) of the discrimination you alleged to file your charge. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]   You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conferences, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your charge. You have had more than 30 days in which to respond to our final written request.

[ ]   The Commission has made reasonable efforts to locate you and has been unable to do so. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]   The respondent has made a reasonable settlement offer which affords full relief for the harm you alleged. At least 30 days have expired since you received actual notice of this settlement offer.

[x]   The Commission issues the following determination: Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]   Other *(briefly state)* _____

---

## -- NOTICE OF SUIT RIGHTS --

[x]   **Title VII and/or the Americans with Disabilities Act:** This is your NOTICE OF RIGHT TO SUE, which terminates the Commission's processing of your charge. If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in U.S. District Court. **If you decide to sue, you must sue WITHIN 90 DAYS from your receipt of this Notice; otherwise your right to sue is lost.**

[x]   **Age Discrimination in Employment Act:** This is your NOTICE OF DISMISSAL OR TERMINATION, which terminates processing of your charge. If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in U.S. District Court. **If you decide to sue, you must sue WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue is lost.

[ ]   **Equal Pay Act (EPA):** EPA suits must be brought within 2 years (3 years for willful violations) of the alleged EPA underpayment.

I certify that this notice was mailed on the date set out below.

On behalf of the Commission

_C 6 - 3 7 - 0 7_
*(Date Mailed)*

_Joseph M Hackman III for_
Marie Tommasso, Philadelphia District Director

Enclosure
      Information Sheet

cc:    Respondent(s)
       Office of Tax Revenue DC Government

EEOC Form 161 (Test 5/95)

D00655

## FILING SUIT UNDER TITLE VII OF THE CIVIL RIGHTS
## ACT OR THE AMERICANS WITH DISABILITIES ACT

**PRIVATE SUIT RIGHTS:**

This issuance of this Notice of Right to Sue ends EEOC's process with respect to your charge. You may file a lawsuit against the respondent named in your charge within 90 days from the date you receive this Notice. Therefore you should **keep a record of this date**. Once this 90-day period is over, your right to sue is lost. If you intend to consult an attorney, you should do so as soon as possible. Furthermore, in order to avoid any question that you did not act in a timely manner, if you intend to sue on your own behalf, your suit should be filed **well in advance of the expiration of the 90-day period**.

Your lawsuit must be filed in U.S. District Court. Filing this Notice is not sufficient. A court complaint must contain a short statement of the facts of your case which shows that you are entitled to relief. Generally, suits are brought in the state where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.

You may contact EEOC if you have any questions about your rights, including advice on which U.S. District Court can hear your case, or if you need to inspect and copy information contained in the case file. (Additionally, many EEOC offices can provide you with names of private attorneys who have agreed to consider referrals for private litigation.)

**ATTORNEY REPRESENTATION:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, at its discretion, assist you in obtaining a lawyer. If you plan to ask the U.S. District Court to help you obtain a lawyer, you must make this request of the court in the form and manner it requires. Your request to the U.S. District Court should be made well before the end of the 90-day period mentioned above. A request for representation does not relieve you of the obligation to file a lawsuit within this 90-day period.

**DESTRUCTION OF FILE:**

If you file suit, you or your attorney should forward a copy of your court complaint to the office where you filed your charge within 10 days after you file suit. Your file will be preserved. Generally, EEOC's rules call for your charge file to be destroyed six months from now (one year in the case of charges dismissed for no jurisdiction) unless you have notified us that you have filed suit in U.S. District Court.

