IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Walter Thomas,                      )
                                    )
        Thomas                      )
                                    )
              v.                    )        Civil Action No. 05-1784 RJL
                                    )
Natwar Gandhi,                      )
Office of the Chief Financial       )
  Officer                           )
              Defendant             )
_____)

**MEMORANUDM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

In the instant case, Plaintiff, Walter Thomas, claims that he was discriminated
against based upon his race (African American), gender (male), age (62), and disability
(permanent cornea deficiency) by Defendant, Natwar Gandhi, in his official capacity as
Chief Financial Officer of the District of Columbia ("CFO") and chief executive of the
Office of the Chief Financial Officer ("OCFO"), based upon Thomas' non-selection for
three different vacancies posted in December 2002 and April 2003.  Thomas brings these
claims under Title VII of the Civil Rights Act of 1964, as amended, the Age
Discrimination in Employment Act, the Americans with Disabilities Act and the District
of Columbia Human Rights Act.

Dr. Gandhi now seeks partial summary judgment under Rule 56 of the Federal
Rules of Civil Procedure as to Thomas's race, gender and disability claims vis-à-vis all
three non-selection decisions, and with respect to age as to two of the three non-selection

claims. The material undisputed facts are set forth in the accompanying LRCiv 7(h) Statement.[1]

### Summary of the Undisputed Facts Supporting Partial Summary Judgment

Thomas was an at-will employee of the CFO, hired on June 24, 1998, at age 57, as a Grade 13 Liaison Specialist, based on a referral by Herbert Huff who then served as Deputy Director of the OCFO Office of Tax and Revenue ("OTR"). During his job interview, Thomas indicated that he needed an enlarged computer monitor, voice activated software and special lighting because he was nearsighted and difficulty focusing. Thomas' supervisor from September 1998 through September 2001 was Thomas Morel who is highly critical of Thomas' performance because he was chronically late for work, failed to take direction, and had many customer service complaints. In the fall of 2001, Thomas was detailed to the General Services Unit at OTR, where he was placed in charge of security issues by a new supervisor, Al Powel.

In December 2002, pursuant to the authority vested in the CFO by section 424 of the District of Columbia Home Rule Act, P.L. 93-198, as amended by section 302 of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, P.L. 104-8, section 142 of the District of Columbia Appropriations Act of 1997, P.L. 104-

---

[1] Thomas's age claims with respect to the Lead Support Services Specialist position are insulated from summary judgment because a dispute of fact exists over whether Thomas's supervisor, Al Lister, made the following statement to Thomas on March 12, 2003, in response to Thomas's question as to how he had done at his interview for that position on March 12, 2003: *"You should look for another job. Rumors everywhere. They don't want people of retirement age."* Thomas made this assertion for the first time at his deposition taken February 16, 2007, under questioning by his attorney, Barbara Hutchison. Lister, who served on the interview panel for the Lead Support Services Specialist position, denies that he made any such statement to Thomas. Thomas did not report this alleged statement to any official at the OCFO before or after his employment ended on March 28, 2003, nor is there any evidence of having reported it to any EEOC official. However, because credibility determinations may not be made at the summary judgment stage, Thomas' age claim with respect to the LSSS position must be tried. Nevertheless, as discussed below, Defendant is entitled to partial summary judgment as to Thomas' age claims regarding his non-selection for the remaining two positions because he cannot establish a *prima facie case* with respect to said claims under the *McDonnell Douglas* standard. *See* Part II.A.1 *infra*.

194, as extended by section 111 (c) of the District of Columbia Appropriations Act of 2002, P.L. 107-206, and section 409 of the 2002 Supplemental Appropriations Act, P.L. 107-206, Dr. Gandhi approved a reorganization plan calling for the abolishment of the Office of Government Relations and Human Capital ("OGRHC") and the General Services Unit and the transfer of all OCFO support functions to the newly constituted Office of Management and Administration ("OMA").   All pre-existing OCFO support positions were also abolished in the restructuring, including the position held by Thomas. The reorganization plan was devised by Diane Camilleri, a career human resource professional who was serving under an inter-agency personnel assignment from the Internal Revenue Service.[2]

