Page 1

1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3    ---------------------------------x

4    WALTER THOMAS,                   )

5              Plaintiff      ) Civil Action

6         V.                  ) No. 05-CV-01784

7    NATWAR GANDHI,                   )

8              Defendant      ) Pages 1-260

9    ---------------------------------x

14         DEPOSITION OF DIANE MARIE CAMILLERI

15            Wednesday, February 28, 2007

16                 Washington, DC

**EXHIBIT 3**

21   Reported by: Sherry L. Brooks

22   Job No. 179505

Page 22

1  the time. I do believe Al Powell was one of them.
2  He was the chief of this organization, this General
3  Services Unit, and others. And again, I don't recall
4  them all. Many of the functions that they did were
5  more in line with an Office of Management and
6  Administration, facilities management, logistics,
7  driving support for Dr. Gandhi.
8       Q. Now, did you review any of the employees
9  -- I'm sorry. Let me withdraw and rephrase it.
10      Did you interview any of the employees in
11 the General Services Unit?
12      A. I don't recall. No. I don't recall.
13      Q. Okay. Did you review the personnel
14 folders of the employees in the General Services
15 Unit?
16      A. I recall reviewing position -- if there
17 were any position descriptions in the personnel
18 folders -- I do recall that.
19      Q. So you looked at personnel folders for
20 position descriptions?
21      A. Yes.
22      Q. Now, you've said that you had been

Page 23

1  involved in reorganizations in human resources in the
2  Federal Government, correct?
3       A. Yes.
4       Q. Had you ever had any experience with the
5  District of Columbia Government?
6       A. No, I have not.
7       Q. So that in terms of your coming on this
8  IPA in the District of Columbia Government, did you
9  seek to determine whether there were particular types
10 of positions that were being affected as you went
11 through this process from June to December?
12      MS. PIVEC: Objection as to form.
13      THE WITNESS: Could you repeat the
14 question? Sorry.
15      BY MS. HUTCHINSON:
16      Q. Okay. In terms of the review that you
17 were doing from June to December, did you seek to
18 determine whether the positions that might be
19 affected by Deposition Exhibit Number 1 had different
20 -- were in different types of career service or
21 accepted service? Did you make any determinations
22 like that?

Page 24

1       MS. PIVEC: Objection as to form.
2       THE WITNESS: Well, the office of the CFO
3  was an at-will employer, but I did spend considerable
4  time with the D.C. Office of Personnel because I had
5  not had experience in the District Government and I
6  wanted to ensure that my federal background and my
7  experience was not so far out of line with what the
8  D.C. Office of Personnel did.
9       BY MS. HUTCHINSON:
10      Q. Now, in terms of the office of the CFO,
11 the General Services Unit in Tax and Revenue, was
12 that part of the office of the CFO?
13      A. Yes.
14      Q. Now, you said you contacted the District
15 of Columbia Government --
16      A. Office of Personnel, yes.
17      Q. Okay.
18      MS. HUTCHINSON: I'd like to have this
19 marked as Deposition Exhibit Number 3.
20      (Exhibit Number 3 was marked for
21 identification and was attached to the deposition.)
22      BY MS. HUTCHINSON:

Page 25

1       Q. Now, in terms of Deposition Exhibit Number
2  3, This is a D.C. 1 form and it's a personnel action
3  form. During the time that you were conducting your
4  review and you reviewed personnel files, did you
5  review any of the personnel action forms of the
6  various individuals who might be affected?
7       A. I don't recall doing that, no.
8       Q. Now, you said you had contacted the
9  District of Columbia, Office of Personnel, and sought
10 their -- I guess sought information from them, and
11 I'd like to direct your attention to Block 37 here.
12 And in Block 37, there's a listing with numbers
13 beside them, and they correspond. Like Number 1 is
14 career, and in this particular Deposition Exhibit
15 Number 3, there is a 1.
16      Did you -- when you were consulting with
17 the District of Columbia Government, Office of
18 Personnel, did you seek any guidance on what might be
19 the rights of individuals who had career positions if
20 their positions were abolished?
21      A. No, I did not, because I was informed that
22 Dr. Gandhi's office was an at-will employer and they

Page 26

1 were not in the career service.
2  Q. Who informed you that Dr. Gandhi's office
3 was an at-will employer?
4  A. I believe right from the start the -- you
5 know, when I was first briefed by Rick Hayes and Dr.
6 Gandhi and maybe Lucielle Dickinson.
7  Q. And so no one ever informed you that there
8 might be positions in the office that were career
9 positions?
10  A. No.
11  Q. And when you went to conduct the
12 abolishment of positions, did you have a review
13 conducted of the personnel files to determine if any
14 individuals held career status?
15  A. No, not specifically. We looked through
16 OPFs at the time of the actual restructuring to
17 determine severance pay. One of the employees in the
18 human resources office did that, so that did -- you
19 know, the review of the OPF did occur, but not
20 specifically for determining any career service
21 because, again, I was under the impression that
22 everyone in the office was at-will.

