Diane Marie Camilleri

Page 118

1    Q.  And that there was a General Services
2  Unit, correct?
3    A.  Um-hum.
4    Q.  And I believe your previous testimony was
5  that Mr. Powell was the chief of that unit, right?
6    A.  Yes, he was.
7    Q.  Okay.  And in terms of your restructuring,
8  did you not testify that the process was going to
9  take anywhere from after you began it a month to a
10  month and a half?
11    A.  Yes.
12    Q.  And did you complete it by February 15th?
13    A.  I don't think we can.  I think it took a
14  long time.
15    Q.  So it took a long time?
16    A.  Yes.
17    Q.  So Mr. Powell --
18    A.  He could have very well still been in the
19  job.
20    Q.  And if he was in the job, he had the
21  authority to do performance evaluations and anything
22  else he had the authority to do?

Page 119

1    A.  Yes.
2    Q.  Okay.
3      MS. HUTCHINSON:  I want to have this
4  marked as Deposition Exhibit Number 16.
5      (Exhibit Number 16 was marked for
6  identification and was attached to the deposition.)
7  BY MS. HUTCHINSON:
8    Q.  Ms. Camilleri, you have before you
9  Deposition Exhibit Number 16 and it is an Office of
10  the Chief Financial Officer panel review and it's for
11  Walter Thomas and it's dated 3/12/03.  Is this your
12  handwriting on this document?
13    A.  Yes.
14    Q.  And this is actually a document, if you'll
15  look at the remaining pages, that you completed on
16  March 12th, 2003?
17    A.  Yes.
18    Q.  Okay.  And in the upper right-hand corner
19  of page 1, there are some numbers in a circle.  Whose
20  handwriting is that?
21    A.  Where is that?  What page?
22    Q.  Page 1.  I'm sorry.  Upper right corner,

Page 120

1  there's numbers in the circle?
2    A.  Right.
3    Q.  Whose handwriting is that?
4    A.  I don't remember who totalled the
5  interview panel responses.  It might have been Tanya.
6  It could have been someone else that was helping in
7  the front office.  Maybe Pam Addison.
8    Q.  So Ms. High, was she at the interviews
9  when they were conducted?
10    A.  No.  This was at the conclusion of the
11  interviews.  They were totalled.
12    Q.  At the conclusions of the interviews, they
13  were totalled?
14    A.  Yes.
15    Q.  And so that was Ms. High present in the
16  office or area?  Did you give her these sheets?
17    A.  They were part of the folder, yes, and she
18  was totalling them from high to low as an assistant
19  to me helping with the documentation of the interview
20  results.
21    Q.  Okay.  Now, in terms of the -- this page 1
22  of Deposition Exhibit Number 16, you've got -- who

Page 121

1  designed these sheets?  Where did they come from?
2    A.  You know, I honestly think the attorneys
3  had given me -- this was something that they had used
4  in the CFO for many years, and I believe that's where
5  it came from.  I did not develop this process.
6    Q.  Now, if you look at this document, for
7  you, this is your sheets?
8    A.  Yes.
9    Q.  But they only go to Question 4 and 5?
10    A.  Okay.
11    Q.  I want to show you and give to you --
12      MS. HUTCHINSON:  I'd like to have this
13  marked as Deposition Exhibit Number 17.
14      (Exhibit Number 17 was marked for
15  identification and was attached to the deposition.)
16  BY MS. HUTCHINSON:
17    Q.  I'm giving you Deposition Exhibit Number
18  127, and is this your handwriting on Deposition
19  Exhibit Number 17?
20    A.  It looks like it, yes.
21    Q.  And on the upper right-hand corner on page
22  1, do you recognize that handwriting?

31 (Pages 118 to 121)

Diane Marie Camilleri

Page 126

1    A. I don't remember. We all asked questions.
2  I don't know who started or who asked the specific
3  question.
4    Q. And was there a format that was laid out
5  for the interview panel as to who should begin the
6  questioning?
7    A. We decided at the start of the interview
8  who would start. Usually Joanne Smoke (phonetic)
9  started, but there were occasions that I did too.
10   Q. Now, on this particular interview, do you
11 recall with Mr. Thomas whether you asked Question 1?
12   A. No, I don't recall.
13   Q. Now, you have a lot of notations, and --
14 but before we get to your notations, no in the
15 response, you circled Number 3, and when you circled
16 Number 3, what did you mean in terms of your circling
17 of Number 3?
18   A. I felt that he answered the question
19 satisfactorily.
20   Q. And if you go down to your handwritten
21 notes, you have on the first line job is and then it
22 looks like two dots, and I assume that's a colon. Is

Page 127

1  that a colon?
2    A. It looks like it, yes.
3    Q. Okay. And then you have an asterisk in a
4  box. Why do you have the asterisk in the box? Do
5  you know?
6    A. No. I think it's my note taking style.
7    Q. And in terms of the writing that you have
8  by this asterisk in the box, was this information
9  that Mr. Thomas provided?
10   A. Yes. This was his answer to the question
11 or my notation of his answer.
12   Q. Okay. And if you go over on the first
13 line PROC, what does that mean?
14   A. Procurement possibly.
15   Q. But you can't recall?
16   A. I'm not certain.
17   Q. Now, in the next paragraph where his
18 skills are -- and you've got the two dots, which may
19 be a colon, correct?
20   A. Um-hum.
21   Q. And then you have a box in the asterisk
22 again and then you have handwriting. Is the

