Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEW JERSEY

3      - - - - - - - - - - - - - - - - X

4    WALTER THOMAS,                      :

5          Plaintiff,                    : Civil Action No.

6          v.                            : 05-cv-01784

7    NATWAR GHANDI,                      :

                                         :

8          Defendant.

       - - - - - - - - - - - - - - - X   Pages 1 - 214

9

10

11

12

13              DEPOSITION OF JO ANN SMOAK

                    District of Columbia

14                 February 23, 2007

15

16

17

18

19                                    **EXHIBIT 6**

20

21    Reported by:  Marijane Simon, RDR, CLR

22    Job No. 179299

JoAnn Smoak

Page 38

1　at this time --

2　　　A.　Mm-hmm.

3　　　Q.　-- as executive director?

4　　　And in terms of this document, it

5　represents a structure chart for the management --

6　Office of Management and Administration.

7　　　And to the best of your recollection,

8　is this an accurate depiction of the structure of

9　the Office of Management and Administration once

10　you became the executive director?

11　　　A.　It's close, to the best of my

12　recollection.

13　　　Q.　When you say "close" --

14　　　A.　Again, the Office of Contracts

15　Procurement, I don't remember to be organized that

16　way.　And, again, I didn't generate these things,

17　so many times --

18　　　Q.　Well, they were generated by your

19　subordinates, were they not?

20　　　A.　Yeah.

21　　　Q.　Who would have generated this chart?

22　　　A.　Probably Diane Camirelli.

Page 39

1　　　Q.　Would she have given you one, a copy

2　of one?

3　　　A.　Possibly.　It depends on the dynamic

4　nature of the change.

5　　　Q.　So in terms of things, if there was a

6　significant change, she would have given you a

7　copy so that you, as the head of the Office of

8　Management, Administration, would have knowledge

9　of any changes that may have been made to your

10　organization structure?

11　　　MS. PIVEC:　Objection.　Calls for

12　speculation.

13　　　BY MS. HUTCHINSON:

14　　　Q.　Go ahead.

15　　　A.　I don't know what she would have done.

16　　　Q.　Did she give you --

17　　　A.　Well, I can't say what she -- didn't

18　do.

19　　　Q.　No.　Did she --

20　　　A.　Did she?

21　　　Q.　Give you this chart?

22　　　A.　I don't recall the chart so I don't

Page 40

1　know if she did or she didn't.

2　　　Q.　You don't recall the chart.

3　　　I want you to take a look at

4　Deposition Exhibit No. 1.　And keep that one, too,

5　in your hand.

6　　　A.　Okay.

7　　　Q.　Go to the box that says, "Director,

8　Office of Logistics and Support Services," and on

9　Deposition Exhibit No. 2, there's a new position.

10　　　Do you see that?

11　　　A.　Yes.

12　　　Q.　There's a "Special Assistant to the

13　Director"; right?

14　　　A.　Yes.

15　　　Q.　So sometime between January of '03

16　when you came on board and this date, April 10,

17　2003, you established a new position; correct?

18　　　MS. PIVEC:　Objection.

19　　　THE WITNESS:　A new position was

20　established in this office.

21　　　MS. HUTCHINSON:　Yes.

22　　　BY MS. HUTCHINSON:

Page 41

1　　　Q.　Did you do that?

2　　　A.　Did I do that?

3　　　Q.　Yes.

4　　　A.　I -- I can't say that I did it.　It

5　was done under my -- while I was the executive

6　director, clearly.

7　　　Q.　So that in terms of this position of

8　special assistant to the director, were you

9　consulted in your position of director to

10　establish this new position?

11　　　A.　I don't remember specifically being

12　consulted, but I can say to you that on matters of

13　the reorganization, because it had started before

14　I got there, and because Diane Camirelli had been

15　brought in to manage that process, generally

16　speaking, I did not have an awful lot of

17　opposition to changes that she would make or

18　recommend.

19　　　Q.　So if Miss Camilleri came to you and

20　told you that in your offices there was a need to

21　have a special-assistant, Grade-13 position, you

22　would have accepted her recommendation?

11 (Pages 38 to 41)

JoAnn Smoak

Page 42

1    A.  Very probably.  I was only three
2  months into the organization.  She'd been there
3  for over a year.
4    Q.  And to the best of your recollection,
5  you don't recall, from January when you came on
6  board till April 10 which is the date of
7  Deposition Exhibit No. 2, the specifics of
8  Miss Camilleri recommending to you a new position
9  be added to your organization?
10    A.  That would be correct.
11    Q.  Now, if you look at Deposition Exhibit
12  No. 2 -- Oh, in the bottom right-hand corner,
13  there is a list of positions that are encumbered,
14  and that has asterisks saying "Position
15  encumbered" and "Position encumbered NTE one
16  year," a "Temporary," and a "Position VACANT."
17    In your position, what did these
18  asterisks -- What was the significance of these
19  asterisks and this little legend?  Do you know?
20    A.  I don't know.
21    Q.  Now I want you to look under the
22  "Director of Office of Logistics and Support