**IF YOU FILE SUIT, YOU OR YOUR ATTORNEY SHOULD NOTIFY THIS OFFICE WHEN THE LAWSUIT IS RESOLVED.**

# EXHIBIT L

## FELTON P. ANDERSON, M.D.
106 Irving St, NW, Suite 314 South
Washington, DC 20010
(202) 291-7707
FAX- (202) 291-4322

May 24, 2001

Mr. Louis Parker, Director
The Mission Support Center
Office of Tax and Revenue
941 North Capital St. NE
Washington, DC 20002

Re: Request for assistance for Mr. Walter Thomas

Dear Mr. Parker:

I am writing on the behalf of my patient, Mr. Walter Thomas, who is assigned to The
Mission Support Center. Mr. Thomas has had back surgery on three discs, and is in need
of a chair that gives full support to his upper and lower back. As you are aware, Mr.
Thomas has a vision impairment. Therefore, he also needs proper lighting in his work
area, and definitely must avoid material that causes him to lose focus and vision. I know
that in the past you have assisted him with challenges associated with his vision, by
assigning him work in the area of communications. That type of assignment gave him
the opportunity to operate with a minimum of difficulty as associated with his vision
impairment. Presently, the lighting in his work area is sufficient.

I am aware that there is an existing requirement at your agency, which stipulates that
there must be a medical request for special equipment for employees who have special
needs. I certainly understand the rationale for the requirement, and I want to assist as
much as possible with the overall endeavor to assist my patient, and to comply with your
policy.

I appreciate very much that you are willing to do all that is possible to assist with this matter. Therefore, I want to take this opportunity to request the type of assistance that I have referenced above. Kindly maintain Mr. Thomas' medical information on a need to know basis only. I thank you for your consideration; and I know that Mr. Thomas appreciates your cooperation.

Sincerely,

Felton P. Anderson, M.D.

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| Walter Thomas,<br>    Plaintiff<br><br>v.<br><br>Natwar M. Ghandi,<br>Office of Chief Financial<br>Officer,<br>    Defendant | )<br>)<br>)<br>) Civil Action No. 05-1784<br>) RJL<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF WATER THOMAS' RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Walter Thomas, (Mr. Thomas), the plaintiff, pursuant to Fed.R.Civ.P. 26 and 33 provides the following responses to Defendant's First Set of Interrogatories, as follows:

1. Identify each individual participating in the preparation of the answers to these Interrogatories and their affiliation with or relationship to Plaintiff and identify the interrogatories they participated in answering.

Response: The individuals providing information for the responses to these interrogatories are Walter Thomas and the objections are from Mr. Thomas' attorney

2. Identify with specificity all elements of damages which you are claiming in this action and set forth separately the computation of the damages for each claim asserted in the Complaint.

Response: Mr. Thomas was 62 years old on March 31, 2003, the date of his termination from employment. Mr. Thomas had intended to continue working until he reach age 69. Mr. Thomas' earnings on the date of his termination from employment with the District of Columbia government were approximately $65,000 annually. After his termination ,due to his lack of funds, Mr. Thomas was unable to meet his living expenses and was threatened with eviction from his apartment; had to borrow money to meet his living expenses; and was unable to find full employment despite submitting numerous applications. Mr. Thomas applied to the Ritz Carlton, Smithsonian Institution, the U.S.

7.    State whether Plaintiff has obtained a statement from any person not a party to this action
concerning any of the matters alleged in the Complaint. If so, state the name and address of the person
who gave the statement, whether the statement is written or oral, and set forth in detail the substance and
content of the statement.

Response: Mr. Thomas received a statement from Shirley Gaddy, which is attached hereto as

Exhibit 2..

8.    If you contend that you are disabled within the meaning of the Americans with Disabilities Act and
the District of Columbia Human Rights Act, please state:

    a.    the nature and severity of your impairment,

    b.    the duration or expected duration of your impairment;

    c.    the permanent or long term impact (or the expected permanent or long term impact) of or

    resulting from your impairment;

    d.    the major life activity or activities you claim are limited by your impairment, and

    e.    the degree to which one or more major life activities are limited by your impairment.

Response:

a.    Keratoconus, both eyes, Nystagmus, amblyopocia and extreme myopia, which causes reduced

and distorted vision, inability to focus, and a wandering eye. The condition causes permanent

damage to the cornea. Mr. Thomas' medical records from July 2003 to November 2003 are

provided in response to defendant's Request for Production of Documents.

b.    Permanent impairment of vision and focus.

c.    Condition is progressive and degenerative, may result in corneal transplants. .

d.    Ability to read and focus on objects and written material. Mr. Thomas requires large type to

read.

e.    The impairment of Mr. Thomas' vision is permanent and requires large type for reading.