Notwithstanding their at-will status, Dr. Gandhi granted Thomas and all affected employees the opportunity to apply for any of the open positions in OMA or elsewhere within the OCFO.  The OMA positions identified in the reorganization chart of December 5, 2002 were posted for 10 business days, beginning December 13, 2002.   Thomas responded to only one vacancy announcement, No. AD-RS-MA017, which referenced two openings for the position of Lead Support Services Specialist, DS-342, Grade 11 ("LSSS"), both of which were slated to report to the new Director of Logistics and Support Services.   The vacancy announcement identified the minimum requirements for the LSSS positions as one year of experience in one of several enumerated specialty support areas (inventory management, fleet management, etc.), the ability to plan, organize and control work involving diverse activities, the ability to gain cooperation and coordinate the work of others, and effective oral and written communication skills.  Four

---

[2] Camilleri returned to the IRS in June 2004.  She currently has no employment ties with the OCFO.

other individuals applied for the LSSS positions: two internal and two external, all African American males. All applicants, including Thomas, were determined to have met the minimum requirements based upon information contained in their application packages. One of the external candidates was Barry Edmonds. Both Thomas and Edmonds reported a relatively equal number of years' of on-the-job experience in support service positions. Ultimately, Edmonds was selected. Thomas was terminated on March 28, 2003, having failed to secure another position in the 16-week period following announcement of the reorganization. No one was selected for the second LSSS position referenced in the December 13, 2002 vacancy announcement.

The Edmonds selection was made based upon the results of personal interviews conducted by a panel of OMA managers consisting of OMA Director, JoAnn Smoak; Logistics and Support Director, Al Lister; and HR Director, Diane Camilleri. The same set of seven questions was put to each candidate at interview. The questions were job-related and probed each candidate's technical knowledge of logistics related functions they had performed such as security, inventory and fleet management. The questions also provided each candidate with the opportunity to articulate why he was the best qualified candidate for the LSSS position, tested their flexibility in taking on varied assignments, and questioned their overall interest and enthusiasm about working for the OCFO.

Each member of the interview panel rated the candidates based upon their responses to the interview questions, awarding a range of 1 to 5 points per question, with 5 being the highest rating. Out of a possible cumulative panel score of 85, Thomas scored a cumulative 57. OMA Director Smoak awarded Thomas the lowest scores of the

panel (16 out of 35).  She testified that she was disappointed in Thomas because he was dressed inappropriately for the interview, demonstrated limited knowledge of the OCFO security system which he was supposed to be managing, and showed little enthusiasm for continuing to work for the OCFO.[3]

Edmonds received a cumulative rating of 68 from the panel, the highest score received by any candidate.  Camilleri, Smoak and Lister each testified that Edmonds outperformed Thomas at interview and was the better qualified candidate.  There is no direct evidence that race, gender or disability was a factor in the panelists' assessments of Thomas and Edmonds for the LSSS position.  Likewise there is no direct evidence that any panelist perceived Thomas to have a vision disability.

On April 3, 2003, two new positions within OMA's division of Logistics and Support were announcement:   AD-RS-MA-033, Specialist Assistant to the Director, MSS-346-13 ("SAD") and AD-RS-MS-034, Lead Logistics Management Specialist DC-346-11 ("LLMS").  The LLMS position was created based on the recommendation of Al Lister, the new Director of Logistics and Support Services, who began work on March 10, 2003, shortly before the internal interviews for the LSSS positions were conducted. Lister, a 25-year veteran logistics manager, recommended that instead of hiring two support generalists from the DS-342 job series the CFO should recruit at lease one logistics and supply specialists from the DS-346 job series.   The Grade 13, DS-346

---

[3] Ms. Smoak left employment with the OCFO in September 2004.  She is currently Director of Operations for the District of Columbia State Education Office.  At the time of her testimony, she had no employment ties with the OCFO.

position was created by Smoak and Camilleri in order to find a manager who could serve as Lister's deputy and act in his absence.[4]

The closing date for applications for each of these vacancy announcements was April 16, 2003. They were posted on the OCFO website and they were available for pick up in the OCFO Human Resources office located at 941 N. Capitol Street. Thomas did not apply for either position. There is no record evidence that Defendant was obligated to provide personal notice to Thomas of OCFO job vacancies that arose after the announcement of the December 2002 reorganization plan. The LLMS vacancy announcement was withdrawn before interviews were conducted and was not re-posted. The SAD vacancy ultimately was filled in June 2003 by Barbara Bryant, a Caucasian female.