Page 27

1  Q. And so that even though you were the
2 individual who was responsible for making the
3 recommendation in Deposition Exhibit Number 3, your
4 actual process by which you arrived at determining
5 that position should be abolished did not include a
6 review of employees actual tenure or status in their
7 positions?
8  MS. PIVEC: Objection as to form.
9  THE WITNESS: Again, I was told that
10 everyone in the CFO's office was an at-will employee
11 and that no matter what the personnel folder said
12 that was the status of the employees in the
13 organization.
14  BY MS. HUTCHINSON:
15  Q. One more question. So in terms of your
16 recommendation in Deposition Exhibit Number 3, it was
17 based upon the premise that you assumed that anybody
18 who would be affected was an at-will employee?
19  A. Yes.
20  Q. And you got that information from Dr.
21 Gandhi?
22  A. Well, actually, I believe it was the --

Page 28

1 I'm trying to think. When I did the restructuring
2 plan right from the start, I worked with the
3 attorney's office, Dr. Gandhi's attorneys, and Jerry
4 Malone, Daryl Miller (phonetic) -- I'm sure there
5 were others -- and I was, you know, obviously advised
6 and given counsel.
7  Q. Now, you've had training in human
8 resources, correct?
9  A. Yes. I did. I was trained by the Office
10 of Personnel Management.
11  Q. And you know in terms of the Office of
12 Personnel Management training that you had had that
13 an individual who has career status has certain
14 rights to their position, correct?
15  A. Right.
16  Q. And in terms of the guidance you sought
17 from the District of Columbia Government personnel
18 office, you never discussed with them whether or not
19 an individual who might have career status would have
20 any rights, did you?
21  A. No, I did not, because my guidance from
22 them was strictly on the restructuring and the review

Page 29

1 of positions and enlisting their help in the
2 qualifications analysis.
3  Q. So you relied upon the guidance of the
4 attorneys that you spoke with --
5  A. Yes.
6  Q. -- who informed you that everybody was
7 at-will?
8  A. Yes.
9  MS. HUTCHINSON: I'd like to have this
10 marked as Deposition Exhibit Number 4.
11  (Exhibit Number 4 was marked for
12 identification and was attached to the deposition.)
13  BY MS. HUTCHINSON:
14  Q. Now, in terms of Deposition Exhibit Number
15 4, was this the structure of the Office of Government
16 Business and Human Capital when you first arrived in
17 June of 2002?
18  A. It looks like it, yes.
19  Q. And in terms of this particular document,
20 were you responsible for drawing up this document?
21  A. I'm not sure if I did it or if it was
22 already done and just -- I'm not sure.

8 (Pages 26 to 29)

Page 54

1   Q. Okay. And did Dr. Gandhi speak at the
2   meetings?
3   A. Yes.
4   Q. And in terms of what is stated in these
5   talking points, to the best of your recollection, did
6   he make the kind of statements that are represented
7   here on page 1?
8   A. Yes.
9   Q. Okay. And can you tell me, in terms of
10  the meetings that were held with employees, what was
11  the purpose of the meetings -- what was the intent of
12  what these meetings were to do?
13  A. To explain to them what would be happening
14  with the restructuring.
15  Q. Okay. Now, if you turn to the second page
16  of this document, it says, employee meetings,
17  December 9th, background Q and A. Do you recognize
18  this document? Did you write it?
19  A. I believe I had input into this document.
20  I don't believe I wrote it. I think the
21  communications office, again, prepared it, and it was
22  part of the restructuring website.