Page 128

1  handwriting when you say his skills are, was this a
2  question that was asked and then this is his
3  response?
4    A. I think that's how he framed his response,
5  that his job was this and that his skills in the job
6  were that.
7    Q. And you have the words background is and
8  then you have a slash and an hour. What does that
9  mean?
10   A. It's just -- again, it's my note taking
11 style. I use it all over the place.
12   Q. What does it mean to you when you're
13 looking at it? Does it mean this is what the person
14 said?
15   A. No, it doesn't really mean anything I
16 don't think. It's just my style of how I take notes.
17   Q. And then you've got MGMT. What does that
18 represent?
19   A. Where is that?
20   Q. MGMT --
21   A. Management officer.
22   Q. Oh, management officer in the foreign SVC?

Page 129

1    A. Service.
2    Q. And then you have an arrow going backwards
3  towards SVC and a slash. Is that your way of putting
4  things in a box?
5    A. Yes, possibly instead of using quotation
6  marks. I don't know.
7    Q. And then you've got C-O-N-T-R-A-C-T. What
8  is that?
9    A. Contracting officer.
10   Q. In --
11   A. Beach Embassy.
12   Q. And you have like a line that looks like a
13 dash?
14   A. Um-hum.
15   Q. And then moves construction ET. What is
16 that ET?
17   A. Etc.
18   Q. And so in terms of Mr. Thomas, was he
19 saying these things, that he was a contracting
20 officer and Embassy's --
21   A. Yes.
22   Q. Okay. So that's -- okay. And then you've

Diane Marie Camilleri

Page 130

1  got after moves, a comma. Is that interior
2  decorating?
3      A. Yes.
4      Q. Okay. And ET means etc. again?
5      A. Yes, I would assume so.
6      Q. Okay. Now, if you go down below the
7  outline box for the question and response, on the
8  left, you have an arrow, and in a box, you have only
9  currently does internal security.
10         Was that information that you were writing
11  from your knowledge or was that something Mr. Thomas
12  said?
13     A. It had to have been something Mr. Thomas
14  said because I didn't know him prior to the interview
15  really.
16     Q. So you had not met Mr. Thomas prior to --
17     A. Oh, I met him, but I didn't know his
18  background, not necessarily. I never worked with
19  him.
20     Q. And then across from the box, the line
21  says -- is that interaction with heads of agencies?
22     A. Um-hum.

Page 131

1      Q. And then he listed -- or he told you all
2  the people he worked with, right?
3      A. Um-hum.
4      Q. And then below the interaction, you've got
5  a box with an asterisk, three embassies was the
6  security officer; is that right?
7      A. Yes.
8      Q. And is this protection or --
9      A. Protection of records and property.
10     Q. I got it, okay. And then below that line,
11  you have a circle with an asterisk. Now, is the
12  circle something different or what does that mean?
13     A. I don't think it really meant anything.
14  Again, it was just a note taking -- my note taking.
15     Q. And then a muriate of talents, over 20
16  plus years. Was this your conclusion?
17     A. I don't recall if that's what I got from
18  the interview or if he might have said those words.
19  I don't recall.
20     Q. And then you have over to the right an
21  arrow and a -- it looks like a double line in front
22  of the arrow, was not succinct. That's your

Page 132

1  conclusion?
2      A. Yes.
3      Q. And then below that, you have a line with
4  an arrow, focused on the past. Is that your
5  conclusion?
6      A. Yes.
7      Q. Okay. And then you say below that,
8  primarily described his experience over 20 years ago,
9  correct?
10     A. Yes.
11     Q. And then you have an arrow, used his
12  security and telecommunications skills most what?
13     A. Most here in D.C. Government.
14     Q. So is that something he told you?
15     A. He used his security in tele -- that's
16  what he must have said, yes.
17     Q. Okay. So that was the sum and substance.
18  Do you recall any other statements that Mr. Thomas
19  made in this interview?
20     A. No.
21     Q. Okay. Did you happen to notice the manner
22  in which Mr. Thomas was dressed?

Page 133

1      A. I did.
2      Q. And how was he dressed?
3      A. I recall that he was dressed in a shirt --
4  it wasn't a suit -- and it was soiled.
5      Q. It was soiled?
6      A. Um-hum.
7      Q. Now, in terms of the interviews that you
8  did, did you interview Alton Hartwell?
9      A. Yes. I believe I did.
10     Q. And in terms of Mr. Hartwell, how was he
11  dressed?
12     A. I don't recall.
13     Q. In terms of Mr. Hartwell -- do you recall?
14  -- was he a current employee?
15     A. Yes.
16     Q. Okay. And in terms of the current
17  employees, do you know whether they were given
18  advance notice of these interviews?
19     A. Yes.
20     Q. Okay. And do you know whether they were
21  told that they should dress in any certain manner?
22     A. No.

34 (Pages 130 to 133)

Diane Marie Camilleri

1    Q.  Okay.  Now, you said Mr. Thomas, was it

2  his shirt or his pants that were soiled?

3    A.  I believe it was his shirt.

4    Q.  His shirt.  What was it?  Was it a food

5  stain?

6    A.  I couldn't tell, but I recall that the

7  panel discussed his appearance.