Page 43

1  Services" on Deposition Exhibit No. 2.  And there
2  are a number of positions.  And in terms of the
3  "Lead Support Services Specialist" position, it
4  has an asterisk beside it that relates to the
5  position being encumbered; correct?
6    A.  According to this document, yes.
7    Q.  Okay.  And it has below that a "Lead
8  Support Services Specialist," and that says that
9  position is encumbered; is that right?
10    A.  Correct.
11    Q.  And can you tell me, to the best of
12  your recollection:  Did you have two lead support
13  services specialists employed on April 10, 2003?
14    A.  I don't recall.
15    Q.  You don't recall?
16    A.  No.
17    Q.  Now, you were a participant in the
18  selection of one individual for a support-services
19  position; correct?
20    A.  If you tell me the name, then I can
21  tell you what position it was.  I just don't
22  remember.

Page 44

1    Q.  Were you a participant in the
2  selection of Barry Edmonds for the
3  lead-support-services position?
4    A.  Yes, I was.
5    Q.  And at that time did you select
6  another individual?
7    A.  Other than Barry?
8    Q.  Yes.
9    A.  I don't recall, because -- I don't
10  recall.  That was three years ago.  Persons
11  related, necessarily, to positions, in every
12  instance, I just don't recall.
13    Q.  So although your office had two lead
14  support specialist positions open, you cannot
15  recall today independently whether you selected
16  another individual to occupy a lead support
17  services specialist position that's listed here on
18  Deposition Exhibit No. 2?
19    A.  That would be correct.
20    Q.  Now, when you became employed as the
21  executive director for Management and
22  Administration, did you go around and meet your

Page 45

1  employees?
2    A.  I did.
3    Q.  Okay.  And in terms of those meetings,
4  did you have those meetings immediately after you
5  began working in January 2003?
6    A.  I can't remember the exact month.  It
7  was a process.  I met with different departments,
8  and then on some occasions, I met with
9  individuals.  And then I met with the entire OMA
10  organization.
11    Q.  And in terms of the Office of
12  Logistics -- Well, at one point, the Office of
13  Logistics and Support Services -- Who was the
14  director of that office when you became employed
15  in January?
16    A.  Mr. Powell.
17    Q.  And how long did Mr. Powell stay in
18  that position?
19    A.  I can't remember.
20    Q.  Was he there in February of 2003?
21    A.  I can't remember when he left.
22    Q.  You don't remember when he left.  What

12 (Pages 42 to 45)

JoAnn Smoak

Page 66

1    A.  I don't recall.
2    Q.  Okay.  Now, in terms of Deposition
3  Exhibit No. 2 and Deposition Exhibit No. 3, did
4  Miss Camilleri -- Let me withdraw that.
5        In terms of Deposition Exhibit No. 2
6  and Deposition Exhibit No. 3, was Miss Camilleri
7  the individual who was responsible for making
8  these organization charts?
9    A.  She was.
10    Q.  Okay.  And in terms of the lead
11  support services specialist position that is
12  represented on Deposition Exhibit No. 2 and
13  Deposition Exhibit No. 3, did you as the director
14  authorize the abolishment of any lead support
15  services specialist position between April 10,
16  2003, and October 9, 2003?
17    A.  I don't recall.
18    Q.  Okay.  And if a position was
19  abolished, would you in your position of director
20  have to have authorized the abolishment of a
21  position in your office?
22    A.  No.

Page 67

1    Q.  Who would authorize the abolishment of
2  a position?
3    A.  The director of HR.
4    Q.  So the director of HR was the
5  individual responsible for the establishment and
6  abolishment of positions?
7    A.  Under the reorganization, yes.
8    Q.  Okay.  And that was Miss Camilleri at
9  the time?
10    A.  Correct.
11    MS. HUTCHINSON:  I'm going to have
12  this marked as Deposition Exhibit No. 4.
13        (The reporter marked Exhibit 4.)
14    BY MS. HUTCHINSON:
15    Q.  In terms of Deposition Exhibit No. 4,
16  have you ever seen a document such as this, prior
17  to today?
18    A.  You mean a Personnel Action Form --
19    Q.  Yes.
20    A.  -- that looks like this one?
21    Q.  Yes, yes.
22    A.  I've seen a Personnel Action Form

Page 68

1  before, yes.
2    Q.  And in your position of director, did
3  you have an understanding of what the D.C.
4  government's rules were as they applied to
5  personnel actions for employees?
6    A.  Not --
7    MS. PIVEC:  Objection.
8    MS. HUTCHINSON:  Go ahead.
9    THE WITNESS:  Not all of the rules,
10  no.
11    BY MS. HUTCHINSON:
12    Q.  Now, in terms of employees of the
13  District of Columbia government, did you -- Well,
14  let me withdraw it.  Let me withdraw it.
15        In terms of Deposition Exhibit No. 4,
16  did you have an understanding that a Personnel
17  Action Form establishes or sets forth an
18  individual's official position that they might
19  occupy in the District of Columbia government?
20    A.  I do.
21    Q.  Now, on this particular document, this
22  is a Personnel Action Form for Walter Thomas.