9.  If you take prescription medications or use other therapies to relieve your please identify the medication and therapies you utilize and the degree to which they improve your ability to function.

Response: Mr. Thomas has no medication or therapies for his condition.

10.  State all facts supporting your contention that you had an observable disability at the time of your interview for the position referenced in Paragraph 6 of the Complaint.

Response:   The impairment of Mr. Thomas' eye could be seen since the eye moved erratically.

11.  If you contend that you are better qualified than Barry Edmonds for the position referenced in Paragraph 6 of the Complaint, state the factual basis for such contention.

Response: From 1998 until March 28, 2003, Mr. Thomas was employed as the Internal Security Coordinator/Support Services Specialist performing the full range of duties of the position, which included liaison for communication and phone service, assuring the physical security of all occupied spaces, making recommendations and securing services for building alterations , and determining communications and utility services among other duties. From 1996 to 1998, Mr. Thomas served as an Operations Specialist for D.C. Public Schools reviewing and analyzing management documents, preparing lease agreements/contract authorizations for the Realty Officer, requisitioning supplies, supervising space allocation, and moves , and was involved in all aspects of the school emergency repair program. Mr. Thomas served as a Foreign Service Officer from 1971 to 1985 in Latin America, the Carribean and Ghana.

Two positions were advertised for Lead Support Specialist DS-342-11. Mr. Thomas was qualified for the position. On March 28, 2003, Mr. Thomas  was informed by Dianne Camillieri he had not been chosen for either position. On April 3, 2003, the defendant readvertised the position of Lead Support Specialist DS-346-11, stating one position was to be filled.

Barry Edmonds became employed with the District of Columbia City Council as a Clerk/Messenger in January 1982. Mr. Edmonds was   promoted to a Clerk grade 6 in 1982 and remained in the position until May 1988. Mr. Edmonds became an Administrative Assistant to

5

D.C. Councilmember Rolark in May 1988 until October 1998, when his appointment was

terminated due to a reorganization of staff. From 1989 until 2001, Mr. Edmonds became

employed by the Wall Street Journal in the Circulation Department. From 2001 until 2003, Mr.

Edmonds was employed by the Washington Times in the Circulation Department.   Mr. Edmonds

application for the position did not include any experience in real estate management, other than

his notation he was taking a real estate management course.

12.    If you contend that you are better qualified than the female selected for the position referenced in

Paragraph 10 of the Complaint, state the factual basis for such contention.

Response: Mr. Thomas as an employee affected by the restructuring of the Office of the Chief

Financial Officer was qualified to be considered for the position of Special Assistant to the

Director but was deprived of the opportunity to apply for the position, since the position was not

identified as a vacant position, prior to Mr. Thomas' termination. Mr. Thomas is not aware of all

of Ms. Bryant's qualifications for the position of Special Assistant to the Director, since no

personnel records were provided in response to Mr. Thomas' discovery request. When Mr.

Thomas receives the responses to his discovery requests, Mr. Thomas will supplement this

response.

<u>CERTIFICATION OF INTERROGATORY RESPONSES</u>

I, Walter J. Thomas  have reviewed and do hereby certify that the foregoing Plaintiff Walter Thomas' Responses to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge and belief.  The objections are the objections of the attorney.

This _30th_ day of November 2006.

Walter J. Thomas

Exhibit A

# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Walter Thomas, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1784 RJL |
| | ) | |
| Natwar Ghandi, | ) | |
| Office of the Chief Financial | ) | |
| Officer | ) | |
| Defendant | ) | |

**AFFIDAVIT OF ALBERT POWELL**

I, Albert Powell, being of lawful age and sound mind and capacity, do depose and say:

1. I retired from employment as Chief of General Services Unit of the District of Columbia Department of Tax and Revenue in 1996 or 1997. In 1998 or 1999, while working for a temporary help firm, I was assigned to work in the Office of the Chief Financial Officer for Joseph Sanchez, Director of Contracts and Procurement. It was at this time that I first met Walter Thomas, who then worked in the OCFO Office of Mission Support. Mr. Thomas was responsible for issuing security badges to all new personnel.