The record is devoid of any direct evidence that Thomas was not selected for the LSSS position and not considered for the SAD and LLMS positions because of race, gender or disability. The record is likewise devoid of evidence that would establish that Thomas had a vision impairment arising to the level of a "disability" at the time of the disputed actions, or that the decision makers regarded him as disabled.[5]

Thomas filed the underlying charge of discrimination with the EEOC on or about August 20, 2003. The only evidence of disability Thomas provided to the EEOC was a May 24, 2001 letter from Dr. Felton Anderson to Louis Parker, former Director of the

---

[4] Lister resigned his employment with the OCFO in July 2003 in order to assume his current position with the Department of Defense, in charge of worldwide logistics support.

[5] Although requested by Defendant as part of discovery, Thomas produced no medical documentation identifying the nature and severity of his vision impairment as of March 2003, the date of the only selection decision involving a position for which Thomas applied but was not selected. The only medical records Thomas produced related to treatment for a detached retina which Thomas suffered in July 2003 as a result of injuries sustained in a collision between a bus and the taxi cab in which Thomas was a passenger.

Office of Mission Support, stating that Thomas needed a special chair due to back surgery in 1991. Anderson also noted that Thomas had an unspecified vision impairment requiring special lighting, which had already being provided to Thomas. The EEOC issued written notices of intent to dismiss in November 2003 and June 2004, but did not conclude charge processing until June 7, 2005. The Civil Rights Division of the U.S. Department of Justice issued a notice of right to sue under Title VII and the Age Discrimination in Employment Act on June 2, 2005. Neither agency made any finding of discrimination.

**Legal Analysis**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions demonstrate that (1) "there is not genuine issue as to any material fact;" and (2) "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).

In ruling upon an application for summary judgment in whole or in part, the Court is obliged to view the evidence in the light most favorable to the non-moving party, and to draw all reasonable inferences in his favor; the Court is otherwise precluded from making credibility determinations and weighing the evidence. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133. 150 (2000). Where there are no genuine issues of material facts, and the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Holcomb v. Powell,* 433 F.2d 889 (D.C. Cir. 2006).

For the reasons discussed below, Dr. Gandhi is entitled to an order of partial summary judgment with respect to the following claims and theories asserted in the Complaint:

(A)    Thomas's claims of discrimination based on race and gender as to all non-selection decisions referenced under Count I of the Complaint, and as to age with respect to Thomas' non-selection for the SAD and LLMS referenced therein.

(B)    Thomas's claims of discrimination based disability arising under Counts II of the Complaint with respect to all three non-selection decisions referenced therein.

### A.    Defendants Are Entitled To Partial Summary Judgment On The Basis of Race and Gender Under Count I of the Complaint.

In the instant case, the record contains no direct evidence of discrimination on the basis of race or gender in connection with any of Thomas's disparate treatment, non-selection claims.  Accordingly, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802005 (1973), applies to the analysis of all three non-selection decisions which Thomas has contested under Count I of the Complaint. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2005); *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C.Cir.2003).    Under this approach, and with respect to each of the contested non-selection decisions, Thomas must first establish a prima facie case of discrimination by showing that: (1) he is a member of the protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications, he was rejected; and (4) either the position was filled or that it remained vacant and the employer continued to seek applicants. *Id.*

**1.    Thomas Cannot Satisfy His *Prima Facie* Burden With Respect to His Non-Selection for the LLMS and SAD Vacancies.**