Page 55

1   Q. Now, in terms of this particular page
2   background Q and A -- let me withdraw that.
3       You're saying that these questions and
4   answers were put on a website?
5   A. Yes.
6   Q. What website?
7   A. It was a -- it was the office of the CFO
8   internal intranet website, restructuring website.
9   Q. So there was a website and these questions
10  were put on there?
11  A. There was many things put on there, yes.
12  I believe these were on there.
13  Q. And in terms of this particular
14  background, Q and A, if you go down to how will
15  employees be impacted, it says the process will begin
16  this week so that the plan was that you all were
17  going to in the week of December 9th, if that was the
18  case, begin the process of abolishing positions?
19  A. Begin the process of restructuring, yes.
20  Q. Okay. And say when restructuring notices
21  will be issued it says there. How will employees be
22  impacted. The process will begin this week when

Page 56

1   restructuring notices will be issued?
2   A. Um-hum.
3   Q. Okay. And then it says after you receive
4   your letter, you will remain in your current position
5   receiving your current pay until the process is
6   complete approximately 1 1/2 months later?
7   A. Yes.
8   Q. The second paragraph says, the
9   restructuring notice will list the positions
10  available in the new organization, as well as
11  vacancies throughout the OCFO. Now, in terms of this
12  restructuring, was it your plan that individuals
13  would be notified of all vacancies in the OCFO or
14  they would only be notified of specific vacancies?
15      MS. PIVEC: Objection as to form.
16      THE WITNESS: Well, the initial
17  restructuring, they were given the vacancies specific
18  to the restructure division, and if there were any
19  others that were currently open for consideration, I
20  believe we gave them the copies of those as well, but
21  I can't swear to that. It was there.
22      BY MS. HUTCHINSON:

Page 57

1   Q. Now, in this second paragraph under how
2   employees will be impacted, it says that the
3   references is a Tanya High. Do you know her?
4   A. Yes. She worked in Dr. Gandhi's office,
5   not in my office.
6   Q. She wasn't in your office?
7   A. No.
8   Q. Okay. What did she do in Dr. Gandhi's
9   office?
10  A. She was an assistant. I don't recall her
11  title, but she was an assistant there.
12  Q. But she wasn't in personnel?
13  A. No, she was not.
14  Q. And even though you were restructuring to
15  reorganize and bring more kind of I guess
16  cohesiveness to the personnel functions, Ms. High
17  continued to do personnel functions --
18  A. No. She didn't work in personnel.
19  Q. No. But she continued to stay in Dr.
20  Gandhi's office and do personnel functions?
21  A. She wasn't doing personnel functions. She
22  was just assisting with the restructuring, and that

Page 62

1   A. Yes. She had a database.
2   Q. Did she have any hard copy listing?
3   A. Yes. She had the hard copies, she had the
4   database, and she had the copies of the
5   acknowledgement sheets that were given back to the
6   people, to the applicants.
7   Q. So the applicants got a copy of their
8   acknowledgement sheet?
9   A. Yes.
10  Q. And these applications once they were I
11  guess rated by the District of Columbia, Office of
12  Personnel, or lottery people, were they then returned
13  to Ms. High --
14  A. No, to me.
15  Q. They were returned to you?
16  A. Yes.
17  Q. So you were to get everything?
18  A. Yes.
19  Q. I want you to look at the third page of
20  Deposition Exhibit Number 10, and if you look at page
21  3 and 4, this appears to be a draft letter, and it's
22  dated December 12th, 2002. And it's -- it has your

Page 63

1   signature block on page 4 of Deposition Exhibit
2   Number 10, right?
3   A. Um-hum.
4   Q. And in terms of things, was this a letter
5   that you drafted?
6   A. I believe I had input into this letter,
7   but I think most of it was drafted by the attorneys.
8   Q. So the attorneys drafted the letter and
9   the references in the first paragraph to the laws
10  that govern this restructuring were the laws that you
11  believed applied, correct?
12  A. Yes.
13  Q. And in terms of the second paragraph, you
14  reference that you're abolishing the Office of
15  Government Business and Human Capital and creating
16  the Office of Management and Administration, right?
17  A. Um-hum. Right.
18  Q. So that the support services positions in
19  Tax and Revenue when you were creating this new
20  office, were you abolishing those positions or were
21  you just moving them?
22  A. They were abolished.