8    Q.  They discussed his appearance?

9    A.  Yes.

10    Q.  Do you know that Mr. Lister testified that

11  Mr. Thomas was in a shirt and pants and that it was

12  no more wrinkled than the normal wear that you would

13  have on a given day?

14    A.  Okay.

15    Q.  And you say that there was a discussion of

16  his appearance?

17    A.  Yes.

18    Q.  And yet Mr. Lister doesn't recall any kind

19  of discussion at all about Mr. Thomas.

20    A.  Well, that's his memory.

21    Q.  And Ms. Smoke, she didn't recall any

22  memory of Mr. Thomas's interview.

1    A.  Okay.  Well, I recall a discussion.

2    Q.  Now, I want you to go to page 2.  And on

3  page 2 -- I'm sorry -- page 3, Deposition Exhibit

4  Number 16-B, these are -- Question 2 is the top

5  question.  Did you ask this question?

6    A.  I don't recall.

7    Q.  And you circled on Question 2 and Number

8  3, correct?

9    A.  Yes.

10    Q.  What does that mean?

11    A.  That I circled Number 3, that he responded

12  in a satisfactory way to the question.

13    Q.  Now, if you look at the comments below,

14  you have an asterisk and a parentheses I think, and

15  you go quick response made to manager's employees

16  bring -- I'm sorry.  You have a line, and then what

17  is that word, bring up positive result?

18    A.  Yes.

19    Q.  And then below that, you have an asterisk

20  with a parentheses, Mr. William.  Who is that?

21    A.  I have no idea.  He must have mentioned it

22  as an example of his customer service skills that a

1  Mr. William Bond possibly gave him a thank you for

2  his quick response.

3    Q.  Now, did you know that person?

4    A.  No.

5    Q.  Did they work in the Office of the Chief

6  Financial Officer?

7    A.  Not that I recall or not that I know of,

8  no.

9    Q.  So that in terms of things -- the people

10  who were on this I interview panel, it was yourself,

11  Mr. Lister and Ms. Smoke, correct?

12    A.  Yes.

13    Q.  And of the three of you, you were the one

14  who had been employed with the Office of the Chief

15  Financial Officer the longest, correct?

16    A.  I guess so yes, at that point, yes.

17    Q.  In fact, Mr. Lister had only been employed

18  two days, correct?

19    A.  I don't know.  I don't remember.

20    Q.  Was Mr. Lister a recent hire?

21    A.  Yes.

22    MS. HUTCHINSON:  I'm going to have this

1  marked as Deposition Exhibit Number 18.

2    (Exhibit Number 18 was marked for

3  identification and was attached to the deposition. )

4    BY MS. HUTCHINSON:

5    Q.  Ms. Camilleri, you have before you

6  Deposition Exhibit Number 18 and over to the -- on

7  the top left, it says OGBHC or MC and dash OMA

8  5/20/03 analysis.  Have you ever seen this document

9  before today?

10    A.  No, I have not.

11    Q.  Now, this document apparently was compiled

12  during the time that you were employed with the

13  Office of the Chief Financial Officer?

14    A.  Okay.

15    Q.  And in fact, on page 1, if you look over

16  on the right, it says director HR division Camilleri.

17  Do you see that?  Do you see your name down there on

18  the second block?

19    A.  Yes.

20    Q.  And it says EEO and division officer was

21  Wilson, correct?

22    A.  Yes.

Diane Marie Camilleri

Page 138

1    Q.  Was that person an EEO officer at the time
2    that you were employed there?
3    A.  Yes.
4    Q.  Okay.  And is that the person that you
5    said was affected by the restructuring --
6    A.  Yes.
7    Q.  -- so you didn't consult him?
8    A.  Yes, she was.
9    Q.  Why don't you turn to page 2 -- I'm sorry.
10   Turn to page 3.  On page 3 on the right-hand side,
11   you'll see director support services, Lister.  Do you
12   see that?
13   A.  Yes.
14   Q.  And on the far right on the last column,
15   it says 3/10/03?
16   A.  Okay.
17   Q.  And based upon the first page where the
18   last column is D.C. SCD, do you know what that is,
19   SCD?
20   A.  Service computation date.
21   Q.  So Mr. Lister apparently came to work on
22   March 10th?

Page 139

1    A.  Yes.
2    Q.  And that's two days before you had this
3    interview?
4    A.  Okay.
5    Q.  So Mr. Lister was new to your
6    organization, right?
7    A.  Right.
8    Q.  And Ms. Smoke, if you look on the first
9    page, her D.C. service comp. date is 5/7/01, correct,
10   of Deposition Exhibit 18?
11   A.  Yes.
12   Q.  But she had come to your offices in March
13   of '03 as well, correct?
14   A.  Yes.
15   MS. PIVEC:  Objection.
16   THE WITNESS:  Well, I think so.  I don't
17   remember when she came.  She was a new hire as well.
18   BY MS. HUTCHINSON:
19   Q.  Okay.  And in fact, if Ms. Smoke testified
20   that she had been hired in January but did not really
21   come to work until sometime in March 2003, you
22   wouldn't dispute that, would you?