Page 69

1        Do you see that?
2    A.  I do.
3    Q.  Okay.  And it says that the
4  originating agency is the Chief Financial Officer.
5    A.  Mm-hmm.
6    Q.  Do you see that?
7        And this particular document -- if
8  you'll look at the effective date in Block 4 -- do
9  you see that?
10    A.  Block 4?  Yeah.
11    Q.  Okay.  And it was 1/13/01; correct?
12    A.  Correct.
13    Q.  Now, that was before you came to the
14  Office of the Chief Financial Officer; correct?
15    A.  Yes, ma'am.
16    Q.  Okay.  I want you to go down to Block
17  No. 37.
18    A.  Okay.
19    Q.  And in terms of Block No. 37, there is
20  a listing of position types.  And this particular
21  position is denoted as a No. 1.  Do you see that?
22    A.  Yes, ma'am.

18 (Pages 66 to 69)

Page 86

1  position, lead support services specialist?
2      A.  No.
3      Q.  So you didn't review applications in
4  any way?
5      MS. PIVEC:  Objection.
6      THE WITNESS:  I reviewed the materials
7  that were provided as part of the interview which
8  is -- which would have included the person's
9  application for the job.
10     BY MS. HUTCHINSON:
11     Q.  So you did as a panel member --
12  interview panel member -- you received an
13  application on any persons that you interviewed?
14     A.  Certainly, you had to have an idea of
15  their qualifications and their own assessment of
16  their application as part of the application.
17     Q.  Now, had the applications that you
18  received -- Let me withdraw it and rephrase it.
19         In terms of the individuals that you
20  were interviewing, prior to the interviews, did
21  you do any rating and ranking of the individuals'
22  applications?

Page 87

1      A.  No.  How could I prior to the
2  interviews?
3      Q.  So that your process was that you went
4  to the interviews, you had an application package,
5  and an interview was conducted.
6         Can you tell me:  When did you first
7  receive the application packages prior to the
8  interview?
9      A.  Well, it was Diane's habit to make
10  sure that we had them the day -- the morning of if
11  it was an afternoon interview; or the day before
12  if it was a morning interview; so, generally,
13  she'd leave them with my exec -- my special
14  executive assistant, and she'd make sure that I
15  got them in time.  Sometimes, you know, I would be
16  actually perusing them just before the interview.
17     Q.  So in terms of the interview process,
18  who contacted you to let you know that there would
19  be interviews?
20     A.  Someone would contact my executive
21  assistant and she would put it on my calendar.
22     Q.  And was this the practice with all of

Page 88

1  the interviews that you did while you were in the
2  position of executive director?
3      A.  Absolutely.
4      Q.  So with this particular position, you
5  would have gotten the package either shortly
6  before you went to it or -- and then you would go
7  to the interview -- and you'd have the interview.
8  And would you make a decision at that point as to
9  the selection?
10     A.  No.  Selection was done with the
11  aggregate -- It was done in the personnel office,
12  but the personnel director who was Diane would
13  then collect the interview packages and make an
14  aggregate decision based on our individual
15  responses.  The package had an opportunity for us
16  to respond to the documents and to the interview
17  process.
18     Q.  Okay.  So that in terms of the
19  interview, once the interview was concluded with
20  all of the applicants that were able to be
21  interviewed, the interview panel did not come
22  together and discuss the applicants?

Page 89

1      A.  No.
2      MS. PIVEC:  Objection as to form.
3      THE WITNESS:  No.
4      BY MS. HUTCHINSON:
5      Q.  You turned in your rating packages to
6  Miss Camilleri and she then reviewed them and
7  combined them and came up with a selectee?
8      A.  Right.
9      Q.  Where were the interviews conducted?
10     A.  Usually in my conference room adjacent
11  to my office.
12     Q.  And this was on the eighth floor?
13     A.  Yes, ma'am.
14     Q.  Now, for this particular position, do
15  you recall the interview with Mr. Thomas?
16     A.  I do.
17     Q.  Do you recall what day you had the
18  interview?
19     A.  I don't.
20     Q.  Do you know when it was?  Was it in
21  2003, 2004?
22     A.  Well, it probably was in 2003, but I

23 (Pages 86 to 89)

JoAnn Smoak

Page 98

1  management specialist position in April.
2      Do you recall that decision?
3      A.  I don't recall it.
4      Q.  So who would have made the decision to
5  advertise this position in April?
6      A.  The Office of Human Resources would
7  have.
8      Q.  Is that Miss Camilleri?
9      A.  It is.
10     Q.  So whatever action she took in
11 readvertising or advertising this position was
12 fine with you?
13     MS. PIVEC:  Objection as to form.
14     MS. HUTCHINSON:  Oh let me withdraw it
15 and rephrase it.
16     BY MS. HUTCHINSON:
17     Q.  In terms of your position of executive
18 director, if Miss Camilleri made a decision to
19 advertise for a lead logistics management
20 specialist position in your offices, in your
21 position, her action would have been appropriate?
22     MS. PIVEC:  Objection as to form.