2. Sometime in the year 2000, I received a call from OTR Director Herbert Huff requesting that I accept a permanent position in his Office, essentially taking up my old duties as Chief of the General Services Unit. I accepted Mr. Huff's offer and returned to work as a full time permanent employee of the OCFO. My employment was at will, as were all other positions working for the OCFO.

3. In or around October 2003, Mr. Huff informed me that the General Services Unit would be responsible for handling security throughout the OCFO organization. I informed Mr. Huff that I would need additional help to handle the security function and suggested that Mr. Thomas be transferred into the unit from Mission Support to take over the security function. Mr. Huff agreed and he requested that the transfer action be processed. Shortly thereafter, Mr. Thomas began reporting to me.

4. In the fall of 2002, rumor had it that Dr. Gandhi wanted to abolish the OTR General Services Unit and consolidate all support services within the new office of Management and Administration. Mr. Huff was opposed to the idea and suggested that OTR continue to provide support services for the whole of the OCFO organization. Mr. Huff left his position sometime late 2002, after which it was announced that the proposed reorganization plan would go through and the General Services Unit would be abolished. Employees of the Unit were told that there jobs also were being abolished and that they would have to compete for positions in the new Office of Management and Administration.

5. In my time with the OCFO, the office that supplies human resources, training, logistics and other support services has gone through many changes and reorganizations. Generally speaking, when every new leader came in he or she wanted to bring their own people in to carry out their vision of how the organization should work.

6. I applied for the vacancy of Director of the new Logistics and Support Unit in the Office of Management and Administration. I interviewed for the position in February 2003. Several weeks later I was informed that I had not been selected. I received my termination letter on March 5, 2003, which was my last day of employment.

7. I have reviewed the attached performance evaluation form bearing my signature and dated on my last

day of work at Chief of General Services, March 5, 2003. The evaluation covers the period 10/01/2001 through 9/30/2002. I do not know why the attached evaluation relating to Mr. Thomas was signed so long after the close of the 2002 fiscal year, which ended 9/30/2001. I did not completed Section 1 (Work Outcomes) of the attached form. Goal/Responsibility categories contained in Section 1 was completed by Mr. Thomas himself, as part of his own Self-Evaluation. I completed Section II of the attached form (Competencies). I cannot explain why the results are totaled as 39 in Section II, rather than 40. I do not know what happened to the official copy of the review after I signed it. I forwarded it to the Office of Human Resources at OMA.

8. I do not believe that age had anything to do with the decision not to select Mr. Thomas for a position in the Office of Management and Administration. I know many retired individuals who have been offered positions with the OCFO. I myself have been called into service by the OCFO on two occasions after my retirement from District Government, the second time in 2004 when I returned to the OCFO on a contract basis to handle security work. I am told that Mr. Thomas claims that my successor, Al Lister, told Mr. Thomas on the date of his interview for the position of Lead Support Specialist position that he was not wanted because he was of retirement age. I do not believe that any manager would say such a thing. Mr. Thomas certainly never told me about such a statement at the time, or at any time since, even though I was in contact with him several times between the date he left in March 2003 and the present time.

9. In April 2003, I received a telephone call from Shirley Gaddy, one of my former employees in the General Services Unit at OTR who was still employed by the OCFO at the time. She called to inform me that the OCFO had just posted a Grade 13 position for employment in the Office of Logistics and Support, entitled "Special Assistant to the Director." I applied but was not contacted about the position.

The testimony which I have given in this Affidavit is based upon my personal knowledge, and is true and correct to the best of my knowledge.