It is undisputed that Thomas did not apply for either the LLMS or SAD vacancies. Accordingly, he cannot satisfy the second prong of the *McDonnell Douglas* test for establishment of a prima facie case. *Cones v. Shalala* 199 F.3d 512, 516 (D.C.Cir.2000); *Morgan v. Federal Home Loan Mortg. Corp.*, 172 F.Supp.2d 98, 112 (D.C., 2001). In a transparent attempt to avoid this deficiency in his prima facie case, Thomas pleads that he was not informed of the availability of the SAD position (Count I, ¶ 10; Count II, ¶ 21). However, the undisputed evidence establishes that both the LLMS and SAD vacancy announcements were posted on the CFO's website and were available for pick up in the OCFO's Human Resource Office, located at 941 N. Capitol Street in the District of Columbia. Thomas does not otherwise plead, nor is there any evidence to support, a contention Thomas was entitled to any greater notice as to available vacancies.

Further, Thomas' discrimination claims relating to the LLMS position are barred because the record establishes that the position was withdrawn and never filled. *Freeman v. Lewis*, 675 F.2d 398, 403 (D.C.Cir.1982) ("if no one was promoted ... during the time plaintiff says she should have been," plaintiff cannot make out a prima facie case of discrimination).; *Jones v. Tanoue*, 131 F.Supp.2d 220, 222 (D. D.C. 2001). Because plaintiff was not rejected in favor of another candidate who filled the position, a prima facie case cannot be made." *Morgan v. Federal Home Loan Mortg. Corp.*, 172 F.Supp.2d 98, 111 (D. D.C., 2001).

As a consequence of the foregoing failures to satisfy his prima facie burden, Thomas' claims based upon his non-selection for the LLMS and SAD positions must be dismissed.[6]

### 2. Thomas Cannot Establish That He Was Denied Selection For The LSSS Position Because of Race or Gender.

Dr. Gandhi concedes that Thomas has satisfied his prima facie burden with respect his claims of race and gender discrimination vis-à-vis the LSSS position for which he applied was interviewed and not selected.[7]  As such, Dr. Gandhi bears the burden of producing evidence that the selection decision was based upon a legitimate, nondiscriminatory reason. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  In this respect, the business records relating to LSSS selection and the testimony of the selecting officials which establish that the position was awarded based upon a non-discriminatory selection scheme, and the person selected deemed to be better qualified than Thomas for the position based upon legitimate, non-discriminatory criteria.

Thomas and Edmonds were interviewed and rated by the same management panel consisting of Human Resource Director Diane Camilleri, OMA Director Joann Smoak and Director of Logistics and Support Al Lister, each of whom had knowledge of the requirements of the position offered.  All of the panelists were provided with the application packages submitted by Thomas and Edmonds in advance of the interviews, wherein Thomas and Edwards provided a written record of their relevant job experience.

---

[6] Thomas' failure to satisfy the second and third prongs of the *McDonnell Douglas* prima facie test for disparate treatment in selection to the LLMS and SAD positions applies with equal force and effect to Thomas' age discrimination theory under Count I as to his non-selection for those positions, and to Thomas' to disability discrimination theory under Count II of the Complaint as to his non-selection for those positions.

[7] Although the successful candidate, Barry Edmonds, is of the same race and gender, those facts have been held non-material material at the prima facie case stage of the *McDonnell Douglas* analysis. *Stella v. Mineta*, 284 F.3d 135 (D.C. Cir., 2002)

Thomas and Edwards were asked the same set of seven (7) job-related questions at interview[8] designed to flesh out the degree to which they met the requirements stated on the face of the vacancy announcement, certain of which are not susceptible to evaluation based on the written application along (i.e., ability to plan, organize and control work involving diverse activities; ability to gain cooperation and coordinate the work of others; and skill in oral and written communications).

Each of the panelists was able to articulate non-discriminatory reasons why they perceived Edmonds to be the better qualified candidate based upon his performance during interview, which is the reason why Edmonds' individual and cumulative scores are higher than Thomas.    For example, OMA Director Smoak recollected being unimpressed by Thomas' explanation of what he had been doing at the General Services Unit, testifying to her belief that "a ten-year-old could have done what he was doing." Smoak was particularly critical of Thomas' lack of knowledge of the availability of computerized reports detailing the use of Kastle cards for ingress and egress in OCFO facilities.  She also testified that when the panel drilled down to explore the scope of his experience in the area of inventory management and tracking, he really didn't know anything.  Smoak concluded that she didn't "see any value in the work he had done for the organization" and that Thomas displayed no "interest in growing the position" or "in making any kind of meaningful contribution to the organization."