Page 64

1   Q. They were abolished, okay. Now, the third
2   paragraph you say all available positions will be
3   advertised for a minimum of ten business days
4   beginning Friday, December 13th. When you said
5   available positions, you were only referencing those
6   positions that existed at the time in Management and
7   Administration?
8   A. On the new work chart, yes.
9   Q. Okay. And that would have been Deposition
10  Exhibit Number 6, right?
11  A. Yes, except for the two asteriks positions
12  because they weren't advertised because they were
13  encumbered.
14  Q. Okay. So that everything else on this
15  chart was to be advertised?
16  A. Yes.
17  Q. Now, you reference in the same paragraph
18  that -- the third paragraph that a fact sheet on the
19  selection process is included in Attachment B so you
20  attached some type of information for the
21  individuals?
22  A. Um-hum.

Page 65

1   Q. Okay. Now, I want you to turn to the
2   fifth page of Deposition Exhibit Number 10. And in
3   terms of the fifth, sixth, and seventh page, was this
4   the fact sheet that was referenced in your letter?
5   A. Yes.
6   Q. Now, in terms of this fact sheet, this is
7   a job application process, correct?
8   A. Um-hum.
9   Q. Okay. And in terms of this Step 2, it
10  says all vacancies in the new organization, as well
11  as in other areas of the Office of the Chief
12  Financial Officer, are posted for application and a
13  definitive period of competition. So that in terms
14  of this process, this restructuring, it was the
15  intention to post every vacancy that was available in
16  the OCFO at the time in December of 2002, correct?
17  A. I don't know that that's a true statement.
18  I know that all the statements in the new
19  organization were posted, but I'm not -- I can't
20  swear to you that every single vacancy that was
21  available was posted.
22  Q. Well, you were in charge of this process

Page 66

1  and this was given to the employees. Was this
2  correct information being given to them?
3      A. Yes, it was correct, but I again can't say
4  that every single vacancy was posted. I can't recall
5  that.
6      Q. So you didn't see to it that it happened?
7      A. Well, they were if they could be, but I
8  can't -- you know, if a vacancy became open the day
9  before the job posting, I can't swear to you that it
10 was posted during that ten days.
11     Q. But was it your responsibility to do that?
12     A. Not for this particular restructuring. I
13 mean, I had to have a cutoff date.
14     Q. Well, in terms of --
15     A. To the best of my ability, they were
16 posted, yes.
17     Q. Okay. Did you continue after employees
18 were issued a letter assure that the vacancies that
19 were available were posted and employees who were
20 being affected had the opportunity to apply?
21     A. Yes.
22        MS. PIVEC: Please give me the opportunity

Page 67

1  to interpose an objection. I would like to interpose
2  an objection to the last question on the basis of
3  form.
4         BY MS. HUTCHINSON:
5      Q. Okay. Now, Step 3, it says applications
6  will be reviewed for qualification determination, and
7  this was the process where you were sending them out
8  to other -- to D.C. Office of Personnel and the
9  lottery for the review?
10     A  Yes.
11     Q. And it says in the second paragraph of
12 Step 3, eligible, external applications will be
13 forwarded to a ranking panel for determination of
14 highly and our best qualified candidates. Who did
15 that?
16     A. I believe that I did most of the external
17 applications that I personally qualified them.
18     Q. So you did the external applicants?
19     A. I believe I did them all, but I can't
20 swear to it because there were hundreds.
21     Q. What happened to the ranking panels?
22     A. The ranking panel was the -- was there a

Page 68

1  ranking panel? I'm sorry. I don't recall.
2      Q. So you may or may not have had a ranking
3  panel, right, for external people? You do know what
4  a ranking panel is?
5      A. I obviously know what a ranking panel is.
6  I just don't recall the process. It's been a long
7  time.
8      Q. And it is separate and distinct from an
9  interview panel, correct?
10     A. Yes.
11     Q. And you don't know whether in this process
12 you actually forwarded outside applicants'
13 applications to a ranking panel?
14     A. I'm sorry. I don't recall. I'm drawing a
15 blank.
16     Q. And so that in terms of things, do you
17 recall whether there was any effort to determine the
18 best qualified and highly qualified external
19 candidates?
20     A. Again, I don't recall. I'm really having
21 a hard time recalling this process.
22     Q. Now, in terms of things, this was an

Page 69

1  important process, was it not?
2      A. Yes, it was an important process.
3      Q. But you were eliminating people's
4  positions?
5      A. Yes, I was.
6      Q. And if --
7      A. But these were external. I don't recall
8  the external. I very clearly recall the internal. I
9  don't recall the external.
10     Q. But if external individuals were selected
11 over internal individuals, the internal individuals
12 would be terminated, right?
13     A. Yes.
14     Q. So that if you --
15     A. Well, I'm sure the files were very well
16 documented. I don't have access to the files. Do we
17 have the files?
18     Q. I don't get to answer questions today.
19     A. Okay. Sorry. I mean, I can't remember
20 from four years ago. Sorry.
21     Q. Okay. But to the best of your
22 recollection, would you concede that this was what