Page 140

1    MS. PIVEC:  Objection.
2    THE WITNESS:  I believe I recall that she
3    was hired but she did not start because she had
4    something to finish.  She was finishing something
5    with her education.
6    BY MS. HUTCHINSON:
7    Q.  Okay.
8    A.  So yes.
9    Q.  So that in terms of things, the only
10   individual on the interview panel for Mr. Thomas was
11   -- who had -- let me withdraw it.
12   In terms of things, the only individual on
13   the interview panel who had been with the Office of
14   the Chief Financial Officer more than six months was
15   you?
16   A.  Yes.
17   Q.  Okay.  And so that when Mr. Thomas or any
18   other candidate mentioned an individual who maybe
19   they had received some favorable response from, none
20   of you would have known how to place that in any kind
21   of context; is that right?
22   MS. PIVEC:  Objection as to form.

Page 141

1    THE WITNESS:  That's probably true, yes.
2    BY MS. HUTCHINSON:
3    Q.  Now, before we leave page 3 of deposition
4    Exhibit 16-B, you have an arrow and you have over
5    here in the box under Question 12, kept on talking.
6    Can you tell us what did you mean by that?  Was that
7    your comment?
8    A.  Yes.
9    Q.  What did it mean?
10   A.  Well, I don't remember now, but I would
11   think it would mean what it says, that he kept on
12   talking maybe after we tried to wrap up the question
13   and he just kept on talking, but I can't tell you for
14   sure.
15   Q.  Okay.  Now, in Question 3, you have see
16   Number 1?
17   A.  Yes.
18   Q.  What does that mean?
19   A.  It means that he answered the question in
20   Number 1.  When we first initially asked him to
21   describe this position in the background, he
22   explained it, so he had answered the question.

36 (Pages 138 to 141)

Diane Marie Camilleri

Page 142

1   Q.  Okay.  And you gave him -- you circled a 3
2   and whatever the response was.  You thought it was
3   satisfactory?
4   A.  Yes.
5   Q.  Okay.  Now, if you go to page 4 of
6   deposition Exhibit 16-B in Question 4, you have a 3
7   circled, so the response that you got was
8   satisfactory, correct?
9   A.  Correct.
10   Q.  And you go, answered in Number 1?
11   A.  Correct.
12   Q.  And is that because he was -- he explained
13   something that you had already previously written in
14   Number 1 or because he answered the exact same thing?
15   A.  He answered the question.
16   Q.  Okay.
17   A.  Yes.
18   Q.  Now, on Question 5, you've got a 3 circled
19   and number -- you have comments down below.
20   A.  Okay.
21   Q.  And you have strengths and you have to
22   underlined.  What's the significance of the

Page 143

1   underlining?
2   A.  Just to show the difference between the
3   strengths and the weaknesses, I think.  It didn't
4   really have any other meaning other than to
5   differentiate the two categories.
6   Q.  And these are things after this -- after
7   strengths, are these things that Mr. Thomas listed?
8   A.  These are things that I picked up during
9   the interview, yes.
10   Q.  And in terms of things, interpersonal
11   skills, is this something he articulated that you
12   wrote here?
13   A.  Yes.
14   Q.  Okay.  And then he said he could interact
15   with anyone, with regular employee, and then you have
16   on the second line interact slash.  What is that
17   second word?
18   A.  It looks like persuade.
19   Q.  And then you have a slash, and what is the
20   rest?
21   A.  Come to a satisfactory conclusion.
22   Q.  Okay.  And then --

Page 144

1   A.  And flexible.
2   Q.  Okay.  And then the next line, you have
3   weakness and it's underlined as well, right?
4   A.  Um-hum.
5   Q.  And then you have a dash and you've got
6   focus slash.  And is that involved?
7   A.  Yes.
8   Q.  What does focus/involved mean?  Can you
9   tell us?
10   A.  I don't recall why I wrote that from his
11   answer to his question.  I don't recall.
12   Q.  Okay.  And it says -- is that in a
13   project?
14   A.  Focused involved in a project.
15   Q.  Okay.  And then you have a period and then
16   what is that next word?
17   A.  Stayed too much on one thing instead of
18   moving on.
19   Q.  And then --
20   A.  Trust and verify.  I don't know what all
21   of that means.
22   Q.  And then you have a line and you wrote

Page 145

1   something below, don't let things -- what does that
2   mean?
3   A.  Don't let things slip.
4   Q.  And is this something Mr. Thomas said as a
5   weakness?
6   A.  Yes.  I would guess so.
7   Q.  Okay.  Now, I'd like you to go to the next
8   page on 16-B, and Question 6, you have got a 3
9   circled and then you go see Number 1.
10   A.  Yes.
11   Q.  And in terms of Number 1, are you saying
12   that in terms of something he may have said in Number
13   1 it described his typical workday?
14   A.  Yes.
15   Q.  Okay.  Now, if you'll go -- Question 7, it
16   says -- you circled the 3?
17   A.  Yes.
18   Q.  And then in the comment box, you've got
19   question.  Is that question?
20   A.  Yes.
21   Q.  And you've got a line and then you have
22   selection process and it looks like a colon and

37 (Pages 142 to 145)

Diane Marie Camilleri

Page 146

1  that's underlined?

2      A.  Um-hum.

3      Q.  Did Mr. Thomas raise a question about the

4  selection process with this panel?

5      A.  It appears to be.  I don't recall it.

6      Q.  Were his questions answered?

7      A.  I would hope so.

8      Q.  Okay.  Now, you got circled over on the

9  right on the bottom of the page a circle or it looks

10  like a part of the circle; is that correct?  And you

11  have an asterisk and you go Walt dash is here and

12  then you scratch something out.  Can you tell me what

13  you scratched out there?