Page 99

1      THE WITNESS:  Would you restate that.
2  I'm sorry.
3      I'm not being difficult.  I just want to
4  make sure.  It was a compound question so I want
5  to make sure.
6      MS. HUTCHINSON:  All right.  All
7  right.  All right.
8      BY MS. HUTCHINSON:
9      Q.  In terms of your position as executive
10 director --
11     A.  Right.
12     Q.  -- if Miss Camilleri made a decision
13 to advertise for a lead logistics management
14 specialist in your offices, that would have been
15 considered by you an appropriate action?
16     A.  Probably.
17     Q.  Okay.  Now, I want you to go back to
18 Deposition Exhibit No. -- I think it's 2.  Yeah.
19 Yeah, Deposition Exhibit No. 2.  Deposition
20 Exhibit No. 2 is the structural chart.
21     A.  Right.
22     Q.  And if you go to the "Director, Office

Page 100

1  of Logistics and Support Services," in terms of
2  the positions that are listed under this office,
3  there's no lead logistics management specialist.
4  Do you know why your organization is advertising a
5  position and you don't have it on your
6  organization chart?
7      A.  Well, your question presumes or
8  assumes that -- makes an assumption about what I
9  know to be position classification but I really
10 can't -- same series -- I can only say that the --
11 particularly when you're advertising positions,
12 and I don't know if that's necessarily what
13 happened here, but the titles generically
14 sometimes are kind of irrelevant as long as the
15 position requirements are the same when one is
16 classifying.
17     One of the things we did in OMA which
18 the City's doing citywide, is to try to collapse
19 position titles to more generic name titles.  That
20 is the only thing that I can state as to
21 understanding what she did.  And she might have
22 been trying to get more generic titles because I'm

Page 101

1  also noticing that the descriptions were the same
2  in these two jobs.
3      Q.  When you say "the descriptions were
4  the same," you're looking at Deposition Exhibit
5  No. 8?
6      A.  Yes.
7      Q.  So the descriptions were the same.
8      A.  There's no material difference in
9  what's being asked, what the tasks of the jobs
10 are, so it might have been simply a technical
11 adjustment to try to capture a more generic -- I
12 don't know because I wasn't micromanaging here,
13 but that would make sense to me.
14     Q.  Now, in terms of Deposition Exhibit
15 No. 8, that is a Job Series 342; correct?
16     A.  Mm-hmm.
17     Q.  And Deposition Exhibit No. 10 is a job
18 series of 346 --
19     A.  346, mm-hmm.
20     Q.  -- correct?
21     And if you look at Deposition Exhibit
22 No. 2, on the chart as of April 10, there's listed

26 (Pages 98 to 101)

JoAnn Smoak

Page 110

1    A.   Did the problems exist?

2    Q.   Yeah.

3    A.   Well, I think they did.  I think that,

4  again, fixing them was a process, not an event,

5  and we were trying to come up with the right

6  staffing-skill mix, and the right resources to fix

7  them.

8    Q.   So somewhere between January and

9  April 3, there was a decision in which you were

10  involved that:  We need to go forward and have a

11  special assistant to the director of the Office of

12  Logistics --

13    A.   Well, I don't think that -- I don't

14  think that the predecessor event to this -- to the

15  decision to get a special assistant was

16  necessarily that single thing.  I think there was

17  a growing awareness and -- you know, there were

18  different strategies that we talked about in how

19  we could make sure that after going through this

20  big reorganization we didn't recreate some of the

21  same problems.  The special assistant was probably

22  a piece of what we saw as a solution but it was no

Page 111

1  single event.

2    Q.   And if you look at Deposition Exhibit

3  No. 10, you also thought there was a need for a

4  lead logistics management specialist; correct?

5    A.   Apparently.

6    Q.   And that was part of your ongoing

7  discussions?

8    A.   Yes.

9    Q.   Prior to advertising Deposition

10  Exhibit No. 10 and No. 11; correct?

11    A.   Probably.

12    Q.   I'm sorry?

13    A.   Probably.

14    Q.   Okay.

15    Now, you testified earlier that you

16  received packages for individuals for whom you had

17  an interview prior to the interview; correct?