BY:                                                DATE:

_Albert Powell_                                    _____

Albert Powell                                      March 27, 2007



## Section I:   Work Outcomes (Goals)

*Please indicate the goals, and the weighting of each goal, determined during development of the Individual Performance Plan.  Indicate employee performance relative to each goal using the 5-point scale listed on the previous page.  Provide comments and the weighted rating for each goal.  Include examples of employee behavior to support performance ratings, especially for performance above or below the "Meets Expectations" level.*

| Goal/Responsibility#1: | WEIGHTING (A) | WEIGHTED RATING (A X B) |
|---|---|---|
| Maintain current security records of all the divisions within The Office of The Deputy Chief Financial Officer Office of Tax and Revenue. | 25% | 1.25 |
| | **TIMEFRAME/ DUE DATE** | |
| **Evaluation Comments:** | **RATING (B)** | |
| During the period covered, all Tax and Revenue divisions were brought into compliance, and surplus security cards were collected, in accordance with the security policy and regulations. | 5 | |

| Goal/Responsibility#2: | WEIGHTING (A) | WEIGHTED RATING (A X B) |
|---|---|---|
| | 25% | 1.25 |
| Maintain an up to date listing of all personnel within each division of the OCFO, and eliminate duplicate possession of security cards. | **TIMEFRAME/ DUE DATE** Done | |
| **Evaluation Comments:** | **RATING (B)** | |
| During the period covered, there was a complete purging of the security files, and the names of all personnel were updated , in order to reflect the names of only the persons who are actively employed as contractors or regular employees, with valid security authorization. | 5 | |

| Goal/Responsibility#3: ____: | WEIGHTING (A) | WEIGHTED RATING (A X B) |
|---|---|---|
| | 15% | .75 |
| Assure that all requests for proper installation of security equipment are satisfied in a timely manner and assure that all of the security equipment is operating properly. | **TIMEFRAME/ DUE DATE** Done | |
| **Evaluation Comments:** | **RATING (B)** | |
| All of the security installation requests submitted during the rating period were completed in a timely manner. The proper inspections were made, without delay in compliance with security policy. | 5 | |



| Goal/Responsibility#4: | WEIGHTING (A) | WEIGHTED RATING (A X B) |
|---|---|---|
| Assure the physical security of all property, confididential documents, furnishings, and records. | 20 | .50 |
| | TIMEFRAME/ DUE DATE | |
| | 4 | |
| Evaluation Comments: | RATING (B) | |
| The proper security measures were taken to secure all records, security cards, and security files. The items were stored under lock and key, and routine inspections were made to assure that safeguards were in place. | | |

| Goal/Responsibility#5: | WEIGHTING (A) | WEIGHTED RATING (A X B) |
|---|---|---|
| Assure compliance with regulations and procedures for safe guarding of property | 15 | .60 |
| | TIMEFRAME/ DUE DATE | |
| | 4 | |
| Evaluation Comments: | RATING (B) | |

| Goal/Responsibility#5: | WEIGHTING (A) | WEIGHTED RATING (A X B) |
|---|---|---|
| | On-going | |
| Evaluation Comments: | TIMEFRAME/ DUE DATE | |
| | RATING (B) | |



## Overall Work Outcomes Rating:

1.  Multiply individual goal rating by the percentage weighting to calculate the weighted rating.
2.  Sum all weighted ratings to determine overall goal rating.
3.  If an unplanned event is included in the overall rating, assign new weightings to all goals so that all weightings, including the unplanned event, add up to 100%.

| 1.25 | 1.25 | .75 | .80 | .60 | | 4.65 |
|------|------|-----|-----|-----|------|------|
| Goal 1 | + Goal 2 | + Goal 3 | + Goal 4 | + Goal 5 | + Unplanned Event | = Overall Goal Rating |



## Section II:  Competencies

Please rate the employee's performance relative to each performance factor using the 5-point performance scale at beginning of the form.  The definition listed for each factor should be used as a benchmark for the performance level *Meets Expectations*.  For categories which do not apply to the employee being evaluated, indicate "N/A" in the rating column.