---

[8] The seven inquiries were open ended and designed to elicit expansive responses from the candidates. They were as follows:  (1) Tell us about the duties of this position as you understand them and explain why your background would make you the best candidate for the position; (2) Please explain what customer service means to you. Give one recent example in which you were noted for your customer service skills; (3) Describe your specific experience with supply maintenance; (4) Describe your experience with asset inventory and control.  What do you see as the problems with the system we currently have in place?  (5) What are your best skills and weakness (sic), and how will these affect your performance here?    (6) Describe your typical workday.  How do you keep yourself busy when the workload is light?  (7) Do you have any questions for the panel or would you like to make a closing statement?

In contrast, Smoak articulated multiple reasons why she viewed Edmonds to be better qualified for the job. She credited Edmonds with being excited about the prospect of working for the OCFO as well as his ability to articulate relevant past experience, e.g., being able to handle "prima donna" executives and officials (based on experience at the D.C. Council) and being able to perform under stressful conditions (managing delivery services for the Washington Post). Camilleri also credited Edmonds with being "upbeat," "extremely positive," "excited about being there" and able to pinpoint his relevant experience. Lister similarly remarked that Edmonds displayed a "positive go-getter type attitude."

The foregoing evidence explains why Edmonds' cumulative interview scores were 11 points higher than Thomas' (68 vs. 57), and on that basis was awarded the position. Taken together, this evidence is more than sufficient to satisfy Dr. Gandhi's burden of production under the *McDonnell Douglas* framework. *Hussain v. Nicholson*, 435 F.3d 359 (D.C. Cir., 2006).

Once a defendant satisfies its burden of production, the court must then determine whether a jury could infer that the plaintiff was discriminated against on the grounds alleged (here, race and gender) from the combination of the plaintiff's *prima facie* case, any evidence attacking defendant's legitimate explanation for the non-selection decision, and any further evidence tending to prove or disprove the existence of discrimination on the basis of race and/or gender in the decisional process. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).

It must be noted that Thomas's *prima facie* case of race and gender discrimination vis-à-vis the LSSS position is particularly weak because the selected candidate is of the

same race and gender as Thomas (African American, male). Moreover, in non-selection cases, the U.S. Court of Appeals for the District of Columbia has set a particularly high bar for proof of pretext. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996). It is not enough for Thomas to assert that he was better qualified than Edmonds; Thomas must establish that he was "significantly better qualified" than Edmonds in order to avoid summary judgment. *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288-91 (D.C.Cir.1998) (en banc) 156 F.3d at 1294.

Quoting approvingly from the decision of the United States Court of Appeals for the Seventh Circuit in *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464( 7th Cir. 1986), the District of Columbia Circuit has recognized that courts are not "super-personnel depart[s] that reexamine[] an entity's business decision[s]," preferring instead to defer to employer's decision of what nondiscriminatory qualities it will seek in filling a particular position. *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003). The *Stewart* court goes on to hold that where the evidence suggests that the selection decision involves a judgment call on the part of the employer, the court should not re-examine the decision. *Id.* at 430. *Accord: Holcomb v. Powell*, 433 F.3d at 896-901 (upholding the employer's selection decision and rejecting the adequacy of plaintiff's pretext evidence); *Butler v. Ashcroft*, 293 F.Supp.2d 74, 79-80 (D.D.C., 2003) (plaintiff's attempt to cast doubt on the employer's legitimate reason by pointing to alleged anomalies in the selection process that did not reflect discriminatory motive held insufficient to permit plaintiff to survive summary judgment).

On this record, Thomas cannot establish pretext under *Fischbach* and its progeny. In their application packages, Thomas and Edmonds reported relatively equal numbers of

years of on-the-job experience in support service positions. The results of their job interviews show a different story. The interviewers were able to examine each candidate with respect to their stated experience and make a qualitative determination with respect to the relative value of that experience in performing the job offered. In the absence of evidence that any of the panel members harbored bias against Thomas based upon his race, gender, or alleged disability, there is no basis upon which to question their individual and collective judgment that Edmonds was the better qualified candidate.