18 (Pages 66 to 69)

Page 70

1  was proposed and given to employees as to how the
2  process would work for the job applications?
3     A. Yes.
4     Q. Okay. And there was an intention whether
5  accomplished or not, to have external candidates,
6  their applications ranked by a ranking panel?
7     A. Yes.
8     Q. And the only thing is that today sitting
9  here you can't recall whether that happened --
10    A. I can't recall the specifics of how that
11 happened, no, I can't, but I am sure that it did
12 because the attorneys were watching this process
13 extremely carefully. I just do not recall it.
14    Q. So they were watching, okay. Now, if you
15 go to the next page of this job application process,
16 there's a Step 5?
17    A. Yes.
18    Q. And Step 5 says that the interview panel
19 will interview all eligible, internal, displaced
20 applicants and up to the top ten best qualified
21 external candidates. So that in terms of this
22 process, internal applicants and best qualified

Page 71

1  external candidates were all interviewed as part of
2  the same process?
3     A. Yes.
4     Q. And internal applicants were not given any
5  type of priority over external applicants?
6     A. Just first consideration. In other words,
7  the interviewers saw them first.
8     Q. That's it?
9     A. Yes.
10    Q. Okay. Now, if you look at the second
11 paragraph of Step 5, it's the third line and the
12 sentence that begins with panel members, that they're
13 to meet for the purpose of reaching consensus on the
14 panel's recommendation with respect to the top five
15 candidates. Did that happen?
16    A. Yes.
17    Q. So that each interview panel after they
18 interviewed the candidates met and discussed the
19 candidates for the position?
20    A. Yes.
21    Q. Do you recall meeting with Ms. Smoke and
22 Mr. Lister to discuss the candidates for the lead

Page 72

1  support specialist position?
2     A. Vaguely, yes.
3     Q. Ms. Smoke and Mr. Lister have both
4  testified that they had no meetings on the
5  candidates, but you recall having a meeting with
6  them?
7     A. Yes, I do.
8     Q. When did that meeting occur?
9     A. I think it was at the close of the
10 interview.
11    Q. At the close of the interview?
12    A. Yes.
13    Q. Ms. Smoke and Mr. Lister both have
14 testified that they did not meet at the close of the
15 interview to discuss the candidates. Do you believe
16 they're lying?
17    A. No, I don't believe they're lying. That's
18 just what I recall.
19    Q. You recall that there was a meeting?
20    A. I recall that each interview -- at the
21 close of each interview, there was a consensus
22 discussion, whether that's a meeting or not, of the

Page 73

1  interview of the people that we interviewed.
2     Q. Ms. Smoke and Mr. Lister have both
3  testified that they ranked the panel, turned in the
4  sheet, and the candidate with the highest score was
5  selected and there was no discussion. Do you believe
6  they're lying?
7     A. I'm telling you what I recollect.
8     Q. That's your recollection?
9     A. Yes.
10    Q. So your recollection is that there was
11 some discussion on the candidates and there was a
12 consensus by the individuals who were the interview
13 panel?
14    A. I remember that there was a discussion. I
15 don't know that there was a consensus. That's what I
16 recall.
17    Q. Okay. Now, it says in the third paragraph
18 of Step 5 that there will be -- there's a last
19 sentence that says that the letters will be issued
20 within five days of the end of the selection process
21 notifying people of the selection or a termination
22 letter notifying them of their nonselection, okay?

19 (Pages 70 to 73)

Page 94

1  -- it says Walter Thomas and it has a response.
2  Now, on this page, are these the ranking
3  factors that are referenced on page 2 of the
4  Deposition Exhibit Number 12? If you want to take a
5  look.
6  A. Yes. They look like it, yes.
7  Q. Okay. Now, in terms of things -- well,
8  let me go on through. If you'll go through to the --
9  there's a page 4 of ranking factors and then there's
10  a resume.
11  A. Yes.
12  Q. And if you'll go three pages, there's a
13  standard field position description?
14  A. Okay.
15  Q. And if you'll go back, there is also a
16  document titled -- it's 5/28/96. It says PER/EX
17  Foreign Service Personnel Audit Report.
18  A. Okay.
19  Q. And then behind that, there's a
20  certificate -- two certificates. Now, in terms of
21  Deposition Exhibit Number 13, do you recall whether
22  or not this was the application that was submitted to