14      A.  It looks like is, but I had already -- I

15  meant to say is here.

16      Q.  Late at night?

17      A.  Yes.

18      Q.  Is that something Mr. Thomas may have said

19  or is that your comment?

20      A.  No.  That's his comment.  It was one of

21  his closing statements, I believe.

22      Q.  And then he had -- you have an asterisk

Page 147

1  and is that can interact with Spanish-speaking staff?

2      A.  Yes.

3      Q.  So those were two things he added as

4  additional information for the interview panel?

5      A.  Yes.

6      Q.  Now, as I understand it, you said that the

7  panel had a discussion.  Now, the panel had a

8  discussion at the end of the interview?

9      A.  Um-hum.

10      Q.  And reached a consensus on the applicant

11  or reached a consensus -- what would they reach a

12  consensus about at this point?

13      A.  I don't recall.

14      Q.  Well, you can't have selected anybody

15  because you didn't have all of your interviews

16  finished?

17      A.  Right.  Typically when we would close an

18  interview, we would do our own scoring and then we

19  would talk about scoring that perhaps was really

20  significantly different from each other.  And so

21  that's sort of the consensus part, you know, why was

22  mine so far off of yours.  What did you see that I

Page 148

1  didn't see, that kind of thing.

2      Q.  Now, your scoring on Mr. Thomas added up

3  to 21.

4      A.  Okay.

5      Q.  And in terms of things --

6      MS. HUTCHINSON:  I'm going to have this

7  marked Deposition Exhibit Number 19.

8      (Exhibit Number 19 was marked for

9  identification and was attached to the deposition.)

10      BY MS. HUTCHINSON:

11      Q.  Deposition Exhibit Number 19 that's before

12  you now is a scoring sheet of Alphonso Lister on Mr.

13  Thomas, and in terms of Deposition Exhibit Number 19,

14  Mr. Lister scored Mr. Thomas -- well, on page 1 of

15  Deposition Exhibit Number 19, Mr. Lister -- there's a

16  circle -- no.  Page 1.  There's a circle in the upper

17  right-hand corner, and it has a 20.

18      A.  Okay.

19      Q.  And whose handwriting is that?  Do you

20  know?

21      A.  No, I don't.

22      Q.  Mr. Lister testified that it wasn't his

Page 149

1  handwriting either?

2      A.  Okay.

3      Q.  So he didn't put this on there.

4      A.  Right.

5      Q.  And you didn't put your scores on your

6  page?

7      A.  No.

8      Q.  So who was writing these scores on these

9  documents?

10      A.  They were totalled after the interview.

11      Q.  So after the interview, and after the

12  interview, they were totalled.  So where were any

13  notations about any consensus or discussions about

14  candidates?

15      A.  We had the discussions before we left the

16  room, as I recall.

17      Q.  Well, of what value would they be since

18  they wouldn't be communicated to anybody who was

19  going to make the selection?

20      A.  They were for the purpose of the interview

21  panel to make sure that we didn't make an unfair

22  judgment.  Maybe someone heard something that another

38 (Pages 146 to 149)

Diane Marie Camilleri

Page 174

1  supervised individuals at the D.C. City Council?
2     A.  I don't know if it was relating to the
3  City Council still, but it said to the staff of five
4  people.  I don't know.  Maybe it was specific to his
5  D.C. Council job.
6     Q.  But when you wrote that, it was from your
7  perspective an indication that he had done some
8  supervisory work?
9     A.  Yes.
10     Q.  Okay.  Let me see the next page.  Now, on
11  the next page of Deposition Exhibit Number 17, you've
12  got Question 4 and this is -- you've got some
13  comments there under Question 4, and you have a total
14  count of -- of some kind of slash log.  What is that?
15     A.  I don't remember.  City Council total
16  count/log of all property.  Good computer skills.
17     Q.  Okay.  Now, in terms of these computer
18  skills that you wrote down on there, was there some
19  kind of description that Mr. Edmonds gave that would
20  have made you write that or --
21     A.  I would assume so.  I don't know why I'd
22  write it down.

Page 175

1     Q.  Okay.  Did he demonstrate something?  How
2  would you know whether he had good computer skills?
3     A.  He probably said he had good computer
4  skills and I probably paraphrased it.
5     Q.  So because the individual said he had good
6  computer skills, you wrote that down and did that
7  mean to you that they did have them or it's just
8  something --
9     A.  Just how he answered the question.
10     Q.  Okay.  All right.  Now, the next question
11  is Number 5, and question Number 5 is the skills and
12  weaknesses, best skills and weaknesses, and you've
13  got down in the comment box business admin.  Was
14  business administration -- was that an indication
15  that Mr. Edmonds had said that he had some kind of
16  degree in business administration or something like
17  that?
18     A.  I don't recall.
19     Q.  You don't remember?
20     A.  No.  Can bring management skills, business
21  administration.  It doesn't really mean anything to
22  me now and his weaknesses were not getting enough