18    A.   Correct.

19    MS. HUTCHINSON:  I'm going to have

20  this marked as Deposition Exhibit No. 12.

21    (The reporter marked Exhibit 12.)

22    . . .

Page 112

1    BY MS. HUTCHINSON:

2    Q.   In terms of Deposition Exhibit No. 12,

3  have you seen this document prior to today?

4    A.   I don't recall it but I'm sure I saw

5  it.

6    Q.   Okay.  Now, in terms of the interview

7  that you had with Mr. Thomas, did you ask any

8  questions during that interview?

9    A.   Yeah.  I asked some questions.

10    Q.   And tell us what they were if you

11  recall.

12    A.   I can't tell you exactly what they

13  were.  Our habit was to adhere very strictly to

14  the questions on the sheet that you have as an

15  exhibit, and we would go around the table and take

16  turns in sequence, so I don't know where my

17  question fell.  We only deviated from that if the

18  applicants themselves brought up an issue that we

19  had to drill down for.  They had questions

20  related.  So I can't say where in the sequence of

21  questioning my questions would have fallen.

22    Q.   Do you recall how long the interview

Page 113

1  lasted?

2    A.   I don't remember.

3    Q.   Okay.  Was it more than 20 minutes?

4    A.   Probably, but I don't really remember.

5  I don't remember any question -- any interviews

6  that were only 20 minutes.

7    Q.   So all of the interviews may have been

8  more than 20 minutes?

9    A.   Yeah, I believe so.

10    Q.   In terms of Mr. Thomas, had you been

11  aware of his work or background prior to attending

12  the interview?

13    A.   No.  I knew he worked in my office,

14  and I had met him, maybe once or twice, before

15  that interview.  I'm just not sure.

16    Q.   Okay.

17    A.   Only if it was as a group situation.

18  And then I got his packet the day of or the day

19  before.

20    Q.   Now, prior to the interviews, did you

21  have any discussions with Miss Camilleri

22  concerning internal candidates and the rights that

29 (Pages 110 to 113)

JoAnn Smoak

Page 114

1 might have to be considered for individuals who

2 were internal candidates versus someone who was

3 applying from outside?

4     A.  I did.

5     Q.  Okay.  And what was the nature of that

6 discussion?  And if you can tell us what --

7     A.  Well, it was to affirm to her that I

8 had a very -- I didn't know most of the people I

9 was interviewing but that I was going to hold her

10 restricted to the fact that I had a very

11 distasteful response to having to let people go

12 out of their jobs.  So if, as we were required to

13 do, these people were in any way eligible or

14 appropriate for the jobs, they would get first

15 rights to those positions.

16     And we in fact had a process.  I had

17 made it clear to her, I was going to enforce that.

18 I had no reason to think she wasn't enforcing it,

19 by the way.  It was just in my new position that I

20 felt very strongly about that.  And so we set up a

21 process where existing employees were interviewed

22 first and maybe even a second time if we felt the

Page 115

1 need to before we went outside of the

2 organization.

3     Q.  So that in terms of your discussions

4 with her, the only issue that was your concern was

5 that you interview internal individuals first.

6 Did you make a decision on the internal

7 individuals after you had interviewed, or was it

8 all part of one process?

9     A.  No.  What we did was -- As I recall,

10 we went through -- We hired and interviewed and

11 gave priority to existing staff first.  And only

12 after we determined that there was no one who fit

13 in the -- in the remaining -- or existing -- or

14 the reorganized organization, did we go outside.

15     Now, how she logistically did that, I

16 wasn't involved in, but we really had to have made

17 a clear determination that existing staff who

18 wanted the positions were not eligible or

19 competent or qualified to do them or didn't want

20 them.  In some cases, we had employees that just

21 didn't want them.

22     Q.  So that in terms of things, for

Page 116

1 instance, Mr. Thomas's position in the old

2 organization was a Grade 13.  It was abolished.

3 Do you recall that?

4     A.  I don't recall it but I have no reason

5 to believe it's not true.

6     Q.  So prior to any advertising of

7 positions, there was some review process that

8 occurred whereby existing employees were looked at

9 for various positions?  Is that --

10     A.  Well, I can't say prior to advertising

11 for sure, but that would have been -- Even if she

12 were advertising it, and I don't know that she

13 didn't -- It makes sense to me that she wouldn't,

14 because my requirement was and what we posted as

15 part of our reorganization strategy and process

16 was that existing employees would have an

17 opportunity to see the job posted, apply for it,

18 and be interviewed for it, and actually determined

19 not to be suited for the position before we went

20 outside.

21     Now, whether or not she did that in a

22 contiguous way or she did it in parallel, I don't

Page 117

1 know.  If it was sequential or parallel, I'm not

2 sure.