| | RATING: |
|---|---|
| **Customer Service** – Demonstrates a commitment to working with customers, both external and internal.  Works with customers to get information, assess needs, and resolve issues and concerns, and consistently acts with the customer in mind.  Establishes good customer relations and can come to workable solutions. Demonstrates commitment to providing high quality services and programs in a timely manner. Meets Expectations | 4 |
| **Flexibility/Adaptability** – Responsive and adaptive to new information and/or events.  Committed to ongoing improvement in work processes and adapts behavior or work methods in response to new information, changing conditions or unexpected obstacles. Effective at dealing with and making sense of uncertain situations. Meets Expectations | 4 |
| **Initiative** – Works to remedy problems without being told by a peer or supervisor.  Persistent in overcoming obstacles.  Sees what needs to be done and does it.  Consistently seizes opportunities when they arise and produces quality work products under minimal supervision. Meets Expectations | 4 |
| **Professionalism** – Focuses on work-related activities and acts in ways that support the goals, direction and standards of the District. Deals calmly and effectively with stress, and is a settling influence in a crisis.  Builds and maintains successful working relationships with colleagues and consistently meets performance and commitment requirements or agreements. Meets Expectations | 4 |
| **Teamwork** - Encourages a participate approach to work, fostering cooperation, pride, dialogue, and trust.  Creates strong spirit and morale.  Lets people finish and be responsible for their work.  Defines success in terms of the whole team and creates a feeling of belonging among team members.  Works well with others to achieve team goals.  Consistently places team priorities before personal priorities. Meets Expectations | 4 |
| **Job Knowledge** - Consistently executes the duties and responsibilities of his or her position in an efficient and accurate manner. Clearly understands and uses knowledge that is acquired through formal training or extensive on-the-job experience to perform duties and responsibilities.  Is effective in working with, understanding, and evaluating technical information related to the job. Effectively uses machines, tools, or equipment. Meets Expectations | 4 |
| **Resource Usage** – Conserves District resources and uses them efficiently (e.g., supplies, equipment, vehicles, uniforms, technology, etc.).  Consistently completes all assigned projects within budget and gains approval if project will exceed budget.<br><br>Meets Expectations | 4 |
| **Dependability** - Maintains an excellent record of attendance/punctuality and plans absences in advance.  Keeps promises and commitments.  Consistently completes projects accurately and on time and is very thorough when performing work and conscientious about attending to detail. Meets Expectations | 4 |
| **Communications** - Presents ideas and information both verbally and in writing in a clear, concise manner.  Shares the information people need to know to be successful.  Informs others on a timely basis.  Consistently shows a great deal of understanding, courtesy, tact, empathy, and concern when addressing others.  Demonstrates very effective listening, questioning and interpersonal skills.<br><br>Meets Expectations | 4 |
| **Integrity and Trust** - Is trusted by others.  Is seen as a direct and truthful individual and keeps confidences of others.  Does not misrepresent him/herself for personal gain.  Displays high standards of ethical conduct and understands the impact of violating these on the organization, self and others. Meets Expectations | 4 |
| **Managing People** – *Supervisors Only*- Provides ongoing guidance and positive reinforcement to improve performance.  Provides challenging tasks and assignments and will work with people who need improvement.  Consistently evaluates, provides feedback and develops employees to their next level of performance.  Shares and/or delegates power and authority with staff.  Shares rewards with | RATING: |



| | RATING: |
|---|---|
| staff. Provides corrective and/or progressive disciplinary actions to modify/improve inappropriate behavior or performance. Ensures staff are properly selected, used, appraised and developed, and are treated fairly. Effective at managing a diverse workforce. | |
| **Leadership** –*Supervisors Only*- Inspires, motivates, guides others toward goals. Coaches, mentors and challenges staff and adapts leadership style to various situations. Consistently demonstrates decisiveness in day-to-day actions. Takes unpopular positions when necessary. Faces adversity head on. Rallies support to accomplish tasks. | RATING: |
| **Strategic Planning** - *Supervisors Only*- Has broad knowledge and perspective on the strategic issues facing the District. Can anticipate future consequences and trends accurately and create improvement strategies and plans. Consistently makes sound, well-informed decisions. Clearly understands the impact and implications of decisions. | RATING: |
| **Operations Planning and Evaluating** - *Supervisors Only*- Anticipates and adjusts for potential problems or opportunities. Implements or utilizes strategic plans on a day-to-day basis. Organizes work, sets priorities, determines resource requirements. Determines short- or long-term goals and strategies to achieve them. Coordinates with other parts of the organization. Monitors progress and evaluates outcomes. | RATING: |
| **Conflict Management** – *Supervisors Only*- Accepts responsibility for effectively managing and resolving conflicts, confrontations, and disagreements in a positive and constructive manner to minimize adverse impact. Employs strong conflict management and people management skills to ensure an effective workplace. | RATING: |

## General Comments

Please indicate any additional information related to the employee's competencies not covered in the previous section.