Nor is Thomas entitled to press his OCFO work experience as evidence that he was "significantly better qualified." Thomas did not have an unblemished employment record with the OCFO, as described in the affidavit testimony of his former supervisor, Al Morel, who describes Thomas as a poor performer who consistently failed to report to work on time. There also serious questions about the legitimacy of the March 5, 2003 performance review that Thomas submitted to the EEOC. The review was partially completed by Thomas himself, relates to a performance period that closed 6 months earlier, and the supervisor section is improperly completed and not signed by the second level supervisor. The debate with respect to Thomas' performance history at the OCFO, even if resolved in Thomas' favor, would not disprove the fact that the interview panel did not consider employee performance reviews in the selection process and determined Edwards to be the best qualified candidate for the LSSS because he performed far better at interview than did Thomas.

Thomas suggested during discovery that the fact that his position was abolished without resort to the process and procedure specified for career service positions within the District of Columbia government was contrary to law and therefore evidence of

14

pretext. However, it is well established that the CFO enjoys at will personnel authority and is not required to follow District Personnel Law in establishing and abolishing positions within his organization, nor in hiring and terminating appointees to agencies over which he has been given personnel authority by Congress. *See District Counsel 20 v. District of Columbia,* 1997 WL 4465254 (D.D.C. July 29, 1997) remanded on other grounds, 159 F.3d 636 (D.C. Cir. 1998); *Alexis v. District of Columbia,* 44 F.Supp.2d 331, 344-346. As these cases establish, Thomas had no property interest in continuing employment with the CFO and the CFO enjoys broad authority to structure his office without regard to pre-existing law and regulations.

Thomas has also suggested evidence of an unlawful motive in connection with the cancellation of the second LSSS position (a Series 342, Support Generalist) described in the December 13, 2002 vacancy announcement, and the alleged readvertisement of said position under a different job title, Lead Logistics Management Specialist (referred to above as LLMS) on April 3, 2003, after Thomas was let go. Thomas' allegation that the cancelled LSSS position and the new LLMS position are the same is not supported by the evidence. Camilleri, Smoak and Lister testified that the second LSSS position was cancelled after Lister came on board on March 10, 2003, because Lister, a 25-year veteran of logistics management in the military and private sector, identified the need for a logistics specialist (classified under the 346 job series) rather than a support service generalist (classified under the 342 job series). Camilleri followed Lister's recommendation and on April 3, 2003, went forward with recruitment for a Series 346 specialist, i.e., the LLMS position.

Significantly, there is absolutely no evidence connecting the decision to cancel the second LSSS vacancy to any racial or gender preference adversely impacting Thomas, nor is there any evidence of a disability bias.   Further, given Thomas' lackluster performance at the interview for the LSSS position, there is no evidence to suggest that Thomas would have been selected for the second LSSS position in an event.

In summary, for the reasons stated under Parts A.1 and A.2 above, Defendant is entitled to partial summary judgment as to the race and gender claims asserted under Count I of the Complaint.

**B.     Defendant Is Entitled to Partial Summary Judgment With Respect To All Claims Asserted Under Count II Of The Complaint, Alleging Disability Discrimination In Non-Selection For The LSSS, SAD and LLMS Vacancies.**

At Count II, of the Complaint, Thomas alleges that he was not selected for the LSSS, SAD and LLMS positions because he has a disabling condition consisting of a permanent cornea deficiency which was known to the OCFO and observable by others. For the reasons stated in Part A.1 above, even assuming Thomas could satisfy his proof burden on the issue of disability, he otherwise would not be able to establish a prima facie case because he did not apply for either position, and because the LLMS position was withdrawn and no longer available to be filled by anyone.  Hence the analysis in this section focuses solely on the merits of Thomas' non-selection claim for the LSSS position on the basis of disability.