Page 95

1  your offices or to Ms. High by Walter Thomas for the
2  position of lead support specialist?
3  A. I have no recollection.
4  Q. You don't have a current recollection?
5  A. No.
6  Q. Now, when you were processing the
7  applications for these positions such as the lead
8  support specialist, to the best of your recollection,
9  did you receive applications on each individual who
10  applied?
11  A. Did I -- you mean me personally receive?
12  Q. No.
13  A. I don't know what you mean. Sorry.
14  Q. Once you -- the vacancy announcement
15  closed and you were ready to set up interviews, to
16  the best of your recollection, did you have an
17  application package from each individual who had
18  applied?
19  A. Yes, if they were qualified. Yes.
20  Q. If they were qualified, you had an
21  application package?
22  A. Right.

Page 96

1  Q. And no application packages were missing
2  for people you interviewed?
3  A. No, not that I recall.
4  Q. Okay. And when the application process
5  and the interview process was completed, what did you
6  do with the applications?
7  A. They were placed in the merit promotion
8  folder so there was supposed to be a merit promotion
9  folder for each vacancy announcement?
10  A. Yes.
11  Q. When did you leave the Office of the Chief
12  Financial Officer?
13  A. In September of 2004.
14  Q. Okay. And in terms of Mr. Thomas's
15  application, do you independently recall today
16  reviewing his application after the vacancy
17  announcement, which is Deposition Exhibit Number 12,
18  closed?
19  A. No.
20  Q. Okay.
21  A. Can I say something though?
22  Q. Uh-huh.

Page 97

1  A. I don't think I reviewed anybody's
2  applications because they went to Tanya after the
3  applications closed. Tanya got all the applications.
4  Q. Okay. So that there was -- you know --
5  A. I wasn't involved in the application
6  process.
7  Q. No problem. Okay.
8  MS. HUTCHINSON: I'd like to have this
9  document marked as Deposition Exhibit Number 14.
10  (Exhibit Number 14 was marked for
11  identification and was attached to the deposition.)
12  BY MS. HUTCHINSON:
13  Q. Now, in terms of the Deposition Exhibit
14  Number 14, it's a letter dated January 3, 2003, and
15  it's a -- from a Barry Edmonds. Over in the upper
16  right corner, there's some handwriting. Do you
17  recognize that handwriting?
18  A. I recognize the qualified. That's mine.
19  Q. That's your handwriting?
20  A. Yes.
21  Q. Okay. The rest of it looks like Tanya
22  High's.

Page 98

1  Q. The ADRRS?
2  A. Yes.
3  Q. And the handwriting over to the left?
4  A. It looks like Tanya's.
5  Q. Okay. So Mr. Edmonds, he was an external
6  employee, correct?
7  A. Correct.
8  Q. And so you rated him qualified?
9  A. Right.
10 Q. Did you have a ranking panel?
11 A. This is eligibility. He was qualified for
12 the position, eligible/qualified. That's what that
13 meant.
14 Q. So there was never a ranking panel, was
15 there, because you did this?
16 A. This is a qualification. This is
17 qualification, which is different from ranking.
18 Q. So --
19 A. But I can't speak to the ranking panel or
20 process unless I saw something, if you've got
21 something from the folder to help me.
22 Q. How many individuals applied for the

Page 99

1  position of lead support specialist? Do you
2  remember?
3  A. I have no idea.
4  Q. So you said you had hundreds of
5  applications that came in.
6  A. Probably a thousand.
7  Q. And you do not recall whether or not Mr.
8  Edmonds was one of the top five highly qualified or
9  best qualified candidates?
10    MS. PIVEC: Objection as to form.
11    BY MS. HUTCHINSON:
12 Q. Do you recall?
13 A. Well, he must have been top qualified
14 because he was interviewed, but he could have been
15 one of -- maybe he was the only external candidate.
16 I don't recall. I don't have that information in
17 front of me, so I'm not going to pretend to know.
18    MS. HUTCHINSON: Ms. Pivec, we asked for
19 the names of every individual not employed by the CFO
20 who applied for this vacancy announcement.
21    MS. PIVEC: I believe he was the only one.
22    MS. HUTCHINSON: That's not what it says