Page 176

1  work.
2     Q.  Okay.  In terms of a weakness of not
3  getting enough work, did you consider as an
4  individual who has human resource experience and has
5  interviewed over 200 people you said that it would be
6  a weakness that an individual was not getting enough
7  work or --
8     A.  I don't even know what that means now, so
9  I would just be guessing.
10     Q.  But I mean if someone said that, do you
11  think that was the comment that Mr. Edmonds made?
12     A.  It must have been because I wrote it down.
13     Q.  Because you wrote it down, so you were
14  writing down the individual's comments?  These were
15  not your thoughts?
16     A.  No.  These were not my thoughts.
17     Q.  Okay.  On the next page, you've got
18  Question 6, and in terms of Question 6 -- in fact,
19  Question 6 was about --
20     A.  Typical workday?
21     Q.  Yes, the typical workday.  And what is it
22  that Mr. Edmonds told you all is the typical work

Page 177

1  day?
2     A.  Incoming mail.  Vehicle logs.  Public
3  works, repairs, copiers, training, messenger
4  services.
5     Q.  That was his typical workday as a
6  circulation manager?
7     A.  I don't know.  It says describe your
8  typical workday.  How do you keep busy when the
9  workload is light.  That's what I wrote down.
10     Q.  And so he was an area manager for The
11  Washington Times, right?  That was his current job.
12  Do you see that?
13     A.  Um-hum.
14     Q.  And so when you were interviewing Mr.
15  Edmonds and he said that this was his typical
16  workday, did that -- was that something that you
17  believed a circulation manager does is keep logs and
18  --
19     A.  Honestly, I don't recall if we questioned
20  him, if it was his current -- I don't remember.
21     Q.  Do you know what a circulation manager
22  does at all?

45 (Pages 174 to 177)

Page 182

1  you know?

2      A.  Yes.  It appears to be.

3      Q.  Okay.  And so apparently Ms. Smoke was in

4  an interview panel with you on the 17th; however, for

5  Mr. Allen, her second sheet doesn't have a date on

6  it.

7      A.  Yes.  Okay.

8      Q.  All right.  In terms of things, she was a

9  panel member, and if you go through to page 7 -- I

10  mean to Question 7 and the comments, we've got

11  interview notes from Ms. Smoke, but we don't have any

12  interview notes for anybody else.

13      A.  We should.

14      Q.  Well, we don't, and let's proceed.  We

15  don't want to hold up progress here.

16          If you go to the employment application in

17  Deposition Exhibit Number 22, Mr. Allen submitted an

18  employment application, and he -- there's a note on

19  the front of his employment application first page

20  qualified.  Whose handwriting is that?

21      A.  That's mine.

22      Q.  So you apparently qualified Mr. Allen and

Page 183

1  -- but you don't remember whether you had a rating or

2  ranking panel on it?

3      A.  No.

4      Q.  And in terms of things, you got a date

5  here -- if you go to the last page, Mr. Allen

6  submitted his application on 1/3/03.

7          And in terms of this process, if I

8  understood when we talked about this process before,

9  the process was that the individual was to bring in

10  the little form and that form would show when the

11  application came in.  There's no form in here for Mr.

12  Allen either, the same type of form that was in Mr.

13  Thomas's package, and there's no ranking factors

14  here.

15          Where are Mr. Allen's ranking factors?

16      A.  I can't answer that.

17      Q.  Why would you qualify someone whose

18  application package has no ranking factors, no -- but

19  you qualify --

20      MS. PIVEC:  Counsel, it's not in the whole

21  package that we had --

22      MS. HUTCHINSON:  Pardon me?

Page 184

1      MS. PIVEC:  There appears to be

2  information -- I see --

3      MS. HUTCHINSON:  There's no ranking

4  factors in this package, is there?  To the knowledge

5  of federal budget and training?  As part of his

6  resume, there's no --

7      MS. PIVEC:  The only way to communicate

8  effectively --

9      MS. HUTCHINSON:  Whoa, whoa, whoa.  You

10  can examine this lady when I'm finished, but let me

11  do mine.

12      MS. PIVEC:  I'm trying to keep us on

13  track.

14      MS. HUTCHINSON:  I am trying to keep us on

15  track too.

16      THE WITNESS:  I can't answer the question.

17  You know, I don't know.

18  BY MS. HUTCHINSON:

19      Q.  You had specific ranking factors that went

20  out with the vacancy announcements?

21      A.  Yes, and they should have been with this

22  package and they should not have even reached me by

Page 185

1  Tanya High unless they had all the ranking factors,

2  so I can't tell you what happened in this specific

3  case.

4      Q.  And this document, which is Deposition

5  Exhibit Number 22, which is the application package

6  of Mr. Herbert Allen, and it has a letter from your

7  offices dated May 6th, 2003 from Deidra White, your

8  human resources assistant.

9          And I looked through the package from page

10  1 all the way to his signed application, the last

11  page, 10303, and in this package today, there are no

12  ranking factors, are there?

13      MS. PIVEC:  Objection.

14      THE WITNESS:  No.  It does not appear to

15  be.

16      MS. HUTCHINSON:  Okay.

17      THE REPORTER:  Is this a good time for a

18  break?

19      MS. HUTCHINSON:  Yes.

20      (A break was taken.)

21  BY MS. HUTCHINSON:

22      Q.  Ms. Camilleri, in regard to Deposition

47 (Pages 182 to 185)

Diane Marie Camilleri

Page 190

1    Q.  Can you tell us which is yours and which

2  isn't?

3    A.  Sure this stuff up here is mine.

4    Q.  In the upper right-hand corner?

5    A.  The 4/6, 11/2 and $39,287 is mine.  All of

6  this is -- this doesn't appear to be my writing in

7  the middle.  And then at the bottom it does appear to

8  be my writing, Lashawn Ross, (202) 307-7456.