3     Q.  But your understanding was, the

4 existing employees were supposed to be considered

5 first --

6     A.  Absolutely.

7     Q.  -- and then outside?

8     A.  I was adamant about it.

9     MS. HUTCHINSON:  Okay.  I want to show

10 you -- Oh, I'd like to have this marked as

11 Deposition Exhibit No. 13.  These are the notes

12 from Mr. Lister's -- I mean, Mr. Edmonds'

13 interview.

14     (The reporter marked Exhibit 13.)

15     BY MS. HUTCHINSON:

16     Q.  Now, I've shown you what's been marked

17 as Deposition Exhibit No. 13.  Is all this your

18 handwriting that's on Deposition Exhibit No. 13

19 other than the numbers in the bottom right corner?

20     A.  This "21" doesn't look like mine.

21     Q.  Okay.  Okay.

22     A.  But page 1 is mine.  Page 2 is mine.

30 (Pages 114 to 117)

JoAnn Smoak

Page 122

1 best candidate, and he talks about having done
2 some of these same tasks for City Council.
3      Q.  Now, did you ever -- During the
4 interview, do you recall asking him exactly what
5 positions he held with the D.C. City Council?
6      A.  I can't recall if I did, but that's
7 something I probably would have asked him.  I just
8 don't recall.
9      Q.  In fact, you have notations throughout
10 about his work at the D.C. City Council, do you
11 not?
12      A.  I have (reading) Worked in Support
13 Services Division of D.C. City Council on Question
14 No. 1.
15      Experience with supply maintenance.
16 Talks about that in Question No. 3.
17      He talked about his supply
18 maintenance, working with the staff of -- managing
19 a staff of five in supply maintenance with City
20 Council.
21      Q.  So this is City Council work that he
22 did that you noted; right?

Page 123

1      A.  Yeah, that's where I made most of my
2 notations.  Experience with inventory control,
3 City Council.
4      That was important to me because it
5 related to two things that I thought important for
6 this position.  One was the ability to interface
7 with City officials.  He may have -- He may have
8 discussed -- I'm sure he did, as a matter of
9 fact -- other relevant experience in these areas;
10 but what was important to me as an interview and
11 as the exec was that I had someone who could
12 properly interface with high-level officials; and
13 that position indicated that; as well as someone
14 who knew the government process, procedures as
15 well.
16      Q.  But other than what Mr. Edmonds had on
17 his resume and what he told you in your
18 interviews, you didn't have any other knowledge of
19 what his actual work for the D.C. City Council
20 was, did you?
21      A.  No.
22      Q.  And so if he served as a clerk and was

Page 124

1 doing mailroom duties while he was with D.C. City
2 Council, you wouldn't know that?
3      A.  No, I wouldn't necessarily know that,
4 but the background check had to have happened with
5 the HR department which I wouldn't have done.
6      Q.  So was the background check supposed
7 to have been completed prior to the interview?
8      A.  Of course not.  Why would you do
9 background checks on applicants?  It's only once
10 you make a determination about the suitability for
11 the position that you confirm that what they said
12 was true in their applications.
13      Q.  So were you to have had a reference
14 check prior to having these interviews?
15      A.  That was our practice.
16      Prior to the interviews, did you say?
17      Q.  Yes.
18      A.  No, not prior to the interviews.  It
19 was after the person was selected.
20      Q.  Okay.  In terms of things, had you, to
21 the best of your recollection, passed upon whether
22 or not Mr. Thomas should be selected for the lead

Page 125

1 support specialist position when you interviewed
2 Mr. Edmonds on March 17, 2003?
3      A.  I don't remember which came first,
4 whatever -- which person I interviewed first.  I
5 probably interviewed Mr. Thomas first.
6      Q.  You can take a look.
7      A.  Let me look.
8      Q.  Why don't you take a look.
9      A.  Okay.  Yeah.  I had interviewed him
10 first.
11      It wasn't an individual selection
12 process, wasn't based on any individual; but my
13 own individual perspective was that Mr. Barry was
14 a better candidate.
15      Q.  Well, in terms of things, though -- I
16 believe you testified that in terms of this
17 selection that the panel had no discussion and
18 that Miss Camilleri toted up the numbers from the
19 interviews and the person with the highest number
20 won?
21      A.  Right.
22      Q.  So that at the time that you

32 (Pages 122 to 125)

Page 126

1  interviewed Mr. Edmonds, you wouldn't have known
2  what his total number would be; right?
3      A.  Well, I also testified that existing
4  employees had priority.  And in that regard, it's
5  no different than any other interview process.  If
6  you were to interview five people, and one person
7  gets the highest grade or the highest score of
8  those five, but that highest-score person is still
9  not -- whatever criteria, not an acceptable
10  candidate, you go back out again and you
11  readvertise.
12      Just to talk about how you do it when
13  there is no reorganization, no existing.  If I
14  issue an RFP or a vacancy announcement, and I get
15  ten candidates, and I interview all ten of them,
16  somebody's Number One, but that Number One still
17  may not be an acceptable candidate.  So you go out
18  and you readvertise.
19      Q.  So in terms of things, once Mr. Thomas
20  was interviewed by your panel, someone, whether it
21  was you or Miss Camilleri, made a decision that he
22  should not be selected?