## Overall Competency Rating

Divide total of points for competencies by total number of categories applicable.

Total Points  39   ÷   Number of categories  10          **3.9**
                                                          **Overall competency rating**

## Section III:  Overall Rating

| | | Rating | x | Weighting | = | Score |
|---|---|---|---|---|---|---|
| Overall Work Outcomes Rating (from Section I) | = | 4.65 | | .6 | | 2.79 (A) |
| Overall Competency Rating (from Section II) | = | 3.9 | | .4 | | 1.56 (B) |

Overall Performance Rating:
2.79 (A)  + 1.56 (B)  =

| OVERALL RATING: |
|---|
| **4.35** |

*Please indicate the overall rating on the first page of this form, after completing the performance evaluation discussion with the employee.*

Round the overall rating figure to the nearest hundredth and mark an X beside the calculated overall rating below:

| | | |
|---|---|---|
| | 4.5 – 5.0 | **Significantly Exceeds Expectations** |
| X | 3.5 – 4.4 | **Exceeds Expectations** |
| | 2.5 – 3.4  x | **Meets Expectations** |
| | 1.6 – 2.4 | **Needs Improvement** |
| | 1.5 & below | **Does Not Meet Expectations** |



### Section IV: Supervisor General Comments

Please indicate any additional information related to the employee's overall performance not covered in the previous section.

Mr. Thomas can always be relied upon to follow up on actions, and to ensure that everyone completes assigned tasks as scheduled. He has always exhibited a high degree of competence, professionalism, and interpersonal skills when interacting with employees at every level.

### Section V: Signatures

Appraised by: _Albert informed_   Title: _Chief General SES_   Date: _3/5/03_

Approved by: _____   Title: _____   Date: _____
(Next Level Supv/Mgr)

I have read this performance appraisal and reviewed it with my supervisor/manager. My signature does not imply agreement or disagreement with the information contained in this appraisal.

Signature (Employee) _Walter J Thomas_   Date: _3/5/03_

Employee Comments (if desired):

# EXHIBIT O

GOVERNMENT OF THE DISTRICT OF COLUMBIA
OFFICE OF THE CHIEF FINANCIAL OFFICER



March 28, 2003

Mr. Walter Thomas
Office of Management and Administration
941 North Capitol Street, NE
Washington, DC 20002

Dear Mr. Thomas:

Pursuant to the authority vested in the Chief Financial Officer of the District of Columbia by section 424 of the District of Columbia Home Rule Act, P.L. 93-198, as amended by section 302 of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, P.L.104-8, section 142 of the District of Columbia Appropriations Act of 1997, P.L. 104-194, as extended by section 111 (c) of the District of Columbia Appropriations Act of 2002, your employment is terminated effective at close of business today, March 28, 2003. This termination is due to the abolishment of your position and your non-selection for the OCFO position(s) for which you applied during the OCFO restructuring process.

You will receive a lump sum severance payment equivalent to 12 weeks of salary. This severance payment may increase depending upon the final outcome of the audit of your personnel records. In addition, you will receive payment for any unused annual leave. However, prior to receiving any severance and leave payments, you are required to return all District government property in your possession and to complete the enclosed OCFO Personnel Separation Clearance Sheet. The completed Personnel Separation Clearance Sheet must be submitted to the Director of Human Resources.

I wish to take this opportunity to thank you for the services rendered to the District Government, and wish you success in your future endeavors.

Sincerely,

Natwar M. Gandhi
Chief Financial Officer