**1.     Thomas Cannot Satisfy His Prima Facie Disability Discrimination Claim Because He Has Failed To Sustain His Burden Of Proof As To Disability.**

The Americans with Disabilities Act defines the term "disability" as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. §12102(2). The Supreme Court has recognized that this definition extends coverage to "qualified individuals" who either have an actual disability (subsection (A)), have a record of a disability (subsection (B)), or be regarded as having one (subsection (C)).

### a.    Thomas Is Not Disabled Under Prong A Of The Definition.

To state a claim of disability discrimination, Thomas bears the burden of proving, in the first instance, that he was in fact disabled within the meaning of the Americans with Disabilities Act. The Americans with Disabilities Act defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." Id. § 12102(2)(A). To establish that he is disabled under the ADA or DCHRA, Thomas must establish that: (1) he suffers from impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial. *See Bragdon v. Abbott*, 524 U.S. 624, 630-31 (1998); *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1167 (1st Cir. 2002). [9]

Thus far, Thomas has offered evidence sufficient to establish only the first and second prongs of the definition, in the form of the letter from Dr. Anderson, dated May 24, 2001, and his own testimony in response to Defendant's interrogatory No. 8. [10]

---

[9] The Court of Appeals for the District of Columbia has stated that the disability discrimination provisions of the DCHRA will be construed in a manner consistent with decisions construing the ADA. *Grant v. May Dept. Stores Co.*, 786 A.2d 580, 583 (D.C. 2001).

[10] During the discovery phase of this case, Thomas was asked to provide medical proof *inter alia* of the nature and severity of his alleged impairment, and the degree to which his vision was impaired. The only medical records Thomas provided related to treatment for a detached retina, sustained as a result of injuries in a vehicular accident that occurred on July 19, 2003, several months after he was terminated.

Americans with Disabilities Act, as the Supreme Court held in *Sutton v United Air Lines*, 527 U.S. 471 (1999) (if vision impairment is reduced by mitigation or corrective measures, the individual is not disabled).

Significantly, Thomas has offered no evidence that his corrected visual acuity during the March 2003 time frame was substantially limited beyond that of the average member of the community. His physician's May 2001 letter establishes, to the contrary, that Thomas is able to use the computer with special lighting, which had already been provided. In the absence of evidence that his visual acuity had deteriorated significantly after that date, the presumption attaches that as of March 2003 Thomas' visual acuity remained the same and that his vision was not substantially limited under the *Sutton* standard.

### b.    Thomas Is Not Disabled Under Prong B, Requiring Proof Of "A Record of An Impairment That Substantially Limits A Major Life Activity."

Assuming, *arguendo*, that Thomas intends to assert a claim of disability discrimination under Prong B of the ADA definition of disability, he has failed to produce any evidence that Camilleri, Smoak and Lister relied on a record of impairment "that would substantially limit one or more major life activities" in not selecting Thomas for the LSSS position. *See* 42 C.F.R. Section 1630.2(k). His physician's letter of May 24, 2001, which is addressed to Louis Parker, former director of the OCFO Office of Mission Support, does not state or otherwise establish that Thomas suffered from a substantially limiting vision impairment. Further, there is no admissible evidence that Camilleri, Smoak and Lister ever saw the Felton letter. Accordingly, Thomas is not disabled within the meaning of Prong B of the ADA definition of disability.

c.    **Thomas Is Not Disabled Under Prong C, Requiring Proof That He Was "Regarded As" Disabled By The Decision Makers Rendering The Disputed Decision.**

Assuming, *arguendo*, Thomas contends that the panelists who interviewed him for the LSSS position "regarded him" as incapable of performing the job because of his perceived vision impairment, he also fails to state a claim.

For purposes of the ADA, a person is "regarded as" disabled if his employer "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 114-16 (D.C. Cir. 2001) (en banc); *Gasser v. District of Columbia*, 442 F.3d 758, 763-764 (D.C. Cir. 2006). Consistent with the EEOC Interpretative Guidance, 29 C.F.R. Section 1630.1(l), a "regarded as" plaintiff must show that an employer made an employment decision because of a perception of disability based on "myth, fear or stereotype."