Page 100

1  here.
2      MS. PIVEC: Which number are you referring
3  to?
4      MS. HUTCHINSON: Interrogatory Number 4.
5  It says that you were continuing to review documents
6  in your possession for additional response of
7  materials. If there are additional candidates, we
8  would like to have them.
9      MS. PIVEC: External candidates?
10     MS. HUTCHINSON: Yes, ma'am.
11     MS. PIVEC: I will check, but I don't
12 believe there were any others.
13     MS. HUTCHINSON: We would like to have
14 them if you have them and if these were ranking
15 panels on these candidates.
16     BY MS. HUTCHINSON:
17 Q. So at any rate, you rated Mr. Edmonds
18 qualified?
19 A. Yes.
20 Q. And apparently this resume -- well, if you
21 go to page 2, it's a signature page and then page 3
22 is a resume, a Barry Edmonds. And if you go to page

Page 101

1  4, whose handwriting is this on the --
2  A. That looks like mine.
3  Q. That's yours?
4  A. Yes.
5  Q. So you reviewed this resume?
6  A. Um-hum.
7  Q. And you determined that he met the
8  qualifications for the lead support specialist
9  position, right?
10 A Yes.
11 Q. Now, in terms of the ranking factor on
12 page 1 of Deposition Exhibit Number 14, in response,
13 Mr. Edmonds as to his knowledge of real estate
14 management, he says he's taking a real estate course
15 and that was his response to that ranking factor?
16 A. Yes.
17 Q. And in terms of things, did you find that
18 to be sufficient -- a sufficient response to that
19 ranking factor? Was that satisfactory to you?
20 A. There's no satisfactory in ranking
21 factors.
22 Q. Well, did it meet your expectations?

26 (Pages 98 to 101)

Page 102

1    A.  I used his experience to qualify him for
2    the package.
3    Q.  What experience were you using?
4    A.  As it was outlined in the application, I
5    believe he needed one year -- let's see -- one year
6    of specialized experience.  He demonstrated knowledge
7    of the methods and procedures for providing or
8    performing a variety of functions applicable to the
9    position to be filled, so he had --
10   Q.  What was the specialized experience that
11   you were seeking?
12   A.  The specialized experience for a lead
13   support services specialist, it meant that he had
14   some kind of specialized experience in any of the
15   variety of support services, including space
16   management, property management, publishing services,
17   supply management, mail service facilities, and
18   equipment maintenance and transportation, that he
19   coordinated work space, office layouts, relocated
20   staff.
21         He worked with contractors.  He could
22   coordinate building access matters or manage fleets

Page 103

1    of vehicles, any of this.  If he had one year of
2    experience relating to this, he was deemed qualified.
3    Q.  Now, you're referencing the vacancy
4    announcement and you're looking at the job duties --
5    the duties of the position?
6    A.  Yes.
7    Q.  And that would be just so that we have the
8    correct deposition reference, that's Deposition
9    Exhibit Number 12, the brief description of the
10   duties is what you say is the specialized experience
11   required?
12   A.  Yes.
13   Q.  Okay.  Now, in terms of Mr. Edmonds, were
14   you basing in your statement that he was qualified
15   based upon his resume?
16   A.  Yes.
17   Q.  Okay.  And in terms of his resume, it says
18   the first experience he has is as an area manager for
19   The Washington Times, correct?
20   A.  Yes.
21   Q.  And he doesn't state a date.  It just says
22   present?

Page 104

1    A.  Right.
2    Q.  Okay.  So in terms of things at that time
3    of this application, you wouldn't have known how long
4    he was in this position?
5    A.  No, I wouldn't have, not at the time of
6    receipt.
7    Q.  Okay.  And it says he's -- his
8    responsibilities were to coordinate work schedules
9    for 18 employees who delivered The Washington Times
10   and other publication in a timely manner in Prince
11   George's County.  Is that what you were looking for
12   was someone who was responsible for supervising
13   individuals who delivered newspapers?
14   A.  Not necessarily, but he had previous
15   experience that did give him the qualifications at
16   the D.C. City Council.  He was a purchasing agent, he
17   said, procurement officer, vehicle maintenance
18   coordinator, etc., and his responsibilities to me
19   indicated that that gave him his one year of
20   specialized experience.
21   Q.  Well, he doesn't even have a date as to --
22   yes, he does.  He says he was employed from --