9    Q.  Now, this information was sent to you from

10  Mr. Edwards -- Mr. Edmonds.  Do you know what the

11  purpose of this information that is listed on page 2

12  was?

13    A.  It appears to be references.

14    Q.  Okay.  So that on somewhere between March

15  17th and March 21st, you requested references from

16  Mr. Edmonds?

17    A.  Um-hum.

18    Q.  And did you offer him the salary that's

19  listed over in the upper right corner?

20    A.  It appears that's the reason it's written

21  there.

22    Q.  Okay.  So you don't know who wrote down

Page 191

1  these handwritten phone or fax numbers that are on

2  this page --

3    A.  It looks like Tanya High's writing.

4    Q.  Okay.

5    MS. HUTCHINSON:  I'd like to have this

6  marked as Deposition Exhibit Number 24.

7    (Exhibit Number 24 was marked for

8  identification and was attached to the deposition.)

9    BY MS. HUTCHINSON:

10    Q.  Now, in terms of Deposition Exhibit Number

11  24, this is a letter dated March 21st, 2003 and it's

12  signed by you.  That is your signature down there; is

13  that right?

14    A  Yes.

15    Q.  And this is your letter offering Mr.

16  Edmonds the position, correct?

17    A.  Correct.

18    Q.  And it is commensurate -- well, actually,

19  it corresponds with Deposition Exhibit Number 23,

20  wherein you had handwritten in some salary and other

21  information?

22    A.  Um-hum.

Page 192

1    Q.  Now, in terms of things, it says this

2  letter does not have a start date -- oh, I'm sorry.

3  The start date is in Number 1.  He was due to start

4  April 7th, 2003, right?

5    A.  It appears that way, yes.

6    Q.  Now, in terms of this decision, this

7  offer, March 21st, am I to understand that somewhere

8  after the March 17th interview and this March 21st

9  letter, is it your testimony that Mr. Lister made a

10  decision to select Barry Edmonds for this position?

11    A.  It is my testimony that whatever process

12  we went through -- because honestly I don't remember

13  if it was the scoring, the ranking -- however we

14  determined that person was going to get the

15  positions, he was offered the position based upon

16  that method.

17    Q.  So there may not have been a decision by a

18  selecting official, correct?

19    A.  Correct.

20    Q.  In fact, you may have been the person who

21  after Ms. High or whomever scored had said, okay,

22  let's offer the job to this person who has the

Page 193

1  highest score.  Is that what you did?

2    A.  Correct.  It appears to be that way.

3    Q.  And so that the idea that individuals were

4  assessed on anything other than the scores on the

5  interview sheets just would not be an accurate

6  depiction of how you made these selections?

7    A.  The interviews were the primary factor for

8  determining selections.

9    Q.  And so there was no effort to review or

10  conduct any kind of assessment of an individual's

11  background, correct?

12    A.  Just by reviewing their paperwork, the

13  interviewees -- I'm sorry -- the interviewers

14  reviewing their paperwork.

15    Q.  And there was no ranking panel for

16  external candidates?

17    A.  There may have been.

18    Q.  You don't have any --

19    A.  There wasn't clearly in this package, but

20  again, I think it was the number of candidates.  A

21  determination was made that -- and I don't remember

22  the number.  It could have been five or fewer.  It

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376    MD 1-800-539-6398    VA 1-800-752-8979

Diane Marie Camilleri

Page 194

1  could have been ten or fewer were qualified. They
2  would go directly to interviews.
3      Q.  Did Mr. Gandhi make that determination?
4      A.  No.  The determination was made by me, but
5  it was --
6      Q.  You made the determination?
7      A.  But it was vetted through the attorneys,
8  and the attorneys, you know --
9      Q.  What attorneys did you consult after Mr.
10  Gandhi had issued an application process to employees
11  --
12      A.  I was working with Dr. Gandhi's attorneys
13  the whole way through.
14      Q.  Which ones?
15      A.  Daryl Miller, Jerry Malone.
16      Q.  Daryl Miller and Jerry Malone told you
17  that after Dr. Gandhi had issued two employees a job
18  application process that said external candidates
19  would have a ranking panel.  They told you you didn't
20  have to do it?
21      A.  Well, the real truth of the situation was
22  we thought we would get a tremendous number of

Page 195

1  external candidates and we didn't, and so going to a
2  ranking panel was a step in the process that would
3  have delayed matters.  And from my recollection, a
4  decision was made that they would be interviewed.
5      Q.  That is not my question to you.  My
6  question to you is, did Daryl Miller and Jerry Malone
7  tell you that after Dr. Gandhi had issued a package
8  to employees certifying that there would be ranking
9  panels for external candidates that they told you you
10  didn't have to do it?
11      MS. PIVEC:  Objection as to form.
12      THE WITNESS:  They went on my judgment and
13  they went with what I told them was really truly
14  happening.
15      BY MS. HUTCHINSON:
16      Q.  So it was your judgment?
17      A.  Yes.
18      Q.  It didn't have anything to do with what
19  was required.  It was what you decided to do, right?
20      A.  Yes.
21      MS. HUTCHINSON:  Okay.  I'd like to have
22  this marked as Deposition Exhibit Number 25.