Page 127

1      MS. PIVEC:  Objection.  Asked and
2  answered.
3      BY MS. HUTCHINSON:
4      Q.  Is that correct?
5      A.  Yeah.  Obviously, someone made a
6  decision he wasn't.
7      Q.  So you went out and then interviewed
8  external candidates?
9      A.  Correct.  That was the process.
10      Q.  And so in terms of things, there would
11  be no way to know whether Mr. Thomas's score was
12  the highest score or not the highest score at the
13  time that he was interviewed?
14      A.  Well, you wouldn't need to know that
15  if Mr. Thomas was not determined to be minimally
16  qualified for the position.  Remember, existing
17  employees did not have to be determined to be
18  qualified to get an interview as opposed to
19  external employees.  External employees, when they
20  applied for these jobs, they went through a
21  process of prequalification.  There are many
22  applicants that never even made it to the

Page 128

1  interview process.  That screening was not done
2  with existing employees.  Those employees were
3  interviewed whether they were determined to be
4  eligible or qualified for that position or not.
5  The panel then made a decision.
6      There still have to be some minimal
7  qualifications.  That happens in the personnel
8  office.
9      It was appropriate in my opinion that
10  the panel not be privy to or even a part of the
11  bifurcation of internal versus external so that
12  the internal employees would not be disadvantaged.
13      Q.  So that somewhere along the way, the
14  panel made a decision on internal employees?
15      A.  No.  The panel made their own
16  individual decisions about the -- that employee
17  who was internal.  That aggregate score was
18  forwarded to the HR office who, through that
19  process and a process of determining minimum
20  qualifications, made a decision whether or not we
21  needed to go out to external applicants.
22      In the case of Mr. Thomas and other

Page 129

1  internal candidates who applied for that position,
2  it was determined by their score or by some other
3  criteria, they were not qualified for the job that
4  we had advertised for them to do.  Then we went
5  external.
6      Q.  Wait a minute.  Now, wait a minute.
7  Back up.
8      You told me that the selection process
9  was that you took the aggregate scores from the
10  interviews and the person with the highest score
11  got selected?
12      A.  I also told you that the first wave of
13  applicants was for internal candidates who got
14  priority.  So there is no disconnect between the
15  statement that they got priority and the highest
16  candidate, but there still had to be some minimum
17  standards; so the highest standard -- the highest
18  score of internal candidates still had to meet
19  some threshold of acceptability for being able to
20  do that job.  What was the standard for the lead
21  support specialist position that was advertised on

33 (Pages 126 to 129)

JoAnn Smoak

Page 162

1  them to you. Nobody's ever asked. We can tell
2  you who's got active cards. We can tell you how
3  many cards are assigned to one person.
4        It turned out, by the way, there were
5  many people who had several active cards assigned
6  to them, so it was not --
7        And he didn't know any of that. He
8  didn't know about any of that.
9        Q.  And your testimony today is that when
10 asked -- when asked about the availability of his
11 computerized reports, he knew nothing about it?
12       A.  He knew nothing about it.
13       Q.  Prior to the day of the interview, had
14 you had any substantive discussion with anyone
15 regarding Mr. Thomas's past performance in support
16 service positions for the OCFO?
17       A.  No.
18       Q.  Did you review his personnel file --
19       A.  No.
20       Q.  -- prior to the day of the interview?
21       A.  That would have been totally
22 inappropriate. No, didn't do that.

Page 163

1        Q.  What conclusions, if any, did you draw
2  with respect to Mr. Thomas's responsibility within
3  the General Service Division at OTR?
4        A.  I felt that -- Not to be harsh, but I
5  felt like a ten-year-old could have done what he
6  was doing and that he had not demonstrated in the
7  amount of time -- And I don't remember how long he
8  had been doing that job, but he had demonstrated
9  no interest in growing the position, in having any
10 kind of meaningful -- making any kind of
11 meaningful contribution to the organization.
12       I didn't -- I didn't know if it is
13 simply attritted (phonetic) that he only did
14 Kastle cards, but that was all he did, and he
15 could not articulate doing anything else
16 substantive or that he had the skills to do, even
17 had additional work been assigned to him, if
18 necessary.
19       He talked in his resume or in the
20 interview about having inventory management, but
21 when we drilled down, he didn't know anything
22 about inventory, really, how to manage it, how to