Thomas' "regarded as" claim suffers from two fatal flaws: First, there is no medical evidence that Thomas had an "observable" substantial, visual impairment as of the date of his LSSS interview on March 12, 2003. Dr. Anderson's letter does not establish such a fact, because it doesn't address Thomas' physical appearance or otherwise identify a condition that would be observable to a lay person. And the mere fact that he was wearing glasses at the time of the interview does not suffice to establish the existence of a substantial, observable visual impairment.

Second, there is no evidence that any member of the selection panel "observed" Thomas to have substantial vision impairment. Thomas' application package otherwise contains no reference to any form of vision impairment, and the notes of the interview panel members contain no reference to a vision impairment. In short, there is absolutely no evidence to support that the decision makers regarded Thomas as having a substantially limiting vision impairment.

Because Thomas has not offered proof sufficient to establish that he was disabled within the meaning of the ADA at the time of the disputed selection decisions, all of his claims under Count II of the Complaint must be dismissed.

## 2.    Alternatively, Thomas Cannot Establish That He Was Denied Selection For The LSSS Position Because of Disability.

Assuming, *arguendo,* that the court deems Thomas to have established that he was disabled at the time in question, his disability non-selection claim otherwise fails for absence of any evidence of pretext. As previously stated, Defendant has more than adequately satisfied its burden of production under *Burdine* by demonstrating that Edmonds was selected for the LSSS position because he was judged to be better qualified than Thomas as a result of his superior performance at interview, a judgment backed by clearly articulated reasons contained in the testimony of the members of the interview panel.

Thomas has no evidence to establish that Defendant's non-discriminatory justification for selecting Edmonds for the LSSS position is a pretext and that he was passed over either because he was visually disabled, had a record of a visual disability, or was perceived to be visually disabled. The record reveals that Defendant's agents hired Thomas in 1998 despite the fact that he said he had a vision problem and needed

specialized computer equipment, voice activated software and special lighting, and Defendant provided that equipment throughout his employment from July 1998 to March 2003. Such conduct is completely inconsistent with proof of disability bias. Second, the vacancy announcement for the LSSS position makes no mention of any special visual acuity requirements in order to perform the essential or marginal functions of the job, nor were candidates tested for visual acuity as a condition of being considered for the job. Third, the Interview rating forms contain no questions relating to any special vision requirements, nor has Thomas alleged that any such questions were posed. In short, there is no evidence whatsoever that would give rise to a reasonable inference that Thomas' vision impairment played any part in the decision to offer the position to Edmonds.

### Conclusion

Based upon the material undisputed facts, as supported by the record, and controlling law as set forth in the instant memorandum of law, Defendant respectfully requests that the court grant him partial summary judgment as to all claims asserted under Count I of the Complaint with the exception of Thomas' age claim as it relates to his non-selection for the Lead Support Services Specialist position, and as to all claims asserted under Count II of the Complaint.

April 2, 2007

Respectfully submitted,

_Mary E. Pivec_

Mary E. Pivec, Esq., D.C.
Bar No. 445760
Lewis Pivec, LLP
1300 Eye Street, N.W., 11th Floor East
Washington, D.C. 20005
(202) 772-5310
(202) 218-6877
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| Walter Thomas, )<br>)<br>Thomas )<br>)<br>v. )<br>)<br>Natwar Gandhi, )<br>Office of the Chief Financial )<br>Officer )<br>Defendant )<br>_____ ) | Civil Action No. 05-1784 RJL |

## <u>Order</u>

Based upon the Court's review of the undisputed material facts contained in the record herein and the argument in support of Defendant's Motion for Partial Summary Judgment, Plaintiff's Opposition thereto, and Defendant's Reply, it is this ___ day of ____ hereby Ordered:

(1)     Plaintiff's claims of discrimination under Count I of the Complaint are dismissed in their entirety, with prejudice, except for Plaintiff's claim of discrimination on the basis of age with respect to his non-selection for the position of Lead Support Services Specialist, with respect to which there exists material disputes of fact as to the existence of direct evidence of discrimination on the basis of age.

(2)     Plaintiff's claims of discrimination under Count II of the Complaint are dismissed in their entirety, with prejudice.

_____

United States District Judge