Page 105

1    A.  From '81 to '89.
2    Q.  Okay.  Now, in terms of this experience
3    with the D.C. City Council, did you seek to check to
4    determine whether or not these -- this experience he
5    had listed here was accurate information based upon
6    his resume?
7    A.  We would never do that for -- for just a
8    qualifications analysis phase.  If he was being
9    hired, our office of internal investigations would do
10   that background check.
11   Q.  So whatever somebody puts on their resume,
12   based upon the process that you were using, you
13   accepted that as fact and that they had actually done
14   whatever they put down here?
15   A.  Absolutely.
16   Q.  Okay.  And so there was no kind of check
17   to determine if these qualifications were accurate
18   representations of the person's experience?
19   A.  No.
20         MS. PIVEC:  Objection as to form.
21         BY MS. HUTCHINSON:
22   Q.  Okay.  Now, in terms of the fourth page --

Page 106

1  this is Deposition Exhibit Number 14 -- you made some
2  notation and you go where and then under that is Al
3  Jones. Who did you talk to to find that out?
4      A.  Well, this to me looks like -- this was a
5  piece of paper that came from -- maybe it was
6  attached to the interview documentation because I
7  wouldn't have known this until I talked to him.
8      Q.  So in terms of things, this application or
9  resume, you may have written that --
10     A.  Right.
11     Q.  -- during the interview?
12     A.  Could have been because I wouldn't have
13 known and I didn't call people.
14     Q.  Right, but you qualified Mr. Edmonds,
15 correct?
16     A.  Yes.
17     Q.  Now, were you the individual who was
18 responsible for setting up the interviews?
19     A.  No.
20     Q.  Who set up the interviews?
21     A.  Maybe Tanya did. Tanya High. I believe
22 she did, yes, Tanya and maybe somebody else that

Page 107

1  worked in the front office.
2      Q.  So Tanya had the packages and she
3  contacted individuals to set up interviews, right?
4      A.  Right.
5      Q.  And then after she did that process, is
6  that when she sent the applications to you? Well,
7  that couldn't be, because Deposition Exhibit Number
8  14 you had before you qualified Mr. Edmonds.
9      A.  Well, she would -- I would go -- what I
10 recall of the external process, she gave me everybody
11 that applied. I did the qualification review and
12 then returned her the ones that were qualified and
13 then she scheduled interviews.
14         Or there had to have been -- and honestly
15 I'm going to say again the ranking process I do not
16 recall how that entered into it -- into where it was
17 in the steps of this.
18     Q.  Could it be there was no ranking process
19 for external candidates?
20     A.  If there were a -- I'm thinking if there
21 were fewer than ten candidates that all external went
22 to interview or maybe it was fewer than five, but

Page 108

1  again, I can't swear to it. It has to be documented
2  somewhere because the attorneys would never have let
3  me do it without some documentation, so if there was
4  -- it could have been that if there were fewer than,
5  you know, a certain number of candidates and that's
6  kind of what I'm recalling, but again it's so long
7  ago. I don't know.
8      Q.  But your process that you sent out to all
9  the employees said that external candidates would go
10 to a ranking panel, not that if there were fewer or
11 less than. You announced to your employees that the
12 external candidates would have to go to a ranking
13 panel?
14         MS. PIVEC:  Objection as to form.
15         THE WITNESS:  And they may have. I don't
16 recall.
17         BY MS. HUTCHINSON:
18     Q.  And the possibility that that -- there
19 wasn't --
20     A.  It would be in the merit promotion file.
21     Q.  The possibility that there wasn't a
22 ranking panel is because based upon your belief that

Page 109

1  the attorneys would never have let you do it, right?
2          MS. PIVEC:  Objection as to form.
3          BY MS. HUTCHINSON:
4      Q.  Is that right?
5      A.  The attorneys wouldn't have let me stray
6  from the process, yes.
7      Q.  Okay. Thanks. Now, so you qualified Mr.
8  Edmonds and then somewhere along the way you believe
9  Ms. High set up interviews?
10     A.  Yes. It looks like that's her writing.
11     Q.  So High set up interviews?
12     A.  Um-hum.
13     Q.  And then the applications were sent back
14 to you? Were y'all passing this paper back and
15 forth?
16     A.  Pretty much.
17     Q.  She was? A different office.
18     A.  Yes, but I was there five times a day.
19     Q.  So you would go down there and she would
20 hand you a stack of paper?
21     A.  Or she would come to my office, yes.
22     Q.  Or she'd come?

28 (Pages 106 to 109)