Page 196

1      (Exhibit Number 25 was marked for
2  identification and was attached to the deposition.)
3      BY MS. HUTCHINSON:
4      Q.  You have before you Deposition Exhibit
5  Number 25.  And Ms. Camilleri, this is a document,
6  and it is from the Office of the Chief Financial
7  Officer and there's handwriting on here.  Do you
8  recognize the handwriting on page 1?
9      A.  Yes.  It's Stan Morel's.
10      Q.  In terms of the first page, on the
11  left-hand side under the Office of Management
12  administration, there's Stan Morel 3/21/03.  What was
13  Mr. Morel -- is that his signature?
14      A.  Apparently.
15      Q.  Okay.  In terms of things, was Mr. Morel
16  one of your subordinates?
17      A.  Yes.
18      Q.  What was his role?
19      A.  Yes.  He was rehired into the OCFO and I
20  don't recall the position he held, but he was working
21  in the human resources office.
22      Q.  So he was in your office?

Page 197

1      A.  Yes.
2      Q.  Okay.  And in terms of this particular
3  document it says it's a personal reference
4  questionnaire.  And at the time that there's a date
5  here 3/21/03, apparently Mr. Morel was checking
6  references, correct?
7      A   Correct.
8      Q.  Okay.  Had you directed him to do this?
9      A.  Yes.  He did it on all external
10  candidates, to my recollection.
11      Q.  Okay.  So can you tell me in terms of
12  things, why was he doing it on this date, 3/21/03?
13      A.  I really couldn't tell you.
14      Q.  You had offered the position to the
15  individual on 3/21/03, correct?
16      A.  Well, we had to check references before we
17  brought someone officially onboard, and we did.
18      Q.  But you had offered them the position
19  already?
20      A.  Um-hum.  Well, we could have rescinded the
21  offer and we did in many cases.
22      Q.  So did you get this sheet, page 1, that

50 (Pages 194 to 197)

Page 250

1  unit?
2    A.  Exactly.
3    Q.  They were in Office of Tax and Revenue and
4  their management structure ran through the lines of
5  the Office of Tax and Revenue, correct?
6    A.  Correct.
7    Q.  Now, in terms of -- I think it's the --
8  this is Deposition Exhibit Number -- the organization
9  of the -- the reorganization or restructuring was for
10  the Office of Government Business and Human Capital.
11  That's what was the focus of this reorganization,
12  correct?
13    A.  That and the support services function in
14  Tax and Revenue, yes.
15    Q.  And in terms of things, though, when you
16  came aboard -- and if you want to take a look at your
17  letter to -- I guess it was Dr. Gandhi of December
18  5th, your letter of December 5th -- let me find it.
19    A.  It's right here.
20    Q.  Your letter -- or memorandum and it's
21  dated December -- what is that date -- December 10th,
22  you were talking about restructuring of the OGBHC,

Page 251

1  right?
2    A.  Um-hum.
3    Q.  And in terms of this restructuring, you
4  said Dr. Gandhi had complaints about Mission Support.
5  Was he talking about the operation support office in
6  OGBHC?
7    A.  He was talking about OGBHC because the
8  name of that office prior to OGBHC was mission
9  support and he never got out of the habit of calling
10  it mission support.
11    Q.  So in all of these complaints he's talking
12  about, he's talking about what was going on over in
13  this organization, correct?
14    A.  In this organization, yes.
15    Q.  So that the people over in the General
16  Services Unit weren't in this organization at that
17  time, were they?
18    A.  No, they were not.
19    Q.  Okay. Now, you testified that you had had
20  extensive experience in restructuring and
21  reorganizing with the Internal Revenue Service?
22    A.  Yes.

Page 252

1    Q.  And in terms of this restructuring that
2  you devised here vis-a-vis the Office of the Chief
3  Financial Officer, am I correct that during this
4  process -- well, let me withdraw it and rephrase it.
5      During the time from December 10th through
6  March 28th, 2003 you conducted no assessment
7  concerning the impact of this restructuring on
8  minorities or individuals who may or may not have
9  disabilities?
10    A.  I did not.
11    Q.  Okay. And in terms of this same period of
12  time, December 10th, 2002 to March 28th, 2003, did
13  you make any requests to have a review done to
14  determine if there were any individuals who had any
15  kind of disabilities in terms of the individuals who
16  were affected by the restructuring?
17    A.  I did not specifically.
18    Q.  And so when you testified that you don't
19  know and didn't know that Mr. Thomas had some type of
20  disability, that was just something that you didn't
21  know because of your own personal knowledge, but you
22  had not done any research to determine if he had any

Page 253

1  disabilities that anyone was aware of?
2    A.  No. I didn't go searching for that
3  information, no.
4    Q.  And you testified that you didn't observe
5  anything during his interview. Did you look at Mr.
6  Thomas and make eye contact with him during the
7  interview?
8    A.  Yes.
9    Q.  And did you not observe that he had any
10  type of different structure to his eyes or vision?
11    A.  I don't recall that, no.
12    Q.  And if you look at Mr. Thomas today --
13      MS. PIVEC:  Objection.
14      BY MS. HUTCHINSON:
15    Q.  -- do you observe that there's any
16  distinction between one eye and another?
17    A.  Let me put my glasses on.
18    Q.  Can you observe whether there's any
19  distinction between one eye or the other?
20    A.  Not necessarily. One is closed a little
21  bit more than the other.
22    Q.  But you didn't observe that during the

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376                    MD 1-800-539-6398                    VA 1-800-752-8979