Page 164

1  track it, how to do anything with it.
2        So I felt that I did not see any value
3  in the work he had done for the organization. And
4  I left with the impression that he was -- he had
5  retired in place, really.
6        Q.  After Mr. Thomas left the interview
7  room, what happened next?
8        A.  I don't know what you mean, "what
9  happened."
10       Q.  Well, at what point did you complete
11 the note sheet that has been marked today as an
12 exhibit?
13       A.  I don't remember. It was my habit to
14 go back to my office, and -- in privacy -- which
15 was only two or three doors down from the
16 interview room and finish my notes privately as I
17 reflected on the whole interview. That was my
18 habit. Occasionally, I would fill them out right
19 there, and sometimes -- So I don't remember which
20 I did.
21       Q.  Was Mr. Thomas's age a factor in your
22 evaluation of his overall qualification for the

Page 165

1  position of lead support specialist?
2        A.  Well, let me say first I didn't know
3  his age; and let me say second I'm 57.
4        Q.  Well, beyond that, yes or no?
5        A.  No.
6        Q.  Was it a factor?
7        A.  No, it was not. I didn't know his
8  age.
9        Q.  Do you personally have any biases
10 against older workers in the workplace?
11       A.  You know, I do have biases, but
12 they're actually towards older workers, quite
13 frankly. I tend to like -- I like the energy of
14 young people, but I also like the experience, and
15 I like having a good mixture. And I think, if you
16 look at my current office, you'd see that I have a
17 good mixture of maturity and expertise.
18       I certainly think that there are some
19 things that only come with time. And particularly
20 when you're trying, as we were doing then, to
21 staff an organization with some strong bench
22 strength, it made sense to me in every place where

42 (Pages 162 to 165)

JoAnn Smoak

Page 202

1  made -- but that was pretty much all he could talk
2  about.
3      Q.   What reporting functions are you
4  speaking of?
5      A.   The Kastle systems had some reporting
6  functions to help whoever managed it to make sure
7  that the building was secure, that we were
8  controlling these cards, that we knew who had
9  them, who had access, which ones got turned on,
10 which ones got turned off, the period of time they
11 were supposed to be.  We had policies in place
12 where they were supposed to be reauthorized
13 periodically.  That had never happened.
14     So those kinds of things.
15     Q.   Now, are you telling me that you asked
16 all of this in the interview?  You were asking
17 these questions?
18     A.   I asked him in the interview to
19 describe his Kastle-card and other responsibility
20 per his -- the documents he had submitted in
21 application for the job.
22     Q.   And --

Page 203

1      A.   I asked for details.
2      Q.   And you're saying he said what to you?
3  What did he say?
4      A.   I can tell you the impressions that I
5  got.
6      Q.   So this is your impression, that he
7  only knew how to issue a Kastle card and cancel it
8  out?
9      A.   I can tell you he did not know the
10 details of the things he purported to be able to
11 do which did not make sense to me if he did them
12 every day.
13     Q.   Now, in terms of this, were you the
14 only one that was asking about the Kastle-card
15 system?
16     A.   I don't remember that, but I can tell
17 you that's what he kept coming back to, whatever
18 you asked him, because that was the only thing he
19 did, so --
20     Q.   So --
21     A.   -- he kept coming back to the Kastle
22 card.  When you talked about his work and his

Page 204

1  contribution and what he did, it was always about
2  the Kastle card, distribution of these Castle
3  cards.  So that's all he did.
4      Q.   Go through and show me where you've
5  made that kind of notation on your notes.
6      A.   I didn't make the notation.
7      Q.   You didn't make the notation.  These
8  are all things that you remember three years
9  later?
10     A.   Absolutely.
11     Q.   You remember three years later?
12     A.   I do.
13     Q.   It's that crystal-clear to you?
14     A.   It is.
15     Q.   And so although you can't remember who
16 was in your offices and who was in the position of
17 director in January 2003, three years later, you
18 can remember one interview that lasted
19 approximately -- How long, Miss Smoak?
20     A.   Don't remember.
21         MS. PIVEC:  Objection.  Argumentative.
22 . . .

Page 205

1         BY MS. HUTCHINSON:
2      Q.   You don't remember how long the
3  interview lasted?
4      A.   I don't.
5      Q.   But you've got a crystalline view of
6  what Mr. Thomas exactly said to you?
7      A.   I do.
8         MS. PIVEC:  Objection.  Argumentative.
9         MS. HUTCHINSON:  That's all I have.
10 FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT
11         BY MS. PIVEC:
12     Q.   Miss Smoak, Miss Hutchinson asked you
13 if you had any knowledge of a performance
14 evaluation, written performance evaluation,
15 prepared by Mr. Powell with respect to Mr. Thomas
16 sometime in 2003.  And you said you had never seen
17 it.
18     A.   I don't remember seeing it.
19     Q.   Did you make an assessment of
20 Mr. Powell's management skills prior to the time
21 he left the organization?
22         MS. HUTCHINSON:  Okay.  I'm going to

52 (Pages 202 to 205)